## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMIR WHITEHURST | : | |
| | : | |
| V. | : | 17 CV 903 |
| | : | |
| LACKAWANNA COUNTY, et al | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

HISTORY ....................................................................... 1

    Factual Background ..................................................... 1

    Prison and Medical Policy ........................................... 9

    Expert Testimony ...................................................... 14

LEGAL STANDARD ................................................... 20

ARGUMENT ............................................................... 20

    PLRA Exhaustion .................................................... 20

    Deliberate Indifference ............................................ 23

        Medical Defendants ........................................... 23

            Serious Medical Need ......................................... 23

            Deliberate Indifference ....................................... 25

        Correctional Defendants ....................................... 31

            Excessive Force .................................................. 31

            Failure to Intervene ............................................ 33

    Qualified Immunity ................................................. 35

    *Monell* Liability ...................................................... 37

        Failure to Train Nurses ........................................ 38

        Failure to Train COs ............................................ 40

        Failure to Implement Policy .................................. 41

Defective Policy ............................................................... 42

    Restraint Chair  ..................................................... 42

    Outside Medical Care .......................................... 42

Failure to Staff ............................................................... 43

Medical Negligence ...................................................... 43

Punitive Damages ......................................................... 46

CONCLUSION ................................................................. 48

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobb, Inc.*, 477 U.S. 242 (1986).........................20

*Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990)........38

*Andujar v. Rodriguez*, 486 F.3d 1199 (11th Cir. 2007).......................23

*Archer v. Dutcher*, 733 F.2d 14 (2d Cir. 1984) ...................................24

*Atkinson v. Taylor*, 316 F.3d 257(3d Cir. 2003).................................23

*Awalt v. marketti*, 74 F.Supp.3d 909 (N.D. Ill. 2014) ..............................40

*Beck v. City of Pittsburg*, 89 F.3d 966 (3d Cir. 1996) .........................38

*Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001) ....................34

*Berg v. Cnty. Of Allegheny*, 219 F.3d 261 (3d Cir. 2000) .................38

*Brightwell v. Lehman*, 637 F.3d 187 (3d Cir. 2011)............................27

*Brown v. Chambersburg*, 903 F.2d 274 (3d Cir. 1990)..........26, 38, 39

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)........................................35

*Campbell v. Sikes*, 169 F.3d 1353 (11th Cir. 1999).............................26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................20

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)..........................39

*Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993).........................26, 27

*Ewing v. Cumberland Cty.*, 152 F.Supp.3d 269 (D. N.J. 2015) ...31, 35

*Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) ..................31

*Farmer v. Brennan*, 511 U.S. 825 (1994)......................................25, 34

*Feld v. Merriam*, 485 A.2d 742 (Pa. 1984)..........................................46

*Gilmore v. Hodges*, 738 F.3d 266 (11th Cir. 2013) ............................23

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................35

*Hope v. Pelzer*, 536 U.S. 730 (2002) ............................................32, 36

*Hudson v. McMillian*, 503 U.S. 1 (1993)............................................31

*Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766 (Pa. 2005) . 46, 47

*In re Kauffman*, 675 F.2d 127 (7th Cir. 1981) ....................................26

*Lancaster v. Monroe County*, 116 F.3d 1419 (11th Cir. 1997) ...........23

*McTernan v. City of York*, 564 F.3d 636 (3d Cir. 2009)....................38

*Monell v. Dep't of Soc. Servs.* 436 U.S. 658 (1978)...........................37

*Monmouth County v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987) .......24, 26

*Pearson v. Callahan*, 555 U.S. 223 (2009).........................................35

*Pearson v. Prison Health Service*, 850 F.3d 526 (3d Cir. 2017)............

...............................................................................20, 23, 25, 26. 27, 28

*Piercy v. Warkins*, 2017 WL 1477959 (N.D. Ill. April 25, 2017) ...........40

*Rouse v. Plantier*, 182 F.3d 192  (3d Cir. 1999)................................23

*Saucier v. Katz*, 533 U.S. 194 (2001) .................................................36

*Simplson v. Kay Jewelers* 142 F.3d 639 (3d Cir. 1998) ....................20

*Swofford v. Eslinger*, 686 F.Supp.2d 1277 (M.D. Fla. 2009)............39

*Thompson v. Nason Hospital*, 591 A.2d 703, 707 (Pa. 1991)..................44

*Todaro v. Ward*, 565 F.2d 48 (2d Cir. 1977) ......................................24

*US ex. rel. Walker v. Fayette Cty.*, 599 F.2d 573(3d Cir. 1987) ........26

*Vineyard v. County of Murray*, 990 F.2d 1207 (11th Cir. 1993).........39

*Whitley v. Albers* 475 U.S. 312 (1986) ................................................31

*Young v. Martin*, 801 F.3d 172 (3d Cir. 2015) ............................32, 36


Restatement (Second) of Torts § 500) ................................................47

Restatement (Second) of Torts § 908(2) (1979) ................................46

## HISTORY

On May 23, 2015, Plaintiff, Amir Whitehurst, entered the Lackawanna County Prison "the Prison" as a healthy 32-year-old male; on June 9, 2015, he was taken out of the Prison on a stretcher, near death.   Plaintiff's rapid descent from health to squalor was caused by neglect and abuse in the Prison by Prison personnel and the medical staff.  This forms the basis for Plaintiff's instant § 1983 action against Lackawanna County ("the County") and Correctional Care Incorporated ("CCI") and their subordinates.  Discovery is complete, and the Defendants have filed Motions for Summary Judgment.  For the reasons stated herein, those Motions should be denied.

### Factual Background

On the morning of May 23, 2015, the Dickson City police department arrested Plaintiff after Plaintiff was undergoing a mental health crisis and listening to "spirits." Exhibit B at 6; Exhibit A at 13, 49.[1]  Police took him to Moses Taylor Hospital to be treated for minor injuries sustained in a small fall. See generally Exhibit B; Exhibit C; Exhibit A at 15, p. 55.   After a short while, he was discharged from Moses Taylor directly to the Prison; upon discharge, Plaintiff's vital signs were normal and he was

---

[1] All Exhibits referenced herein refer to those appended to Plaintiff's Answer to Medical Defendants' Statement of Material Fact.

physically "Well-Developed and Well-Nourished and Not in Acute Distress."  Exhibit C at MT0033, MT0035.

Plaintiff was thirty-two years old and his vital signs remained normal on intake to the Prison.  Exhibit D at CCI0041; Exhibit N at 49.  While physically healthy, Plaintiff was suffering mentally.  Exhibit A at 52, p. 202.  Defendant CCI's intake sheet notes that Plaintiff was a habitual spice user.  Exhibit D at CCI0039.  Plaintiff denied spice use, but nurses nevertheless noted that he was suffering from spice withdrawal despite no evidence to indicate as such.  Exhibit D at CCI0039; Exhibit H at 25; Exhibit A at 9, p. 32; Exhibit A at 17, p. 65-66.  On intake, Plaintiff was confused.  Exhibit D at CCI0040, CCI0042.  He was also noted to have mental health problems.  Plaintiff suffers from bi-polar disorder, schizophrenia, depression, anxiety, and paranoia.  Exhibit A at 4, pp. 12-13.  Based on this, he was ordered to have "constant 1:1" monitoring.  Exhibit D at CCI0042.  As a result of the 1:1 order, Plaintiff was placed in a camera cell from May 24, 2015, until his admission to the hospital on June 9, 2015.

While being housed in the camera cell, Plaintiff was placed in the restraint chair on May 25, 2015, at 12:25 a.m.  Exhibit R at 12-13, Exhibit D at CCI106 – CCI108, Exhibit W at 223.  When an inmate is placed into a restraint chair, medical records indicate placement into and removal from the restraint chair.  Exhibit R at 18-19, 21.  Additionally, all medical interactions have to be

2

documented by nurses and must be done every two hours.  Exhibit R at 14.

Plaintiff was checked by medical upon being put into the chair. Exhibit R at 13,

Exhibit D at CCI106 – CCI108.  No additional medical intervention occurred until

4:40 a.m. – four hours later.  Exhibit R at 14-15, Exhibit D at CCI106 – CCI108.

No additional medical intervention occurred until 9:06 a.m. – over four hours later

– when Plaintiff was released from the chair.  Exhibit R at 15-16, Exhibit D at

CCI106 – CCI108, Exhibit H at 66-68, Exhibit W at 224.  Later that day, Defendant

Dr. Satish Mallik[2] saw him for the first time and noted that he was psychotic. Exhibit H

at 62-63.  Dr. Mallik indicated it was spice-induced psychosis[3], but he noted that it was

unspecified psychosis, even though a drug-induced psychosis was an available option,

indicating that Mallik knew it was a mental-health related psychosis.  Exhibit H at 64-

65.

Plaintiff was placed into the restraint chair again on May 26, 2015, at 11:30

p.m..  Exhibit R at 19-20, Exhibit D at CCI106 – CCI108.  Plaintiff was placed in

the chair despite not presenting a threat to himself or others – the only legitimate

reason to use the chair.  Plaintiff was not seen by medical again until 3:30 a.m.

Exhibit R at 20, Exhibit D at CCI106 – CCI108. The next notation in the record

_____

[2] Defendant Mallik is a psychiatrist who contracts with Defendant CCI to provide
psychiatric care at the Prison. Exhibit H at 108.

[3] This is despite the fact that no evidence of such withdrawal existed and Plaintiff
denied spice use.

indicates "inmate to remain in restraint chair until further notice per corrections."

Exhibit R at 20, Exhibit D at CCI106 – CCI108.  Plaintiff was not removed until

1:17 p.m. – fourteen hours after being placed in the chair.  Exhibit W at 229.

Plaintiff was in the restraint chair more often than noted in the records, for long

periods of time, up to ten hours.  Exhibit A at 22, p. 82.  Mallik did not see Plaintiff

while he was in the restraint chair.  Exhibit H at 73.  At one point, Plaintiff was in the

chair for 14 hours, when only eight hour increments are permitted. Exhibit W at

228-229.   Exhibit I at 14-15; Exhibit X at 3.  Another point he was in for over

eight hours, as noted above.  Also as noted, medical failed to check him every two

hours as required.  He was also not monitored by guards every fifteen minutes as

required by policy.  Exhibit X at 2; See Generally Exhibit W.

   In addition to being placed in the restraint chair multiple times, Plaintiff was

in a camera cell between May 24, 2015, and June 9, 2015.  He was naked in a cell

with no mattress for two weeks.  Exhibit A at 53, pp. 206-207.  He was not allowed

to leave his cell for two weeks, other than to go to court once.  Exhibit A at 20, p.

76.  Plaintiff was abused by Corrections Officers ("COs"); it began with verbal

harassment by COs, including, but not limited to COs Brian Hughes, Seebecker,

Robert Mazzino, and Mark Johnson. Exhibit A at 19, P. 71-72.  This verbal

harassment escalated to physical abuse.  CO Hughes pulled Plaintiff's hand

through the cell wicket and bashed his head off the door multiple times and on

multiple occasions out of the blue in order to hurt and punish him.  Exhibit A at 19, P. 72.  Plaintiff was not resisting.  Exhibit A at 19, p. 73.  Despite nonresistance, the COs stormed his cell and attacked Plaintiff with electric shields, shocking him while he was lying on the floor.  Exhibit A at 19, p. 73.  Guards drug Plaintiff around the block naked for other inmates to see.  Exhibit A at 22, p. 82.  Based on his mental health symptoms, COs, including Hughes, entered his cell, unprovoked, punched him and shocked him while he was on the ground, shot him with O.C. spray and did not wash him down before putting him in the restraint chair.  Exhibit A at 22, p. 83-84.  The attacks left him bruised and injured.  Exhibit A at 38, p. 146-147.  Hughes would also bust his lip on purpose and stomp on his fingers. Exhibit A at 49, 192.

While in the camera cell, Plaintiff was routinely denied food and water and had to beg for it.  Exhibit A at 38-39, pp. 149-150.  Plaintiff was delirious and hallucinating during this time.  Exhibit A at 9, p. 30.  Plaintiff was beginning the nurses for help; they would not help, and they were depriving him of food and water.  Exhibit A at 9, p. 31.  Plaintiff's lack of food and water and mental health caused him to refuse medication.  Exhibit A at 19-20, pp. 73-74.  CO Hughes specifically denied Plaintiff water by turning off water to his cell.  Exhibit A at 47-48, pp. 185-186.   Plaintiff was begging COs for help, including Defendant Hebron; he was screaming, "help, I feel like I'm dying," about not being given

food and water.  Exhibit A at 20, pp. 75-76.  He was screaming other nonsense which was indicative of a mental health crisis, including things about the COs killing JFK.  Exhibit A at 20, p. 76.   On the day he was taken to the hospital, Plaintiff had previously been screaming for help, food, and water and was ignored.  Exhibit A at 23, p. 86.

Plaintiff specifically complained of the abuse to and asked for help from COs Isaac Hebron and Johnson.  Exhibit A at 48, pp. 187-188.  Hebron was one of the COs in charge of watching Plaintiff in his camera cell.  Exhibit P at 8.  He specifically recalls Plaintiff not being well.  Exhibit P at 8.  He specifically remembers him thinner than he normally was.  Exhibit P at 9.  COs Donald Lavin and Robert Mazzino watched the abuse and did not stop or report it.  Exhibit A at 48, p. 189.  COs Jason Ortona, Lee Myers, Robert Gerrity, Jeffrey Robinson, John Trama, and Joseph Aloe also witnessed the abuse and took no action.  Exhibit A at 49, p. 190-194.  Other offices who failed to intervene were COs Bryan Ancherani, John Delfino, Joseph Gorton, and Cole.  Exhibit A at 50, p. 195.

While this abuse was occurring, Plaintiff had no medical care from medical doctors, physicians assistants, or nurses whatsoever between May 27, 2015, and June 9, 2015.  Any time a nurse evaluates an inmate in any capacity, it is documented in the chart.   Exhibit R at 21-22.  There are no nursing notations whatsoever in Plaintiff's chart between May 27, 2015, through June 9, 2015.

Exhibit R at 22; Exhibit D at CCI96 – CCI108. The only notes in the record are

from Dr Mallik. Exhibit D at CCI163 – CCI166. However, Dr. Mallik does not

issue medical intervention in the Prison, he is <u>only</u> a psychiatric consultant. Exhibit H

at 76.

      On May 25, 2016, Dr. Mallik evaluated Plaintiff as not oriented, talking

nonsense, difficult to redirect, a spice abuser; his ultimate diagnosis was "psychosis,

not otherwise specified." Exhibit H at 39-40, 46. Dr. Mallik's plan was "continue

medication, continue camera cell, follow up next week." Exhibit H at 44, 46. His

evaluation and plan were nearly identical on May 28, May 30, June 1, and June 4.

Exhibit H at 44-46. On June 6, the only difference is that Plaintiff is more oriented, but

the evaluation and plan remain identical. Exhibit H at 47-48. On June 8, Plaintiff has

worsened, and his Risperdal medication was changed to Navane. Exhibit H at 48-49.

The reason for the change is that Plaintiff was not taking the Risperdal. Exhibit H at

49. The Navene administered by Dr. Mallik could not, according to Dr. Mallik, have

caused Plaintiff's condition. Exhibit H at 76. Dr. Mallik said that he would follow up

in three months, and ordered that Defendant continue in the camera cell. Exhibit H at

54. Camera cells are 23 hour a day lockdown with no social interaction. Exhibit H at

48. Dr. Mallik makes the decision about how long someone stays in a camera cell.

Exhibit H at 54. Dr. Mallik's notes indicated that he put Plaintiff on a new

psychotropic medication, did not follow up, ordered he remain in solitary confinement,

and he would not check on him for three months.  Exhibit A at 54-55.  Dr. Mallik did

not see Plaintiff again until after Plaintiff's near-death and hospitalization.  While

Plaintiff saw Dr. Mallik between May 24 and June 9, there was no treatment or

meaningful interaction between the two.  Exhibit A at 6, p. 25.  He also had

interaction with Defendant Nurse Moritzkat during this period, but this was limited

to attempting to provide medication.  Exhibit A at 8, p. 27-28.

Dr. Mallik acknowledged that Plaintiff received no medical intervention

whatsoever between May 27, 2015, and his emergency release to the hospital on June

9, 2015.  Exhibit H at 74-75.  During Mallik's treatment between intake and

hospitalization, Plaintiff was not improving.  Exhibit H at 116.  Dr. Mallik claimed that

Plaintiff was not medically compromised on June 8, 2015, when he saw Plaintiff.

Exhibit H at 77-78.  On June 8, Dr. Mallik made no notes about Plaintiff's physical,

medical wellbeing.  Exhibit H at 56.  The only treatment provided to Plaintiff was

seclusion and medication.  Exhibit H at 143-144.

On June 9, 2015, Plaintiff was found unconscious, on the floor, in a pool of

liquid.  His blood pressure was dangerously low – 70/40.  Exhibit D at CCI0015.

His body temperature was unbelievably low – 84.9 degrees.  Exhibit D at

CCI0015.  He was exhibiting signs of confusion.  Exhibit D at CCI0015.  He was

tympanic, and he had an altered mental status.  Exhibit D at CCI0015.  Plaintiff

was immediately transferred to Geisinger Community Medical Center ("GCMC").

He arrived at 9:46 a.m.  Exhibit N at 47.  Upon admission, he was diagnosed with Hyperkalemia, Acute Renal Failure, Elevated CPK, Hyperphosphatemia, Hypothermia, Hypothermia due to non-environmental cause, Metabolic acidosis, Normocytic anemia, Pneumomediastinum, Pneumoretroperitoneum, Protein-calorie malnutrition, Rhabdomylosis, Schizophrenia, Substance abuse, Tobacco abuse, and Uremia.  Exhibit N at 45-46.  Plaintiff was cachectic – extremely malnourished.  Exhibit P at 31, p. 118.  Plaintiff has a MRSA infection in his leg. Exhibit A at 24.  In over thirty years of practice, Dr. Evans never saw a patient with a rectal temperature as low as Plaintiff's upon his admission to the hospital. Exhibit P at 31, pp. 21, 119.  Plaintiff was "on death's door" upon admission to the hospital.  Exhibit P at 15, p. 55, 135.  Plaintiff had air pockets in his spinal canal, which is "almost unheard of."  Exhibit P. at 33, pp. 128-29. CMC told Plaintiff the oxygen pockets in his body could be a result of him being assaulted.  Exhibit A at 27-28, pp. 105-106. Plaintiff was hospitalized in intensive care for days.  Plaintiff is being treated for PTSD as a result of his ordeal at the Prison.  Exhibit A at 33, pp. 125-127.

## Prison and Medical Policy

The Prison has policies and practices in place regarding the use of restraint chairs and camera cells.  Guidelines for restraint chair use require that an inmate in the chair be given exercise, a bathroom break, and nourishment.  Exhibit I at 14-

15.  Whenever any of these things happen, the medical department is to evaluate the inmate.  Exhibit I at 15.  An inmate should be given exercise in the chair every two hours.  Exhibit I at 18, Exhibit R at 13.  All of these interactions and the entry/exit into the chair are captured on video and in a report by the Prison.  Exhibit I at 15, 17-20.  They should also be reflected in the medical records.  Exhibit I at 20.  Defendant County could not produce and videos or reports of these interactions with Plaintiff because their files were seized by the Pennsylvania State Attorney General's Office during the course of an investigation into pervasive and systemic sexual abuse at the Prison.  Exhibit I at 16.  Every time an inmate is in a restraint chair there should also be an Extraordinary Occurrence Report ("ERO").  Exhibit I at 29.  The Prison failed to document each time Plaintiff was in the restraint chair in an ERO.  Exhibit I at 28-30.

In practice, the Prison was using the restraint chair as a disciplinary tool, not for medical or psychiatric treatment; Dr. Mallik does not use the chair for treatment.  Exhibit H at 135-136.  No policy exists to prevent inmates with serious mental illness to be placed in restraint chair.  Exhibit R at 17.   There is no psychiatric monitoring of inmates in the chair.  Exhibit H at 146. The restraint chair at the Prison is used by correctional staff, not medical staff, and there is no psychiatric consultation regarding the restraint chair.  Exhibit H at 72.

Inmates get placed in solitary confinement sometimes due to mental health reasons.  Exhibit Q at 68. There is no control for differentiating between inmates who have behavioral issues and inmates with mental health issues.  Exhibit Q at 68-69. When an inmate is in a camera cell or on suicide watch, they are monitored on camera and checked on every fifteen minutes by COs, not medical staff.  Exhibit H at 58.  Camera cells have both an officer who monitors the inmates on camera and another who makes rounds on the unit.  Exhibit P at 10. Individuals monitoring inmates must fill out watch sheets.  Medical staff at the Prison do not look at the watch sheets kept by COs.  Exhibit P at 18.   Correctional staff monitors inmates in camera cells and use their discretion as to when to call medical.  Exhibit R at 23. Exhibit R at 24.   Despite this, training is given to correctional staff in order to help them identify mental illness or in regard to psychiatric care.  Exhibit H at 114.

Not only are the COs managing the psychiatric observation of inmates untrained, Nurses at the Prison receive no training in regard to psychiatric care of inmates.  Exhibit R at 17, Exhibit V at 108-109.  This is despite the fact that they are not psychiatric nurses and are often fresh out of school.  Exhibit R at 50. No training was provided to nurses regarding this restraint chair use and psychiatric care. Exhibit R at 17.  Alexis Mortizkat is in charge of training nurses.  Exhibit Q at 13.  Additionally, despite the lack of training, Referrals to Dr Mallik are made by nursing staff upon admission.  Exhibit H at 20-21, 31-32.  The only other ways

inmates are seen are by referral from COs or by self reporting.  Exhibit H at 33-35. at 22-23.  Dr.

Mallik goes to the Prison three days per week and spends a total of nine hours per week at the Prison.  Exhibit H at 27-28.  Dr. Mallik is the only psychiatric care provider at the Prison.  Exhibit H at 94.  At the time of the incident in this case, he was only spending six hours a week at the Prison.  Exhibit H at 96.  Eighty percent of inmates in the Prison need mental health treatment from Dr. Mallik.  Exhibit Q at 57-58.  Dr. Mallik's notes do not indicate how much time he spends with specific inmates.  Exhibit H at 37.  Dr. Mallik's evaluation of patients, such as Plaintiff, who are in camera cells, is done through glass; he does not meet them face to face. Exhibit H at 38-39.  This is not a therapeutic environment.  Exhibit H at 39.

Furthermore, there is a built-in contractual provision in CCI's contract with Lackawanna County to disincentivize transfer to outside facilities for treatment because of cost.  Exhibit E at 1, ¶ 2.  This perverse incentive affected actual decisions made by Zaloga.  Zaloga often refused to send patients for outside care for cost concerns. Exhibit R at 36.  Nurses were not permitted to call an ambulance without first contacted Dr. Zaloga, even if he was not on site and even if there was an emergency which would regularly require nurses to call an ambulance.  Exhibit R at 32, 44-45.  Dr. Zaloga often made crucial medical decisions based on cost. Exhibit R at 32-33. Dr. Zaloga does not give his staff – even his physician's

assistant the ability to refer a patient for outside treatment if they need it.  Exhibit Q at 23.  Furthermore, he has no policy for referring patients to long term care for general psychosis.  Exhibit H at 117-118.  The Prison does not have any facility to send inmates who are acutely mentally ill; such a transfer has never been done by Mallik in his time at the Prison.

Dr. Mallik is also in charge of detoxing inmates in the Prison.  Exhibit H at 108.  There were 548 inmates with substance abuse history and 374 inmates with mental health issues in the Prison in 2015, according to a report commissioned by Defendant County. Exhibit H at 106.  There is no protocol in medical or at the Prison to determine the number of inmates who need psychiatric care at any given time.  Exhibit H at 107-108.  There is no detox policy in medical at the Prison in regard to spice.  Exhibit H at 108-110.  Nurses have no procedure to determine if someone is suffering from a detox issue upon intake; they rely on what the patient tells them.  Exhibit A at 64.

There are four nurses on 7:00 a.m. – 3:00 p.m. shift, three on 3:00 p.m. – 11:00 p.m. shift, and one on 11:00 p.m. – 7 a.m. shift.  Exhibit Q at 15-16.  Nurses were always short staffed, with only one nurse per 1,200 inmates on some shifts.  Exhibit R at 31.  In addition to lack of psychiatric care, Doctor Zaloga did not routinely see inmates for medical care; treatment was mostly left up to nurses, even if they were not qualified to provide it.  Exhibit R at 30, 35-36.  Dr. Zaloga does

not see patients if requested by the patients; he only sees referrals from his nurses. Exhibit Q at 31.  Most treatment is left up to nurses.  Exhibit Q at 31-32.  Dr. Zaloga often spent less than two hours per day at the Prison.  Exhibit R at 30.

CCI has no written policy for providing medical care to inmates at the Prison. Exhibit S at 9-10, pp. 33-34; Exhibit V at 123-124.  His only policy whatsoever is that he instructs staff to provide the "correct care in the correct place at the correct time."  Exhibit S at 9, p. 33, Exhibit V at 123.  Dr. Mallik is the only psychiatric care provider at the Prison, and he has no written policies.  Exhibit H at 70-71.  Dr. Mallik does not know what the restraint chair policy is at the prison.  Exhibit H at 68-70.

## Expert Testimony

Dr. Nathaniel Evans testified in regard to the Medical Care at the Prison. Because Dr. Mallik was insistent that he did not provide any medical care in the Prison, Dr. Evans opined that Plaintiff received no medical treatment between May 26, 2015, and June 9, 2015.  Exhibit S at 5, pp. 15-16, 20, 66-67. No meaningful medical evaluation was done by Dr. Malik or anyone else between that dates. Exhibit S at 11, pp. 39-42, 116-117.  Had he received such evaluation, his condition upon entry to GCMC would have been detected much earlier.  Exhibit S at 31, p. 118-120.There was a twelve day complete abandonment of nursing and medical treatment culminating in Plaintiff's hospitalization.  Exhibit S at 39, 150-

14

151.  This abandonment was the cause of Plaintiff's injuries.  Exhibit S at 11, pp.

38-39; Exhibit S at 35, pp. 135-136.  The lack of medical treatment between May

28, 2015, and June 9, 2015 was below the standard of care.  Exhibit S at 44-45.

The lack of any nursing care in this two week period is below the standard of care.

Exhibit S at 32, 124-125.

      In noting that Plaintiff was provided with medicine, Dr. Evans indicated that

the mere administration of medication is not medical treatment or evaluation; this

is based partly on the lack of any vital signs or medical notes.  Exhibit S at 5, p. 17.

Plaintiff did not receive a medical intake upon admission to the Prison.  Exhibit S

at 10-11, pp. 37-38.  This was below the standard of care.  Exhibit S at 37, pp. 142-

144.  Furthermore, there is no indication that Plaintiff ever received a meaningful

medical evaluation; if notes are not made, no evaluation was done. Exhibit S at 5-

6, pp. 17-18.

      Plaintiff was extremely malnourished upon entry into GCMC to the point

that he was "wasted" – a condition that indicates he was not eating or drinking in

the Prison and a condition which took days to occur.  Exhibit S at 19, pp. 72-73.

Therefore, medical staff knew that Plaintiff was ill earlier than him being rushed to

the hospital because Plaintiff's presentation to GCMC on June 9, 2015, proved that

Plaintiff was acutely ill between June 7 and June 8, 2015.  Exhibit S at 6, p. 20-21,

68-69.  Plaintiff's condition could only have occurred over the course of several days,

15

Case 3:17-cv-00903-MEM   Document 117   Filed 06/17/19   Page 22 of 56

indicating that any doctor who saw him during those days and did not treat him ignored the condition.  Exhibit S at 15, pp. 55-56.

In addition to the medical neglect, the assaults by the guards and the restraint chair use contributed to Plaintiff's physical condition upon entry into the hospital. Exhibit S at 37-38, pp. 145-146.

CCI had no written policies and procedures regarding patient care, Defendant Zaloga's "correct care, correct time, correct" place policy is, quite simply, nonsense; this is below the standard of care and was a contributing factor to the injuries suffered by Plaintiff.  Exhibit S at 27, pp. 103-106. There is also a defective practice at the Prison in that the only three ways someone gets psychiatric care is by self-reporting, nurse referral, or CO referral; this is problematic because the nurses and COs have no psychiatric training.  Exhibit S at 24-25, pp. 93-94.  This is below the standard of care. Exhibit S at 25, p. 94.

 Plaintiff had no mental health evaluation prior to being placed in the restraint chair because the nurses were untrained and unqualified in mental health. Exhibit S at 31, 120-121.    Inappropriate and excessive restraint chair use causes kidney failure and rhabdomyloyis, as Plaintiff presented with to GCMC; this is causally related to the lack of medical attention in the restraint chair.  Exhibit S at 31-32, pp. 121-124.

16

Dr. Michelle Joy testified in regard to the Psychiatric Care at the Prison. Based upon her review of the record, Plaintiff received no meaningful medical or psychiatric care between intake into the Prison and the admission into GCMC. Exhibit T at 46, 180-181.  Whether Plaintiff's psychosis was spice-induced or an inherent mental health illness would not have affected the care required to treat Plaintiff and does not change the standard of care.  Exhibit T at 49, p. 190-192. While in the Prison, Plaintiff was suffering from serious mental illness.  Exhibit S at 49-50, pp. 193-194. The frequency of treatment of Plaintiff by both staff and doctors violated the standard of care because it was insufficient and staff were not properly trained.  Exhibit T at 50, pp. 194-196.  Dr. Mallik's treatment of Plaintiff – to "give him time and space" – was counter-theatpeutic and below the standard of care.  Exhibit S at 50, p. 197.  The standard of care was violated by failure to force administer psychiatric drugs to Plaintiff and instead place him in a restraint chair – a more restrictive alternative.  Exhibit T at 51, P. 199-203.  Restraint chairs are not psychiatric treatment; they should not be used for punitive purposes. Exhibit T at 52, pp. 204-204.    Plaintiff should have been psychologically evaluated prior to being placed in the chair.  Exhibit T at 53, p. 207-208. Excessive restraint chair use can cause malnourishment, dehydration, and rhabdomyolysis.  Exhibit T at 53-54, pp. 209-211.  The failure to make sure Plaintiff ate and drank was a violation of the standard of care.  Exhibit T at 57, p.

222-223.  Not transporting Plaintiff, who was in acute psychiatric crisis, to an

outside facility for mental health treatment was a breach of the standard of care.

Exhibit T at 57, pp. 223-225.  It would have been obvious to Dr Mallik, if he saw

him on June 8, that Plaintiff was extremely sick and needed medical treatment.

Exhibit T at 57-58, pp. 225-226.  Dr. Mallik did nothing to treat this and

completely ignored Plaintiff's desperate condition. Exhibit T at 58, p. 226.

　　　The policy of having a psychiatrist on staff for only nine hours a week for

prison the size of the Prison was inadequate.  Exhibit T at 54-55, pp. 213-218

(Indicating that the numbers of mentally ill and addicted inmates at the Prison were

far greater than could be treated by a single psychiatrist). The level of staffing

rendered it "impossible" for Plaintiff to receive appropriate psychiatric care.

Exhibit T at 55, pp. 214-215. This lack of appropriate care was a proximate cause

of his condition at admission into GCMC.  Exhibit T at 55, p. 215.

　　　Dr. Dominic Sisti testified regarding policy at the Prison.  Dr. Sisti is an

ethics expert, and the ethics standards often match the medical standard of care.

Exhibit U at 18-19, p. 69-71.   Ethically, there is no difference between spice-

induced mental health issues and those naturally occurring in terms of the

obligation to treat.  Exhibit U at 19, p. 72.  The use of solitary confinement on

Plaintiff – a patient suffering from a serious mental illness – was unethical.

Exhibit U at 20-21, pp. 75-79.  This was the fault of both the medical staff and the

corrections staff due to the failure to properly train corrections staff.  Exhibit U at 21, pp. 79-81.  The restraint chair policy at the Prison is defective because it allows for excessive use of the restraint chair.  Exhibit U at 22, p. 82.  In regard to this case, the use on Plaintiff was excessive.  Exhibit U at 22-23, pp. 85-86.  CCI's policies in regard to the restraint chair and solitary confinement are defective because they are nonexistent; this is an ethical violation and a violation of the standard of care. Exhibit U at 22, pp. 82-83.  The County's Prison policies for medical care at the Prison are insufficient without CCI having developed their own policies.  Exhibit U at 22, pp. 83-85.  Plaintiff should have been transferred to an outside facility for treatment, but Zaloga's practice of not transferring patients out prevented this.  Exhibit U at 23, p. 87.  The contract with the County which incentivizes this is unethical because it creates a conflict of interest. Exhibit U at 23, pp. 88-90.  The prison is inadequately staffed in terms of psychiatrists.  Exhibit U at 27, pp. 104-105.

All three experts agree that Plaintiff's outbursts at the Prison and any misbehavior or refusal to eat and take medication was a result of his mental illness. This should have been recognized by doctors and treated accordingly.  Instead, it was ignored and deemed to be "spice withdrawal."  However, this is irrelevant to the issue, because either diagnosis would have required treatment which was not provided.

## LEGAL STANDARD

Summary judgment is appropriate only if there are no genuine issues of material fact and the evidence establishes that the moving party is entitled to judgment as a matter of law.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 – 23 (1986).  A party moving for summary judgment bears the burden of demonstrating that there are no facts supporting the claim or defense.  The evidence must be viewed in the light most favorable to the non-moving party and the Court must draw all justifiable inferences in the non-movant's favor.  *See Id.* at 322 – 24.   A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobb, Inc.*, 477 U.S. 242, 248 (1986).  A court should not engage in credibility determinations when ruling on a motion for summary judgment.  *Pearson v. Prison Health Service*, 850 F.3d 526, 533 (3d Cir. 2017) (citing *Simplson v. Kay Jewelers, Div. of Serling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998)).

## ARGUMENT

### I.   PLAINTIFF EXHAUSTED HIS ADMINISTRATIVE REMEDIES IN REGARD TO CLAIMS AGAINST THE MEDICAL DEFENDANTS.

The Medical Defendants assert that they are entitled to summary judgment because Plaintiff "admitted during his deposition that he did not file any grievances or complaints regarding the Medical Defendants prior to the instant Complaint." See Defendant's Br. in Supp. at 5.  This is factually inaccurate and without merit.

The only thing Plaintiff admitted to was not "writ[ing] anything to medical" and not "writ[ing] any complaints to medical." Exhibit A at 29, pp. 111-112. Plaintiff did not admit to not filing grievances regarding medical treatment. He did grieve about his medical treatment, and he followed the Prison's policy in doing so.

The Lackawanna County Prison Inmate Handbook sets forth the following Grievance Procedure:

> If you feel that someone or some action that has been taken against you is unfair, you may file a grievance. A grievance will include at least one level of appeal. Inmates are encouraged to settle the issue with the housing unit officer. If you are unable to solve the issue at this level, you may request a Grievance Form from the Officer. Your grievance will be forwarded to the Grievance Coordinator/Administrative Officer who will attempt to solve it at this level. If you are still not satisfied, you may appeal the grievance to the Deputy Warden attaching the answer from the Grievance Coordinator / Administrative Officer and stating why you are not satisfied with the answer. The Warden is the final internal step in all grievances. All grievances shall be handled in the most expedient manner possible, but shall be responded to in (5) business days on each level. Issues dealing with Commissary, the Phone System, and Laundry will be treated as complaints, not grievances, and will be handled accordingly. At no time will an inmate be retaliated against, by staff, for filing a grievance. Should an inmate require assistance with filing a grievance, he/she should see their housing unit counselor.

Exhibit J at 11. Plaintiff complied with this policy. Plaintiff filed a grievance on July 2, 2015. Exhibit K. This grievance was directed to Ms. Oprisko, the grievance coordinator. Exhibit K; Exhibit A at 29, p. 111. This grievance

complained of excessive force, harassment, and mistreatment by corrections staff. Exhibit K.  It also complained about medical neglect and mistreatment by the medical staff.  Exhibit K. Having received no response, Plaintiff filed an appeal of that grievance on July 3, 2015.  Exhibit L.  Having not gotten a response, Plaintiff filed an inquiry about the status of the grievance on August 6, 2015.  Exhibit M.

Medical Defendants utterly ignore this grievance history.  They appear to rely on the fact that the grievances were sent to the grievance coordinator, and not to the medical department.  This is a distinction without merit.  The Prison's policy requires grievances be sent to the grievance coordinator.  This is precisely what he did.  He specifically cited to the inadequate medical care he received at the time he was found unconscious in his cell and transferred to GCMC – the conduct complained of in this civil action.  Exhibit K.  He further followed the policy by appealing the decision of the grievance coordinator.  Finally, having not received an answer on his appeal, in an abundance of caution, he wrote a letter inquiring as to the status of the grievance, because he wanted to protect his rights.  The fact that no one from the Prison transferred the grievance to medical is not the fault of Plaintiff.   Plaintiff followed Prison policy to the letter.  Therefore, he properly exhausted his administrative remedies.

## II.   PLAINTIFF HAS ESTABLISHED A CLAIM OF DELIBERATE INDIFFERENCE UNDER THE 14th AMENDMENT

### A. Medical Defendants

Plaintiff brings his § 1983 claim for deliberate indifference to a serious medical need under the Fourteenth Amendment to the United States Constitution because, at all times relevant to this case, Plaintiff was a pretrial detainee; nevertheless, the identical standard that applies to an Eighth Amendment Claim for lack of medical treatment applies. *Gilmore v. Hodges*, 738 F.3d 266, 271 (11th Cir. 2013) (citing *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) (overruled on other grounds); *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007)).

In the context of a § 1983 claim for failure to provide medical care under the Eighth or, by virtue of the law previously cited, Fourteenth Amendments, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson*, 850 F.3d at 534 (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). Plaintiff has presented sufficient evidence of both elements to proceed to trial.

### a. Plaintiff suffered from a serious medical need.

A medical need is serious "if it has been diagnosed by a physician as requiring treatment." *Id*. (quoting *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir.

2003)).  A medical need may be serious if it "is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (other citations omitted)).  A medical need may be serious if it produces "extreme pain."  *Lanzaro*, 834 F.2d at 347; *Archer v. Dutcher*, 733 F.2d 14, 16-17 (2d Cir. 1984); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)).

On June 9, 2015, Plaintiff was found unconscious on the floor of his cell in a pool of liquid.  His blood pressure was dangerously low – 70/40.  His body temperature was unbelievably low – 84.9 degrees.  Exhibit D at CCI0015.  In over thirty years of practice, Dr. Evans never saw a patient with a rectal temperature as low as Plaintiff's upon his admission to the hospital.   He was exhibiting signs of confusion.  He was tympanic, and he had an altered mental status.  Plaintiff was immediately transferred to GCMC where he was diagnosed with Hyperkalemia, Acute Renal Failure, Elevated CPK, Hyperphosphatemia, Hypothermia, Hypothermia due to non-environmental cause, Metabolic acidosis, Normocytic anemia, Pneumomediastinum, Pneumoretroperitoneum, Protein-calorie malnutrition, Rhabdomylosis, Schizophrenia, Substance abuse, Tobacco abuse, and Uremia.   Plaintiff was cachectic – extremely malnourished.  Plaintiff had air pockets in his spinal canal, which is "almost unheard of."     Plaintiff was "on death's door" upon admission to the hospital according to Dr. Evans.  Plaintiff was

hospitalized in intensive care for days. All of this occurred only two-weeks after Plaintiff was discharged from Moses Taylor Hospital – a picture of physical health – directly into the Prison. These are serious medical conditions capable of producing extreme pain and death. They were diagnoses by doctors at GCMC as requiring medical treatment. Certainly, this satisfies the definition of serious medical need. This is all in addition to Plaintiff's mental health situation, which experts described as serious and acute. All three of Plaintiff's experts agreed that for all of these ailments to be present upon admission to the hospital, they must have been present for at least days, if not a week prior – while Plaintiff was in the Prison. Defendants' contention that no serious medical need existed until June 9, 2015, is simply without merit.

### b. Medical Defendants were Deliberately Indifferent to Plaintiff's Serious Medical Needs.

Deliberate indifference to serious medical needs requires more than mere negligence. *Pearson*, 850 F.3d at 538. It requires an official "to both 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and to 'also draw that inference.'" *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994). Deliberate indifference can exist in numerous scenarios including: (1) denial of reasonable treatment requests; (2) failed to provide care despite knowledge of the need for that care; (3) delayal of treatment

for non-medical reasons; and (4) preventing an inmate from obtaining

recommended treatment. *Id*. (citing *Lanzaro*, 834 F.2d at 347).

  "Deliberate indifference is a subjective state of mind that can, like any other

form of scienter, be proven through circumstantial evidence and witness

testimony.' *Pearson*, 850 F.3d at 535 (citing *Durmer v. O'Carroll*, 991 F.2d 64,

69 (3d Cir. 1993); *Campbell v. Sikes*, 169 F.3d 1353, 1372 (11th Cir. 1999); *In re

Kauffman*, 675 F.2d 127, 128 (7th Cir. 1981)). In analyzing whether deliberate

indifference exists, there is a distinction between cases where a plaintiff claims

denial of medical care and cases where a plaintiff claims to have received

inadequate care because "mere disagreement as to the proper medical treatment"

does not give rise to a § 1983 violation. *Id*. (citing *United States ex. rel. Walker v.

Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1987)). In denial or delay of care

cases, there is no presumption in favor of the caregiver, and there is only a

subjective component as to mens rea. *Id*. at 537. "All that is needed [to make a

claim for denial or delay of care] is for the surrounding circumstances to be

sufficient to permit a reasonable jury to find that the delay or denial was motivated

by non-medical factors." *Id*. (citing *Durmer*, 991 F.3d at 68-69). In adequacy of

care cases, evidence of the violation of professional standards of care is required.

*Id*. at 535 (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir.

1990)). Also in adequacy of care cases, inadequate care must be accompanied by a

culpable *mens rea* to support a § 1983 claim.  *Id*. at 535-36 (citing *Durmer*, 991

F.2d at 69 n.13).  In those cases, the state of mind component need not be

supported by expert testimony.  *Id*.  Expert medical testimony may be required in

adequacy of care cases only where a jury "would not be in a position to determine

that the particular treatment or diagnosis fell below a professional standard of

care."  *Id*. at 536.  It is only required where "other forms of extrinsic proof may

suffice."  *Id*. (citing *Brightwell v. Lehman*, 637 F.3d 187, 194 n.4 (3d Cir. 2011)).

This is an abandonment of care case; expert testimony was not required, but it was

provided.

Additionally, in *Pearson*, the Court determined that the plaintiff's claim that

a nurse "failed to examine him when he initially requested medical assistance

creates a triable issue as to whether [the nurse] was deliberately indifferent because

it raises a claim that [the plaintiff] was either denied reasonable requests for

medical treatment, or necessary medical treatment was delayed for non-medical

reasons."  *Pearson*, 850 F.3d at 540.  This is because nurses can be held liable for

the failure to treat where an inmate is not being treated by a physician.  *Id*.  The

Court went on to say:

> Nurse Rhodes cannot claim that Pearson was already
> being treated by a physician. In addition, when Rhodes
> initially denied medical care, he was confronted with a
> report from a corrections officer that an inmate was
> suffering from excruciating pain—an inmate who had
> twice sought medical assistance earlier in the day,

reporting the same complaint but with increasing severity. As *Farmer* noted, an official may not escape liability by "merely refus[ing] to verify underlying facts that he strongly suspect[s] to be true, or declin[ing] to confirm strong inferences of risk that he strongly suspect[s] to exist." Neither is he immunized from liability merely because he delays care for an emergent condition in reliance on a sick call policy. Because these circumstances may suggest that Nurse Rhodes engaged in a pattern of deliberately indifferent conduct in spite of evidence that he was aware that Pearson faced a substantial risk of harm, there is a genuine issue of fact as to why Nurse Rhodes refused to examine Pearson and "we cannot conclude as a matter of law [his] conduct did not run afoul of the [Eighth Amendment]."

*Id*. (citations omitted). Furthermore, in evaluating that nurse's performance, the Court found that the nurse's intentional delay or denial of treatment rendered the claim on adequacy of care triable even without expert testimony because the jury could infer malintent from the pattern of behavior. *Id*.

As described above, Plaintiff was "on death's door" upon admission to GCMC. He was severely dehydrated. He was extremely malnourished. He had lost huge amounts of weight in just two weeks. He was in kidney failure. Because he was previously hospitalized, it is evidence that this happened in the Prison. All of Plaintiff's experts agree that he could not have gotten into this condition overnight. It would have had to occur due to neglect over a long period of time and it would have been obvious to those observing him. Furthermore, not only would it have been obvious, but Plaintiff cried out for help to guards and the

nursing staff – all of whom ignored him.  This was a collective failure of the entire

nursing staff – all of the defendants of which, Defendant Mortizkat identified in

her deposition as being those working in the Prison at the relevant timeframe.

This, contrary to Defendants' position is not an adequacy of care claim – it is

an abandonment of care claim.[4]  Defendants do not dispute the fact that Dr. Zaloga

and Anthony Ianuzzi, CRNP – the only two medical care providers at the Prison –

never saw Plaintiff between his entry into the Prison on March 23, 2015, and his

emergency transportation to GCMC on June 9, 2015.  Furthermore, Defendant was

not treated by nurses for a significant period of time prior to his hospitalization.

There is a complete and total gap in the nursing notes from March 27, 2015, until

after Plaintiff's return from GCMC.  There is not a single medical note in

Plaintiff's chart between March 27, 2015, and June 9, 2015 – when Plaintiff was

rushed to the hospital.   There was no nursing intervention.  There was no medical

intervention.  This is despite the fact that Plaintiff was on 1:1 monitoring and

suicide watch.  He was supposed to be under constant medical attention.  He got

none for a period exceeding twelve days.  This is also despite Plaintiff's assertions

---

[4] Even if this were an adequacy of care claim, Plaintiff would still succeed because
he has put on the requisite expert testimony.  All of the experts testified that it
would have been obvious to the medical staff that Plaintiff need emergency
treatment and that their care was inadequate, but they ignored Plaintiff.

that he was crying out to help from nurses for days, receiving no assistance.  Dr. Evans opined that this abandonment of care caused Plaintiff's injuries.

While Defendants claim that Dr. Mallik's notes constitute medical notes, they do not, and this, at least, gives rise to a question of fact for a jury.  Dr. Mallik was clear in his deposition that, while he was technically a medical doctor, he did not provide medical care at the Prison.  He only provided a psychiatric consult.  So, when confronted with his notes and the lack of nursing notes from May 28, 2015, through June 9, 2015, Dr Mallik – the Prison's own psychiatrist – agreed in his deposition that Plaintiff received no medical treatment during that period of time.  Plaintiff's expert, Dr. Evans, agreed with Mallik that no medical care was provided during this time period and that it constituted a complete abandonment of care.  Therefore, Plaintiff has stated a claim for deliberate indifference against the medical and nursing staff at the Lackawanna County Prison.

Furthermore, Plaintiff has presented a deliberate indifference claim against Dr. Mallik.  Dr. Mallik claims to have seen Plaintiff on June 8, 2015 – the day prior to his hospitalization.  This admission demonstrates his own deliberate indifference.  Plaintiff's experts all claim that his condition would have been obvious as having needed immediate treatment on June 8, 2015, for him to present as he did to the hospital.  Therefore, Dr. Mallik ignored his obvious symptomology.  They rendered this opinion within a reasonable degree of medical

certainty.  He saw a patient in medical need.  He provided no medical services.  He

did not notify nurses or the doctors at the Prison of Plaintiff's need for treatment.

This is the height of deliberate indifference.

### B. Corrections Defendants

#### a. Excessive Force

The Eighth Amendment applies to a pretrial detainee's claims for excessive

force.[5]  *Ewing v. Cumberland County*, 152 F.Supp.3d 269, 289 (D. N.J. 2015)

(citing *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003)).  The Eighth

Amendment "prohibits punishment that is cruel and unusual, or force that is

imposed 'maliciously and sadistically to cause harm.'"  *Id*. (citing *Hudson v.*

*McMillian*, 503 U.S. 1, 7 (1993)).  A Plaintiff must show that the force was not a

"good faith effort to maintain to restore discipline."  *Id*. (citing *Hudson*, 503 U.S. at

1).  Factors relevant to excessive force are: (1) the need for force; the

proportionality of the need to the force used; (3) the injury inflicted; (4) the threat

to staff and inmates; and (5) the efforts made to temper the forceful response.  *Id*.

at 290 (citing *Whitley v. Albers* 475 U.S. 312, 321 (1986)).

_____

[5] As addressed in *Ewing*, there is an issue as to whether the Fifth or Eighth
Amendments protects apply to a pretrial detainee's use of force claim.  See *Ewing*,
supra.  The Court there did not reach a conclusion, merely finding both standards
were satisfied. Like in *Ewing*, whichever standard is applied, Plaintiff has met his
burden.

In the instant matter, Plaintiff claims he was attacked by guards, including Hughes, without provocation and while he was not resisting. His arm was grabbed through the wicket while he was locked in his cell and his face was bashed against his door multiple times with no legitimate purpose.  He was beaten while he lie on the floor defenseless.  He was sprayed with O.C. spray.  He was shocked over and over again with electric shield shields.  His fingers were viciously stomped on by guards while he was on the ground.  There is sufficient evidence in these actions to establish malice.  These actions alone are sufficient to impose liability for excessive force.

Furthermore, in this case, there was excessive use of the restraint chair.  The use of a restraint chair should be analyzed under the excessive force test.  *Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015).  In regard to restraints the Supreme Court has held that " '(1) where the inmate had 'already been subdued, handcuffed, and placed in leg irons' and (2) there was a 'clear lack of an emergency situation' such that 'any safety concerns had long since abated,' then (3) subjecting the inmate to 'substantial risk of physical harm' and 'unnecessary pain' serves no penological justification.  *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).  In *Young,* the Court indicated the Plaintiff was non resistant upon placement into the chair and that "reasonable minds could differ" as to whether the plaintiff was a risk to himself or others.  *Id*. at 181.  There was also no emergency.  *Id*.  There

32

was also a question as to whether there was an unnecessary risk that the guards subjected plaintiff to substantial and unnecessary pain. *Id*. The Court also noted that the time in the chair exceeded that allowed by policy without receiving special authorization. *Id*. at 181-182.

Here, there was no emergency when Plaintiff was put into the chair. Even if there was, he calmed down and was kept there an excessive period of time. Prison policy allows a maximum of eight hours. Once he was left in for 8.5 hours; the second time, it was fourteen hours. He was not checked on by guards every fifteen minutes according to policy. He was not checked on by medical every two hours according to policy. There was no punitive rational for the use. Expert testimony revealed it was used excessively, punitively, without medical purpose, and unethically. Defendants have produced no witnesses to counter Plaintiff's assertions or to provide a reason he was in the chair that was justified. The County relied on state reports of compliance. These are irrelevant to the issue at hand and likely not admissible at trial. Like in *Young,* there was no emergency, and Plaintiff was kept in the chair for 14 hours. Therefore, like in that case, Plaintiff  has established excessive force.

### b.  Failure to Intervene

To establish an Eighth Amendment claim against a prison official, a plaintiff must prove two things: "(1) the deprivation alleged must be, objectively,

sufficiently serious; and (2) the prison official must have a sufficiently culpable state of mind." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The state of mind that must be proven is "deliberate indifference to inmate health or safety." *Id.* (quoting *Farmer* 511 U.S. at 834).  "Deliberate indifference is a subjective standard" where the prison official "must actually have known or been aware of the excessive risk to inmate safety." *Id.*

A prison official's knowledge of a risk to a plaintiff may be proven be direct evidence, but it need not be. *Id.* at 131.  A plaintiff can prove knowledge through indirect or circumstantial evidence. *Id.*  Specifically, "If the risk is obvious, so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Id.* (citing Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3. 7 p. 335 (1986)).  A plaintiff need not know that a prison official was aware of specific risk to that plaintiff; a plaintiff can "make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff's situation." *Id.* (citing *Farmer*, 511 U.S. at 842-43).  In order to survive summary judgment, a plaintiff must only "present enough evidence to support the inference that the defendants 'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" *Id.* at 132 (quoting *Farmer* 511 U.S. at 846).

34

A CO may not ignore other guards' unconstitutional force against inmates in their presence or within their knowledge. *Ewing*, supra at 309 (citing *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). Here, Plaintiff named the guards and testified that he asked them for assistance, describing his condition to them. He specifically told Defendant Hebron and knew Hebron was watching on the camera. These Defendants failed to take any action to protect Plaintiff. They knew he not onyl was being physically abused, they knew Plaintiff was suffering mentally. They failed to take any action. Defendants put on no testimony to counter Plaintiff's story. Therefore, Plaintiff has established a claim for failure to intervene.

### III.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

"Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pelzer*, 656 F.Supp.2d at 530 (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). The qualified immunity analysis is two-part; "First, 'taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?' If the answer is no, then the inquiry is concluded. If, on the other hand, the plaintiff has satisfied the first step, the court 'must ask whether the right was

clearly established." *Id*. (citing *Saucier v. Katz*, 533 U.S. 194 (2001)) (internal citations omitted).  A court may undertake either step of the analysis first.  *Id*. (citing *Saucier*, 533 U.S. at 201).

The correctional officers are clearly not entitled to qualified immunity. They astoundingly claim they do not know which right is claimed to have been violated; clearly it is the right to be free from cruel and unusual punishment and excessive force.  It is and has been clearly established that corrections officers cannot beat plaintiffs in manners that exceed efforts to maintain discipline.  *Ewing*, supra (citing *Hudson*, 503 U.S. at 7).  Here, if Plaintiff is believed, as to being maliciously beaten which helpless on the ground, sprayed, having his head bashed off doors and being stepped on without providing resistance are being a threat to himself and others, Plaintiff has clearly met this standard.  Furthermore, the Third Circuit has previously held that protection from unnecessary use of a restraint chair is a clearly established right and that guards who misuse the chair should not be entitled to qualified immunity.  *Young*, supra at 182.  (citing *Hope*, 536. U.S. at 739).  This was in a factually identical case to this matter where there was no emergency and where the restraint chair was used for 14 hours.  Therefore, the correctional Defendants are not entitled to summary judgment.

The Medical Defendants raise qualified immunity but fail to adequately brief it.  See Defendants' Brief in Support at 19-20.  For this reason alone, the motion

36

should be denied.  Nevertheless, the Defendants claim that they cannot have

known that their conduct violated Plaintiffs rights because he was being seen by

nurses and Dr. Mallik.  This argument completely ignores the questions of fact that

exist in this case. Yes, if these individuals provided meaningful care each day to

Plaintiff, but something bad happened anyway, they would be entitled to qualified

immunity.  However, Plaintiff, and all of his experts assert that no meaningful care

was actually provided.  There is a difference between "seeing" a patient and

treating them.  Plaintiff's experts are clear that he was not provided meaningful

medical treatment.  Furthermore, the experts are clear that – to the extent these

Defendants saw Plaintiff – that he was obviously deathly ill and the completely

ignored his need for help.  Certainly, it is clearly established that you cannot ignore

acute, deadly symptoms exhibited by a patient.  Therefore, the qualified immunity

defense fails.

## IV.   THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING MONELL LIABILITY

To establish a § 1983 claim against a municipality, a Plaintiff must should

that "(1) he possessed a constitutional right of which he was deprived; (2) the

municipality had a policy [or custom]; (3) the policy [or custom] 'amounted to

deliberate indifference' to his constitutional right; and (4) the policy [or custom]

was the 'moving force behind the constitutional violation.'"  *Monell v. Dep't of*

*Soc. Servs. Of City of N.Y.*, 436 U.S. 658, 694 (1978)).  A municipality may only

be held liable for the deprivation of an individual's constitution rights where the alleged deprivation was caused by "a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009) (quoting *Beck v. City of Pittsburg*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*, 436 U.S. 658). *Monell* "created a 'two-path track' to municipal liability, depending on whether a § 1983 claim is premised on a municipal policy or custom." *Id.* (citing *Beck*, 89 F.3d at 971). Specifically:

> A government policy or custom can be established in two ways.  Policy is made when a 'decisionmaker possessing final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy or edict.  A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials are so permanently and well-settled' as to virtually constitute law.

*Id.* at 658 (citing *Beck*, 89 F.3d at 971 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990))).

## A. Plaintiff has established *Monell* liability based on failure to train medical staff.

A *Monell* claim under § 1983 premised on a failure to train generally requires an existing pattern of constitutional violations, *Hall*, 43 F. Supp. 3d at 424 (citing *Berg v. Cnty. Of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000); however, there is a " 'narrow range of circumstances' in which a failure to train claim may be established without a pattern of violations." *Id.* at 424-25 (quoting *Brown*, 520

U.S. at 409)).  The instant case is such a circumstance.  "There need not be a pattern of similar conduct equating for notice for *Monell* liability to stand; 'A single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.'"  *Swofford v. Eslinger*, 686 F.Supp.2d 1277, 1284-85 (M.D. Fla. 2009) (quoting *Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993)).  Failure to train in a specific area which the Supreme Court has identified as "fundamental to the protection of a constitutional right" is a sufficient policy or custom that can trigger liability absent notice of a need for training.  *Id.* (citing *Canton*, 489 U.S. at 390).  This occurs when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Hall*, 43 F. Supp. 3d at 425 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).  For example, a city may be held liable for failure to train policy "on the constitutional limitations of deadly force even though the know with a 'moral certainty' that armed police officers will be required to arrest fleeing felons."  *Id.* (citing *Canton*, 489 U.S. at 390 n. 10). This is because the right to be free from excessive and unlawful force is "fundamental to the protection of a constitutional right."  *See Swofford, supra.*

39

It is undisputed that the nurses at the Prison received no psychiatric training, despite the fact that they were not psychiatric nurses. Despite the lack of training, the nurses were required to help provide psychiatric care for inmates. They were required to monitor psych patients who were on psych watches. They were not trained to identify that for which they were monitoring. This is especially egregious given the fact that inmates generally did not get pysch help unless referred by a nurse. Given their job descriptions, notice of the need to train is not required because CCI knew "to a moral certainty" that they would be called upon to provide psychiatric care or at least to be aware of psychiatric issues to report them to the doctors. Despite this, no training whatsoever was provided. Plaintiff's experts opined that this was proximately related to his injuries. Therefore, there is a *Monell* claim for failure to train CCI nurses in psychiatry and mental health.

### B. Plaintiff has established *Monell* liability based on failure to train corrections offices.

It is undisputed that the COs at the Prison received in psychiatric or mental health training. In *Piercy v. Warkins*, the Northern District of Illinois held that a prison medical provider can be held liable under *Monell* for failure to train corrects officers that were employees of the state and not the medical provider itself. 2017 WL 1477959 *15 (N.D. Ill. April 25, 2017) (citing *Awalt v. marketti*, 74 F.Supp.3d 909, 925 (N.D. Ill. 2014), *supplemented*, 75 F.Supp.3d 777 (N.D. Ill. 2014)). There, the medical department relies on corrections officers to provide them with information of inmates'

health.  *Id.*  Therefore, the medical provider had a contractual interest in these officers'
practice and procedure for obtaining and communicating this information.  *Id.*

This case is analogous to *Piercy*.  Here, CCI contracts with the County to
provide medical and psychiatric care.  CCI utilizes the COs employed by the County to
watch inmates on suicide watch and 1:1 monitoring – like Plaintiff – and to report
incidents regarding mental health.  This is one of the ways inmates get referred for
mental health treatment in the Prison.  Despite this, it is undisputed that these COs
receive absolutely no training regarding mental health.  Like training the nurses, and
like in *Piercy* CCI knows to a moral certainty that these guards will need the training.
The County is also aware of this.  Therefore, both entities are responsibly for failing to
train COs in the signs and symptoms of mental health.  As Dr. Evans makes clear, this
is part of the neglect from which Plaintiff suffered and was a proximate cause of his
injuries.

## C. Plaintiff has established *Monell* liability based on failure to implement policy.

It is undisputed that CCI has no written policies or procedures whatsoever.  In
fact, CCI's owner and operator, Dr. Zaloga, admits that in the entire course and scope
of his provision of medical treatment at the Prison he has just one oral policy: "correct
care, correct place, correct time."  Dr. Evans calls out this laughable policy in his report
(Exhibit 0) and in his deposition.  This policy provides no guidance to CCI employees.
Furthermore, as discussed above, these employees are untrained in mental health.  Not

only do they not have training; they have no policy to rely on. How then could these employees know what the correct care, at the correct place, at the correct time is. The complete lack of policy is insufficient to run a medical department. It is dangerous to the inmates in the Prison. It is a moral imperative and known to a moral certainty that policy is required. The failure to have policy is reckless, deliberately indifferent, and absurd. The absolute failure to implement any policy gives rise to *Monell* liability.

### D. Plaintiff has established *Monell* liability based upon defective policy.

#### a. Restraint Chair Policy

Expert Dominic Sisti testified as to the restraint chair policy at the Prison. It is defective in that it allows excessive use of the restraint chair. It allows inmates to be put in restraint for non-medical purposes. It allows use of the restraint chair in manners that are unethical. This is sufficient to give rise to *Monell* liability against the County.

#### b. Policy Regarding Outside Medical Care

The contract between CCI and the County provides an explicit disincentive to provide outside medical care. Nurses testified to Dr. Zaloga's adherence to this and hesitation to send patients out of the Prison for cost concerns. This is a perverse cost-based incentive which ignores the needs of patients. All three experts testified that this was improper and unethical. Furthermore, they testified to the effect that this had on Plaintiff. Plaintiff should have been transported to the hospital much earlier. He should have been transferred to a psychiatric facility at the beginning of his

incarceration.  He was denied both.  Furthermore, this was not even an option as Dr. Mallik testified that they did not send patients out for psychiatric care.  This is despite the aforementioned lack of appropriate psychiatric facilities in the prison.  The policy is defective, and the failure to allow for outside psych consults for the severely mentally ill is morally bankrupt.  Therefore, Plaintiff has stated a *Monell* claim against both parties to the contract – the County and CCI.

### E.  Plaintiff has established *Monell* liability based on failure to staff.

It is undisputed that in excess of five hundred patients at a time in the Prison require mental health care.  Despite this, only one person – Mallik provides psychiatric care at the Prison.  He is only there for nine hours a week.  All of Plaintiffs experts have testified that this is patently insufficient to meet the needs of the inmates.  It was a contributing fact to Plaintiff's injuries.  Furthermore, the nurses are understaffed, which exacerbates the lack of training discussed above.  The absolute minimal psychiatric care at the Prison, supplemented with the testimony of Plaintiff's Experts is sufficient to establish a claim for failure to staff.

### V.  PLAINTIFFS HAVE ESTABLISHED MEDICAL MALPRACTICE CLAIMS AGAINST DEFENDANTS ZALOGA AND MALLIK AND THE CCI NURSES

CCI's only claim in regard to the lack of a medical malpractice claim is that Plaintiff's experts did not call out the nursing staff by name.  This assertion is not fully developed and is without merit.  CCI does not contest that Plaintiff has established the

elements of medical negligence through facts and expert testimony.  Plaintiffs experts noted that the nursing staff as a whole as negligent.  Nurse Moritzkat testified to those nurses who were present at the time Plaintiff was neglected.  Numerous witnesses named Mortizkat and nurse Raenn by name as some who saw Plaintiff during the time in which he received no medical treatment.  Plaintfif specifically complained to Moritzkat.  As Defendants do not contest the elements, and the perpetrators were identified specifically by the witnesses and generally by the experts, Plaintiff has established a claim of medical negligence against the CCI Staff.

Furthermore, Plaintiff has established vicarious liability and corporate liability on the part of CCI.  CCI Defendants appropriately layout the standard for Corporate Negligence.  *Thompson v. Nason Hospital*, 591 A.2d 703, 707 (Pa. 1991).  A corporate, by Defendant's admission, can be held liable for defective policy, defective staffing, and defective oversight of staff, on a claim of corporate negligence.  This is akin to *Monell* liability, as discussed above.  Furthermore, *Monell* is a higher standard – requiring deliberate indifference.  Therefore, if the Court finds that Plaintiff has succeeded on *Monell*, it should find hat corporate negligence has been established for defective policy, lack of policy, failure to train, and failure to staff.

Expert Witness Michelle Joy clearly laid out the claim for negligence against Dr. Mallik, as did Dr. Evans.  He was negligent as a medically doctor for failing to treat Plaintiff's deteriorating medical condition, which was obvious and which was life

threatening and present at the time he treated Plaintiff. Psychiatrically, he violated the standard of care by not forcing medication to be taken and food and water to be eaten by Plaintiff.

While in the Prison, Plaintiff was suffering from serious mental illness. Exhibit S at 49-50, pp. 193-194. The frequency of treatment of Plaintiff by both staff and doctors violated the standard of care because it was insufficient and staff were not properly trained. Exhibit T at 50, pp. 194-196. Dr. Mallik's treatment of Plaintiff – to "give him time and space" – was counter-theatpeutic and below the standard of care. Exhibit S at 50, p. 197. The standard of care was violated by failure to force administer psychiatric drugs to Plaintiff and instead place him in a restraint chair – a more restrictive alternative. Exhibit T at 51, P. 199-203. . Not transporting Plaintiff, who was in acute psychiatric crisis, to an outside facility for mental health treatment was a breach of the standard of care. Exhibit T at 57, pp. 223-225. It would have been obvious to Dr Mallik, if he saw him on June 8, that Plaintiff was extremely sick and needed medical treatment. Exhibit T at 57-58, pp. 225-226. Dr. Mallik did nothing to treat this and completely ignored Plaintiff's desperate condition. Exhibit T at 58, p. 226.

The policy of having a psychiatrist on staff for only nine hours a week for prison the size of the Prison was inadequate. Exhibit T at 54-55, pp. 213-218 (Indicating that the numbers of mentally ill and addicted inmates at the Prison were

far greater than could be treated by a single psychiatrist). The level of staffing

rendered it "impossible" for Plaintiff to receive appropriate psychiatric care and

violated the standard of care.  Exhibit T at 55, pp. 214-215. This lack of

appropriate care was a proximate cause of his condition at admission into GCMC.

Exhibit T at 55, p. 215.

Dr. Mallik's Counsel merely argues that Dr. Joy's assertions that the

standard of care was violated show mere negligence, not gross negligence.

However, Dr. Joy opined that Mallik exercised gross negligence, thus creating a

fact issue for the jury.  Dr. Mallik asks the Court to simply disregard Dr. Joy and

not allow her to testify.  That is unsupported by the facts and the law and the

motion should be denied.

## VI.   PLAINTIFF HAS ESTABLISHED A CLAIM FOR PUNITIVE DAMAGES

"Punitive damages may be awarded for conduct that is outrageous, because

of the defendant's evil motive *or his reckless indifference to the rights of others*."

*Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (quoting *Feld*

*v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) (quoting Restatement (Second) of Torts

§ 908(2) (1979))) (emphasis added)[6].  Punitive damages are available where

---

[6] This standard applies to medical malpractice cases.  *Goldberg v. Nimoityn*, 193 F.Supp.3d 482, 494 (E.D. Pa. 2016) (applying Pennsylvania Law).

conduct is outrageous because is it based on "willful, wanton, *or reckless* conduct."
*Id*. (citations omitted) (emphasis added).  The Court focused its analysis on what
would constitute "reckless indifference."  *Id*. at 771.  In determining whether
reckless conduct can give rise to a punitive damage award the Court looked to the
following proposition:

> The actor's conduct is in reckless disregard of the safety
> of another if he does an act or intentionally fails to do an
> act which it is his duty to the other to do, knowing or
> having reasons to know of facts which would lead a
> reasonable man to realize, not only that his conduct creates
> an unreasonable risk of physical harm to another, but also
> that such risk is substantially greater than that which is
> necessary to make his conduct negligent.

*Id*. (quoting Restatement (Second) of Torts § 500).  The Court found that this
Restatement gives rise to two types of reckless conduct: (1) where a person knows
of the high degree of risk of harm and fails to act; and (2) where a person has
reason to know the degree of risk, but does not appreciate that risk where a
reasonable person would have.  *Id*. (citing *Martin v. Johns-Manville Corp.*, 494
A.2d 1088, 1097 (Pa. 1985)).  Only the first category of recklessness can give rise
to punitive damages.  *Id*.  (citing *Martin*, 494 A.2d at 1097-98).  Therefore, in
order to receive punitive damages under Pennsylvania law, the evidence must
establish that: "(1) a defendant had a subjective appreciation of the risk of harm to
which the plaintiff was exposed and that (2) he acted, or failed to act, as the case

may be, in conscious disregard of that risk." *Id*. at 772 (citing *Martin*, 1088 A.2d at 1097-98).

Defendant seek to frame the issue as whether or not Defendants' conduct was outrageous – attempting to have the Court examine the conduct in the ordinary parlance of the term. That is not the proper question. While punitive damages are generally available where conduct is 'outrageous', that term has been modified and explained by the Courts and the legislature as willful, wanton, or reckless conduct. 40 P.S. § 1303.505(a); *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005). This case involves reckless conduct. Therefore, the question is not whether the Court deems the conduct to be 'outrageous' in the general sense, but whether the conduct, as pled, rises to the level of the standard set forth for reckless indifference in *Hutchison*. It does.

Here, it is clear from the facts and expert opinions that Defendants knew of the life threatening condition that Plaintiff suffered from. Despite this, they did nothing. This deliberate indifference is sufficient to give rise to punitive damages. Therefore, Plaintiff should be permitted to proceed on this claim.

## CONCLUSION

For the reasons stated herein, Defendants' Motions for Summary Judgment should be denied.

Respectfully Submitted,


*/s/ Matthew T. Comerford*
Matthew T. Comerford, Esq.

*/s/ Curt M. Parkins*
Curt M. Parkins, Esq.
204 Wyoming Avenue
Scranton, PA 18503
570-880-0777
Fax: 570-880-0476

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AMIR WHITEHURST | : | |
| | : | |
| V. | : | 17 CV 903 |
| | : | |
| LACKAWANNA COUNTY, et al | : | |

### CERTIFICATE OF SERVICE

AND NOW, this 17th day of June, 2019, I, Curt M. Parkins, Esq., hereby certify that a true and accurate copy of the foregoing Brief was served upon counsel for all Defendants via ECF.

Respectfully Submitted,

*/s/ Curt M. Parkins*
Curt M. Parkins, Esq.