Page 1

1              IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF PENNSYLVANIA

2

3      AMIR WHITEHURST,           :   NO. 3:17-CV-00903
                                  :
4          Plaintiff             :
                                  :
5              vs.               :
                                  :
6      LACKAWANNA COUNTY,         :
       et al.,                   :
7                                 :
           Defendants            :

8

9

10

11

       VIDEOTAPE DEPOSITION OF NATHANIEL R. EVANS, II, M.D.

12

13       Taken in the offices of Burns White, LLC,

14   100 Four Falls, Suite 515, 1001 Conshohocken State

15   Road, West Conshoshocken, Pennsylvania, on Friday,

16   February 22, 2019, commencing at 9:30 a.m., before

17   Sara J. Vanchure, Notary Public.

18

19

20                    - - -

21              VERITEXT LEGAL SOLUTIONS
                  MID-ATLANTIC REGION
22           1801 Market Street - Suite 1800
             Philadelphia, Pennsylvania 19103

23

                      - - -

24



Page 2

1  APPEARANCES:
2  COMERFORD LAW OFFICES
3  BY: CURT M. PARKINS, ESQ.
4  204 Wyoming Avenue
5  Scranton, Pennsylvania 18503
6  (570) 880-0777
7  curt@comerfordparkins.com
8  -- Representing the Plaintiff
9
10
11
12
13  BURNS WHITE, LLC
14  BY: JOSEPH T. HEALEY, ESQ.
15      NICOLE C. FREILER, ESQ.
16  100 Four Falls, Suite 515
17  1001 Conshohocken State Road
18  West Conshohocken, Pennsylvania 19428
19  (484) 567-5700
20  jthealey@burnswhite.com
21  -- Representing the Defendants Correctional Care,
22  Inc.; Edward Zaloga, D.O.; Alexis Moritzkat; Amy
23  Collarini; Raenn Rodriguez; Nicole Ortana; and
24  "Nurse Ken" (Ken McCawley)

Page 3

1  APPEARANCES CONT'D:
2  CIPRIANI & WERNER, P.C.
3  BY: CHRISTIAN W. FRANCIS, ESQ.
4  415 Wyoming Avenue
5  Scranton, Pennsylvania 18503
6  (570) 347-0600
7  cfrancis@c-wlaw.com
8  -- Representing the Defendant Satish K. Mallik,
9  M.D.
10
11
12
13  CIPRIANI & WERNER, P.C.
14  BY: DAVID HEISLER, ESQ.
15  415 Wyoming Avenue
16  Scranton, Pennsylvania 18503
17  (570) 347-0600
18  dheisler@c-wlaw.com
19  -- Representing the Defendant Lackawanna County
20
21
22
23
24  Also present: Ryan Morton

Page 4

1               INDEX OF WITNESSES
2  EXAMINATION                       PAGE
3  NATHANIEL R. EVANS, II, M.D.
4  by Mr. Healey            8, 148
5  by Mr. Francis           74
6  by Mr. Parkins           110, 150
7  by Mr. Heisler           147
8
9
10
11
12
13
14
15
16
17
18
19
20
               INDEX OF EXHIBITS
21
   EXHIBIT        DESCRIPTION       MARKED
22
   Evans 1 - Evans Notice of Videotaped
23   Deposition              6
24  Evans 2 - 12-18-18 Evans Expert Report    151

Page 5

1              DEPOSITION SUPPORT INDEX
2  Direction to Witness Not to Answer
3  PAGE    LINE          PAGE     LINE
4   --      --            --       --
5
6
7
8
   Request for Production of Documents
9
   PAGE    LINE          PAGE     LINE
10
    --      --            --       --
11
12
13
14
15
   Stipulations
16
   PAGE    LINE          PAGE     LINE
17
    6       2            --       --
18
19
20
21
22  Questions Marked
23  PAGE    LINE          PAGE     LINE
24   --      --            --       --

Page 6

1        S T I P U L A T I O N S
2            It is stipulated and agreed by and
3    between counsel for the respective parties that
4    the sealing and filing of the transcript is waived
5    and that all objections, except as to the form of
6    the questions, are reserved to the time of trial.
7            - - -
8            (Evans Exhibit Number 1 was
9              premarked for identification.)
10           THE VIDEOGRAPHER:  Good morning.  We are
11   going on the record at 9:30 a.m. on February 22nd,
12   2019.  Please note that the microphones are sensitive
13   and may pick up whispering, private conversations, and
14   cellular interference.  Please turn off all cellphones
15   and place them away from microphones, as they can
16   interfere with the deposition audio.
17           This is media unit one of the video
18   recorded deposition of Nathaniel R. Evans, M.D. in
19   the matter of Amir Whitehurst versus Lackawanna
20   County, et al. filed in the United States District
21   Court, Middle District of Pennsylvania, case number
22   3:17-CV-00903.
23           This deposition is being held at Burns
24   White located at 100 Four Falls Corporate Center, West

Page 7

1    Conshohocken, Pennsylvania.  My name is Ryan Morton
2    from the firm Veritext and I am the videographer.  The
3    court reporter is Sara Vanchure from the firm
4    Veritext.  I am not authorized to administer an oath.
5    I'm not related to any party in this action and I'm
6    not financially interested in the outcome.
7            Counsel and all present in the room and
8    anyone attending remotely will now state their
9    appearances and affiliations for the record.  If there
10   are any objections to proceeding, please state them at
11   the time of your appearance, beginning with the
12   noticing attorney.
13           MR. HEALEY:  My name is Jodi Healey and I
14   represent Dr. Edward Zaloga and Correctional Care,
15   Inc.
16           MS. FREILER:  Nicole Freiler also on
17   behalf of Dr. Edward Zaloga and Correctional Care,
18   Inc.
19           MR. FRANCIS:  Christian Francis on behalf
20   of Dr. Mallik.
21           MR. HEISLER:  David Heisler on behalf of
22   Lackawanna County.
23           MR. PARKINS:  Curt Parkins for the
24   plaintiff.

Page 8

1            THE VIDEOGRAPHER:  Will the court
2    reporter please swear in the witness?
3            - - -
4            NATHANIEL R. EVANS, II, M.D., having been
5    duly sworn, was examined and testified as follows:
6            - - -
7            THE VIDEOGRAPHER:  Thank you.  You may
8    proceed.
9            EXAMINATION
10   BY MR. HEALEY:
11   Q.      Good morning, Dr. Evans.
12   A.      Good morning.
13   Q.      My name is Jodi Healey and we just met
14   and I represent Dr. Edward Zaloga and Correctional
15   Care, Inc.  We're here today for your deposition.  I'm
16   going to be asking you about the opinions that you've
17   rendered in a report from December of 2018.
18           I believe you've given depositions
19   before.  So I'll just do a cursory review of the
20   rules, Doctor.  I'm going to ask that you keep your
21   responses verbal, meaning "yes" or "no" as opposed to
22   a gesture or an "um-hum" or an "uh-uh".
23   A.      Sure.
24   Q.      I do have a tendency to ask a convoluted

Page 9

1    question every now and again.  If you don't understand
2    my question for any reason, if you could just please
3    tell me and I'm more than happy to clean it up.  Is
4    that fair?
5    A.      I will.
6    Q.      And, finally, if you and I were naturally
7    conversing, Doctor, you might have a tendency to
8    anticipate the end of my question and jump in with an
9    answer.  I'm going to ask if you could resist that
10   urge, and the reason for that is the court reporter
11   can't take down two people talking at once.  Is that
12   fair?
13   A.      That's of course fair.
14   Q.      Doctor, I'm going to show you what's been
15   previously marked as Evans Exhibit Number 1, which is
16   a Notice of Videotaped Deposition.  Have you seen this
17   before?
18   A.      I have seen that before.
19   Q.      Okay.  And on that document, Doctor,
20   there are a number of things which I asked you to
21   bring with you today.  Were you able to do that?
22   A.      I was able to bring the ones that were
23   available to me.
24   Q.      Can you put those on the table --

3 (Pages 6 - 9)

Page 10

1  A.       I can.

2  Q.       -- and show us what you have?

3  A.       Certainly.  (Witness complies.)  I have a

4  copy of that document (indicating).

5  Q.       Okay.

6  A.       I have policies of the Lackawanna County

7  Prison that arrived recently.  I have a statement.  I

8  have a CV.  I have a report that is not the

9  authoritative signed report that I sent to

10  Mr. Comerford.  I didn't have a copy of that

11  available.  What I have is what I printed off from my

12  computer, which is not signed, which may not be the

13  final version of the report.  So you can get the final

14  version I'm certain.

15  Q.       Yes, I do have a copy.  Thank you,

16  A.       I have an invoice; a list of cases

17  reviewed; a list of handwritten notes that are stated

18  to be from Dr. Mallik, although I can't read anything

19  on it; and I have a set of policies, medical

20  service -- suicide policies from Lackawanna County

21  Prison directed towards officers and a set of use of

22  force policies again directed towards officers from

23  the Lackawanna County Prison.

24  Q.       Thank you.

Page 11

1           MR. PARKINS: Just for the record, Jodi,

2  I told him not to print out all the depositions that

3  he reviewed --

4           MR. HEALEY: Oh, that's --

5           MR. PARKINS: -- because we already have

6  them.

7           MR. HEALEY: That's fine.

8  BY MR. HEALEY:

9  Q.       Doctor, did you bring with you a copy of

10  the medical chart for Amir Whitehurst?

11  A.       The medical chart came to me as a large

12  stack of documents, part of it.  Part of it was by

13  e-mail I do believe.  Once I review those documents

14  and reach my conclusions and put them into a report, I

15  don't need them anymore.  My wife doesn't like

16  clutter.  I tend not to keep them around.

17  Q.       Do you know how many pages the medical

18  chart was?

19  A.       I do not.

20  Q.       Okay.  Do you know what it entailed, what

21  records were contained in it?

22  A.       Well, the records are specified in my

23  report.  I detail the records in my report regarding

24  what I reviewed.

Page 12

1  Q.       Okay.  The policies and procedures that

2  you've given me as well as the records of Dr. Mallik,

3  did you have those in your possession before you

4  drafted your report?

5  A.       I don't recall.  I don't think I had

6  those LCP policies.  I don't frankly recall.

7  Q.       Okay.  How about the orders and progress

8  notes of Dr. Mallik?  Did you have those before you

9  drafted your report of December I believe it's 18th,

10  2018?

11  A.       Yes.  You referred to those as orders.  I

12  don't know if they're orders or not; and I do believe

13  they were a part of what I reviewed, but as I said in

14  my initial comment about them, I can't decipher

15  anything on them.

16  Q.       Okay.  Did you review Dr. Mallik's

17  deposition transcript --

18  A.       I did.

19  Q.       -- before drafting your report?

20  A.       Is it in my -- if it's in my note -- my

21  report that I reviewed it, I reviewed it.  If it

22  isn't, then I would say I probably did not, but I

23  think I did review it.

24  Q.       Okay.  I'm going to represent to you

Page 13

1  that -- and we will go over it in some detail -- that

2  Dr. Mallik's deposition transcript is not referenced

3  in -- as having been reviewed in your report.

4  A.       Well, I think it's -- I think it's

5  referenced in my report.

6  Q.       Okay.  We can -- and we'll ultimately

7  mark this as Evans 2.  Doctor, this is a clean and I

8  believe signed copy of your December 18th, 2018

9  report; and if you go to page 2 where it outlines the

10  documents that you reviewed, it doesn't mention

11  Dr. Mallik's deposition transcript.

12           So I guess my question is, as you sit

13  here today, do you know did you review Dr. Mallik's

14  transcript before drafting that report?

15  A.       Let me look at this report and I can

16  answer the question in a few minutes.  I would

17  represent to you that I have reviewed Dr. Mallik's

18  report.  I do believe I reviewed it before I wrote

19  this, but I will tell you that it didn't change

20  anything that I wrote in this report.  So whether I

21  reviewed it before or after, it would have been the

22  exact same thing.

23           So, yes, I reviewed the report.  Did I

24  review it before I wrote this?  I don't frankly know

4 (Pages 10 - 13)

Page 14

1  for certain.  Would it have changed anything that I
2  had written?  No.
3  Q.      Okay.  And when you're referring to your
4  report, you're referring to the deposition transcript
5  of Dr. Mallik?
6  A.      I've reviewed the deposition transcript
7  of Dr. Mallik.  That's correct.
8  Q.      Okay.
9  A.      And, having reviewed it, it wouldn't
10  change anything I have written in this report dated
11  December 18th.
12  Q.      All right.  And that sort of leads to my
13  next question.  In your report, I believe in three
14  separate paragraphs you note that between -- for an
15  eight-day period between May 28th and June 8th of 2015
16  that Mr. Whitehurst received no medical psychiatric or
17  nursing intervention at all through those dates.  Is
18  that -- is that --
19  A.      That is true.  He received no nursing
20  intervention, and I think it can be argued that he did
21  receive psychiatric.  Once one reads those notes that
22  he wrote there, it does apparently have dates during
23  the timeframe that I did not see or did not comment on
24  the existence of any psychiatric involvement.  So he

Page 15

1  obviously had psychiatric evaluation.  If those
2  cryptic notes mean a psychiatric evaluation, then
3  perhaps he did.
4  Q.      Would you agree with me that a review of
5  Dr. Mallik's deposition transcript and a review of the
6  progress notes reveal that Mr. Whitehurst was seen and
7  evaluated by Dr. Mallik every two days between
8  May 26th and June 8th of 2015?
9  A.      I agree that the notes that have dates on
10  them that are handwritten say something about the
11  dates that you're describing.
12  Q.      And that Dr. Mallik himself -- in his
13  deposition transcript that he described his
14  intervention or his psychiatric care that he provided
15  to Mr. Whitehurst every two days between May 24th and
16  June 8th; correct?
17  A.      I don't recall that specific about
18  Dr. Mallik's deposition transcript.  As I said to you
19  before, I read the transcript.  It didn't change
20  anything that I wrote in my opinion, but I did -- I
21  don't recall that specific statement by him with
22  regard to an every two day assessment.
23  Q.      The last paragraph of your report says,
24  "The absence of medical records between May 28th and

Page 16

1  June 8th of 2015 indicates that there was medical and
2  nursing abandonment of Mr. Whitehurst during these
3  days."  That statement is incorrect?
4  A.      Well, Dr. Mallik made it very clear that
5  he's not the medical doctor in that scene.  He's the
6  consultant.  He's the psychiatrist.  So when posed in
7  that way, there were no medical records.  There may be
8  psychiatric records, but Dr. Mallik made it very clear
9  he was not the medical interventionalist there.  He
10  was the psychiatric person and he was a consultant.
11  So I stick by those words, and medical refers to
12  nonpsychiatric medical.
13  Q.      Are you suggesting that psychiatric
14  progress notes are not medical records?
15  A.      I'm suggesting that Dr. Mallik made a
16  clear distinction between medical and psychiatric.
17  Q.      So Dr. Mallik's medical records -- or
18  Dr. Mallik's psychiatric records aren't, in your
19  opinion, medical records?
20  A.      In Dr. Mallik's opinion that's stated in
21  his deposition, he was separate from medical.  He was
22  psychiatric.
23  Q.      Did you review the MARs for
24  Mr. Whitehurst?

Page 17

1  A.      I'm sure I did.
2  Q.      Okay.  And that showed you that there
3  were nurses administering medication two times every
4  day between May 24th and June 8th of 2015; correct?
5  A.      There's a total absence of vital signs
6  during that time period that -- as far as I saw.  I
7  saw no vital signs.  I saw no nursing notes about any
8  interaction with this individual.  Giving him
9  medicine, perhaps they passed the medicine through a
10  door.  I don't frankly know if that was done, but
11  nurses do more than pass medicines; and with respect
12  to nursing notes, I saw none.  With respect to notes
13  about his condition, I saw none.  With respect to
14  vital signs, temperature, pulse, respiration, I saw
15  none.
16  Q.      And were -- did you read the deposition
17  transcript of Alexis Moritzkat?
18  A.      I read her deposition.  Of course.
19  Q.      Okay.  And Alexis Moritzkat accompanied
20  Dr. Mallik every time that he saw Mr. Whitehurst;
21  correct?
22  A.      Well, there are no Moritzkat notes that I
23  saw.  I saw no nursing notes documenting any visits by
24  Nurse Moritzkat.

5 (Pages 14 - 17)

1  Q.        Did you see her transcript?

2  A.        Well, let me just say to you nurses write

3  notes. They tend to write them contemporaneously.

4  They see a patient and that day they write out what

5  they did. So a transcript written months later is not

6  the way nurses tend to recall their actions; and you

7  know as a lawyer, if it's not written, not done.

8  Q.        Are you disputing whether Nurse Moritzkat

9  accompanied Dr. Mallik every two days when he saw

10  Mr. Whitehurst at the Lackawanna County Prison?

11  A.        What I'm saying to you is there is zero

12  nursing documentation during that time period.

13  There's no nursing documentation. Nurses are taught

14  on -- in the early part of nursing school

15  documentation is key. I didn't see any documentation

16  of any nursing assessment of this gentleman during

17  that time period from the 28th through the 8th of

18  June.

19  Q.        In your report, you note that you

20  reviewed case law. What case law did you review?

21  A.        Let me see what you're referring to,

22  please.

23  Q.        Sure. Number 12 (indicating).

24  A.        I don't recall offhand. I received a

1  stack of documents. I reviewed them all and I can't

2  tell you specifically what that refers to.

3  Q.        Okay. Do you know -- did you review

4  the entire Lackawanna County Prison medical chart,

5  215 pages prior to drafting your report?

6  A.        I did.

7  Q.        You did?

8  A.        I did.

9  Q.        Okay. And that includes --

10  A.        Do I remember every detail of it? No, I

11  don't.

12  Q.        Okay. And that included Dr. Mallik's

13  notes; correct?

14  A.        Yes, they were there. As I said to you

15  before though, Dr. Mallik's are largely indecipherable

16  to me. So having reviewed something that you can't

17  read doesn't mean you extracted the understanding from

18  it.

19  Q.        And so where you write, for instance,

20  "Curiously there are no medical or nursing records

21  from May 28th, 2015 through June 8th of 2015," you

22  don't include in your definition of medical records

23  psychiatric records, psychiatric orders, or MARs?

24  A.        As I said to you before, Dr. Mallik made

1  a clear distinction between medical and psychiatric in

2  his deposition and so that -- I also said to you I

3  couldn't really read those notes that he wrote.

4        So if you want to call psychiatric notes

5  medical, then that's not unreasonable, but he made it

6  very clear that he was not a medical person. He was a

7  psychiatric person. He wasn't a medical doctor on the

8  scene. He was a psychiatric consultant on the scene,

9  and that consequently limited his role in interacting

10  with Mr. Whitehurst.

11  Q.        He's also an M.D., isn't he?

12  A.        Of course he is.

13  Q.        And --

14  A.        I'm repeating his words.

15  Q.        Okay. And did you note in his deposition

16  transcript that he said if there was something acutely

17  wrong with Mr. Whitehurst that he would have addressed

18  it and bought it to the attention of the Medical

19  Department?

20  A.        Well, let me tell you there was something

21  acutely wrong with Mr. Whitehurst on the 7th and 8th

22  of June because otherwise he wouldn't have been

23  cachectic. He wouldn't have been dehydrated. He

24  wouldn't have had rhabdomyolysis. He wouldn't have

1  had kidney failure. He wouldn't have had all the

2  things that were found when he got to the hospital on

3  the 9th. So he was undeniably with something wrong

4  with him on the 8th of June, and so why Dr. Mallik

5  didn't address those issues is unknown to me.

6  Q.        Okay. I'm going to jump around. You are

7  board certified in internal medicine; correct?

8  A.        That is correct.

9  Q.        Is that still valid?

10  A.        Yes, it is.

11  Q.        Okay. How about board certification in

12  emergency medicine? Did you let that lapse?

13  A.        I was board certified in emergency

14  medicine. I became certified in 1983. I worked

15  through -- having worked 7,000 hours in the Emergency

16  Department, 7,000 hours. I also had to take a written

17  examination, followed by an oral examination. That

18  was for a 10-year certification.

19        Ten years later I took the exam a second

20  time and passed that examination, became recertified

21  for another 10 years.

22        Ten years later I took that examination

23  again and successfully became certified for another

24  10 years. At the end of 30 years of certification, I

Page 22

1  decided not to take the examination again.
2  Q.        As we sit here today are you board
3  certified in emergency medicine?
4  A.        Of course not. I ended it at 30 years,
5  having not taken the examination for a 40th -- for the
6  next 10 years.
7  Q.        In your report you note, "I am a fellow
8  in the American Board of Emergency Medicine"; is that
9  accurate?
10 A.        It should say the American College of
11 Emergency Medicine. Does it say board?
12 Q.        It does.
13 A.        Well, that's an error.
14 Q.        I'm more concerned -- as you sit here
15 today are you a fellow in the American Board of
16 Emergency Medicine?
17 A.        I'm a fellow in the American College of
18 Emergency Medicine. The American Board of Emergency
19 Medicine doesn't issue fellowships.
20 Q.        Okay. Do you have to be board certified
21 in emergency medicine to be a fellow?
22 A.        You have to have been board certified to
23 earn fellowship, and fellowship is not taken away if
24 you decide to not take the examination again.

Page 23

1  Q.        Okay. So if I were to contact the
2  American College of Emergency Medicine, what they
3  would tell me is that you can be a fellow without
4  being currently board certified?
5  A.        That's what they would tell you if they
6  tell you the truth, yes. I expect they would tell you
7  the truth. Feel free to contact them.
8  Q.        Okay. So that's an accurate statement,
9  that I am a fellow in the American Board of Emergency
10 Medicine?
11 A.        As I just said to you I think twice, the
12 American Board of Emergency Medicine does not issue
13 fellowships.
14 Q.        Okay.
15 A.        The American Board of Emergency Medicine
16 does not issue fellowships. I am not a fellow in the
17 American Board of Emergency Medicine. I'm a fellow in
18 the American College of Emergency Physicians.
19 Q.        Okay. The licensure of Florida, Indiana,
20 New Jersey, North Carolina, and Pennsylvania, which
21 are currently active?
22 A.        Well, those are listed under past and
23 present I believe and I am currently licensed in the
24 states that I've practiced in in the past five years,

Page 24

1  Pennsylvania and New Jersey.
2  Q.        Okay.
3  A.        The others I did not pay the annual fee,
4  which can be hundreds of dollars to maintain because I
5  don't work in those areas, those geographic areas.
6  Q.        Currently where do you work, Doctor?
7  A.        Currently I'm the medical director of a
8  Concentra Center in Northeast Philadelphia.
9  Q.        And what is that?
10 A.        Concentra is the largest occupational
11 medicine center service in the country. There are
12 600 locations around the country. It's a company that
13 provides care to employees of employers, and my board
14 certification is in occupational medicine and so I
15 examine the people who are injured at work. I examine
16 people who are being considered for various kinds of
17 positions. So that's the thrust of what I do.
18 Q.        Okay. Is occupational medicine
19 essentially -- would it entail employee screening and
20 then the treatment of workplace injuries?
21 A.        That's basically true, yeah.
22 Q.        Okay. And is -- so it's not a -- what
23 I'd call a standard internal medicine or family
24 clinic; correct?

Page 25

1  A.        It's not a family clinic. We certainly
2  do see urgent care patients and urgent care patients
3  treat us as a family center, but that's not our
4  primary mission, no.
5  Q.        Okay. And, Doctor, when was the last
6  time you worked in a correctional facility?
7  A.        I worked in corrections for more than
8  25 years. I started working corrections in 1980 I do
9  believe, maybe '70 -- probably '77. I last worked in
10 a correctional facility about 26 years later in
11 1980 -- sorry, in 2013, end of 2013.
12 Q.        What correctional facility was that?
13 A.        I was medical director of the Burlington
14 County Correctional Facility in New Jersey. That
15 facility has a main jail, a juvenile detention center,
16 a drug rehab center, and a -- it was called minimum
17 security facility.
18          I was the medical director there from
19 1986 to 1996 and in '96 I got a contract to continue
20 as the medical director and the provider of services
21 analogous to what Dr. Zaloga does or did, and in my
22 capacity I have the nurses. I have the doctors. I
23 have the nurse-practitioners and I also worked there
24 myself in providing care to inmates in the

7 (Pages 22 - 25)

Page 26

1  correctional system of Burlington County from 1996
2  until 2013.
3  Q.        Okay. The CV that I've been provided has
4  you last listed as medical director in December of
5  2007. Does that sound accurate?
6  A.         Seven? I may be -- maybe I'm -- I have
7  to think about this for a moment.
8  Q.        I have a clean copy of the --
9  A.         Well -- yeah, it was a total of
10  26 years -- total of 21 years, I'm sorry, from 2000 --
11  from '86 to 2007, yes, so a total of 21 years.
12  Q.        Okay. So 2007 would have been the last
13  time --
14  A.         That's correct, December 31st, 2007, not
15  '13.
16  Q.        Okay. So over 12 years ago was the last
17  time you worked in a correctional facility?
18  A.         That's about right.
19  Q.        Okay.
20  A.         After plus 25 years of doing so.
21  Q.        How many inmates at a given time were at
22  Burlington County Correctional Facility?
23  A.         It was on the order of 500.
24  Q.        Okay. Did there come a time that you

Page 27

1  were only on site two days a week at Burlington County
2  Correctional Facility?
3  A.         Never.
4  Q.        Have you testified under oath that you
5  were present only two days a week at Burlington County
6  Correctional Facility after hiring a
7  nurse-practitioner?
8  A.         Let me ask you this.
9  Q.        Sure.
10  A.         If you say I was on site, I should say
11  that, yes, you're right. I was not on site, but my
12  nurse-practitioner was. So when you say "you", I
13  don't know if you mean you meaning my service or you
14  meaning me personally. Which are you referring to?
15  Q.        I mean you personally.
16  A.         Okay. I personally was not on site more
17  than two days a week during that part of that time.
18  That's correct.
19  Q.        Okay. Why is that?
20  A.         Because I had hired two
21  nurse-practitioners who are state licensed providers
22  authorized to diagnose, authorized to treat, and I had
23  a nurse-practitioner there five days a week.
24  Q.        Okay. So, in your opinion, your --

Page 28

1  meaning your -- physical presence two days a week was
2  adequate for meeting the medical needs of 500 inmates
3  at the Burlington County Correctional Facility?
4  A.         In view of the fact that there were two
5  nurse-practitioners who were doing the hands-on
6  day-to-day interaction with inmates, yes.
7  Q.        Okay. Did you maintain a practice
8  somewhere else during that timeframe that you were a
9  medical director?
10  A.         Yes. My practice was called Burlington
11  Medical Center and Burlington Medical Center in fact
12  was the entity that was contracted to the county for
13  the provision of correctional services.
14  Q.        So for the three days a week that you --
15  of the workweek that you weren't on site at Burlington
16  Correctional Facility, where were you?
17  A.         I was on site at my practice, and I
18  should also insert that I advised my nurses that I was
19  available 24 hours per day every day. I went away to
20  Africa on a trip to see my daughter, who's in the
21  Peace Corps, and I took a satellite phone with me so I
22  would be available during that time.
23          I encouraged my nurses to call me with
24  any medical concerns because, even though I had

Page 29

1  nurse-practitioners, I'm the final and most
2  knowledgeable and the most experienced person in the
3  group; and for the protection of my nurses and myself
4  and my patients, I wanted to be accessible at all
5  times.
6  Q.        Was Burlington County Correctional
7  Facility accredited by the NCCHC?
8  A.         We had a bevy of policies that were based
9  on NCCHC guidelines, but we did not have accreditation
10  per se.
11  Q.        Did you ever apply for it?
12  A.         No. The application requires the
13  county's involvement. It requires the warden's
14  involvement, the jail's administrative involvement.
15  We didn't have that involvement. So we had, as I
16  said, policies that met the standards for NCCHC. We
17  built them according to those guidelines, but we were
18  not certified or not reviewed for certified by the
19  NCCHC.
20  Q.        Would you agree with me that the mere
21  fact that the Burlington County Correctional Facility
22  was not accredited by the NCCHC does not in and of
23  itself violate the standard of care?
24  A.         I would agree with that, yes.

Page 30

1  Q.      Would you agree with me that the NCCHC
2  and their guidelines don't constitute the standard of
3  care?
4  A.      I would agree that they don't constitute
5  the standard of care. The standard of care is
6  defined, as I understand it, as what a reasonable
7  doctor would do under a certain circumstance, so a
8  reasonable group of medical providers would do under a
9  certain circumstance.
10 Q.      And I think you and I agree on your
11 definition about the standard of care. So, stated
12 another way, guidelines of the NCCHC don't constitute
13 the standard of care?
14 A.      Well, I just said that, with respect to
15 my report, I pointed out that Dr. Zaloga hailed the
16 NCCHC as a model of what they were doing at Lackawanna
17 County and that they would meet and exceed those
18 standards, and nothing along that line was done. So I
19 made that point in my report because the NCCHC is a
20 very valid organization, as he pointed out in 2008 --
21 that Dr. Zaloga pointed out in 2008; and contrary to
22 seeing that they were meeting and exceeding those
23 standards, I saw no evidence of any effort in that
24 direction.

Page 31

1  Q.      But the standards themselves don't
2  constitute -- or the guidelines themselves don't
3  constitute the standard of care; right?
4  A.      They don't constitute the standard of
5  care. That's correct.
6  Q.      Okay. The -- were there two reports
7  drafted in this case, Doctor? And the reason I ask is
8  because you handed me today a report dated
9  December 12th, 2018 and the one I have is dated
10 December 18th, 2018. So I guess my question is what's
11 the December 12th report?
12 A.      There were probably six or seven reports
13 generated in this case, as I do in most cases. I've
14 been reviewing cases for 25 years. It's not a thing
15 that I do heavily, but I do a few -- a couple of cases
16 a year and my routine procedure is to do a draft and
17 review it and update it and review it and update it,
18 and there was further updating I do believe beyond the
19 one that I had to do this morning.
20        As I said, that's not the final version
21 and I hesitated to -- hesitated to give it to you
22 because it's not signed because it's not the official
23 version and there may be typographical errors in
24 there. In fact, they were found and eliminated on the

Page 32

1  last version.
2  Q.      Okay. And I apologize, Doctor. How many
3  reports then do you believe you drafted in this case?
4  A.      I frankly don't know. I mean its draft
5  was in my computer and there might have been three,
6  might have been four. I don't know.
7  Q.      Okay. What documents did you receive
8  after this report? Did you receive additional
9  documents?
10 A.      After the report?
11 Q.      Yeah.
12 A.      I received the policies you showed me
13 last night -- that I printed out last night, those
14 policies. I don't think I reviewed them before my
15 report. Yeah, I don't think so. I don't see them.
16 So I don't refer to policies in my report and I don't
17 think I reviewed those policies prior to my report.
18 Q.      Okay. Do you think it would have been
19 important to have policies and procedures governing
20 the use of restraints prior to drafting your report?
21 A.      Well, those are policies from the
22 Lackawanna County Prison that, in large part, are
23 directed to officers. They're not medical policies.
24 They're not written by medical people, as I read them,

Page 33

1  and so I don't view those policies as relevant to my
2  report.
3  Q.      You don't believe they're relevant?
4  A.      That's correct.
5  Q.      Okay. So policies governing the use of
6  restraint chairs aren't relevant to your opinions?
7  A.      Well, policies that are directed towards
8  officers aren't relevant to my involvement; and if you
9  read those policies, they're, in the main, directed
10 towards what officers should do regarding restraint
11 chairs. I don't think I was asked to make any comment
12 about the behavior of corrections officers.
13 Q.      Did you review the medical services
14 policies and procedures for Lackawanna County Prison?
15 A.      I reviewed Dr. Zaloga's deposition in
16 which he stated there was no policy. The policy is
17 the right action for the right patient at the right
18 time, a single sentence.
19 Q.      I'm asking you if you reviewed Chapter 9,
20 Section 1, Medical and Health Services Lackawanna
21 County Prison, 9.01.01, Health Examinations Medical
22 and Health Services, Medical Records Policies and
23 Procedures, Notification of Illness or Death, all of
24 these policies and procedures governing medical

9 (Pages 30 - 33)

**Page 34**

1  services at Lackawanna County Prison?  Do you --
2  A.        Yes, I reviewed them.  Can I see them?
3  Q.        Sure.
4  A.        To my awareness, I reviewed these.  These
5  are not CCI policies that I'm aware of.  They don't
6  appear to be CCI.  CCI's name is not written on here
7  anyway, and the question was what policies did CCI
8  have in providing services for Mr. Whitehurst.
9         So I don't know the source of these
10  policies.  There's nothing on here identifying them.
11  I don't even know that they apply to Lackawanna --
12  well, Lackawanna County Prison is mentioned here, but
13  I don't know the origin of them.  There's nothing
14  about these that would influence my opinions regarding
15  CCI, but I don't see, as I said, any reference to CCI
16  in these policies.  There's no CCI letterhead and --
17  Q.        Did you see these before drafting your
18  report?
19  A.        I cannot tell you with absolute
20  certainty.  I don't know.  I can't tell you with
21  absolutely certainty.  I believe that I did, but I
22  don't know.
23  Q.        Okay.  And they're medical and health
24  services policies from the Lackawanna County Prison,

**Page 35**

1  if you read them; correct?
2  A.        Well, policies from a prison are not the
3  policies that dictate what a private contracted
4  group's employees will do.  I've had a private
5  contracted group to a jail and, when I came to the
6  jail, there were policies that the last group had
7  written years earlier.  Now, those weren't my policies
8  and someone could have dragged those policies up and
9  said that they were policies for me, but they really
10  weren't.  I needed to have policies for my staff, for
11  my nurses.
12         Those, in my opinion, do not have any
13  reference to CCI.  Perhaps you can show me somewhere
14  on there where it says CCI.  I don't think it does.
15  Those 20 pages of policies are written by someone, but
16  I think they have nothing to do with CCI, nor do they
17  seem to have anything to do with what the CCI staff
18  and nurses did.
19  Q.        Well, it says, "Procedure: Healthcare
20  personnel shall."  So it's obviously applicable to the
21  healthcare personnel at the Lackawanna County Prison;
22  correct?  So is your distinction that if it doesn't
23  say, "Correctional Care, Inc.," that it's not somehow
24  binding?

**Page 36**

1  A.        My distinction is I have no reason to
2  think that CCI nurses ever saw that policy.
3  Q.        Based on what?
4  A.        Well, based on the fact that Dr. Zaloga
5  said there was no policy in his deposition.
6  Q.        There was no Correctional Care policy,
7  meaning --
8  A.        Well, that's correct.
9  Q.        -- with that heading.  Is that what
10  you're -- is that the distinction you're making?
11  A.        That is Correctional Care.  That is
12  correct.
13  Q.        Okay.  Now, in your report, you take
14  issue with that there was no intake done for
15  Mr. Whitehurst.  Can you explain that to me?
16  A.        I did not see, in my review of the
17  records, an intake by a doctor or a nurse or a
18  nurse-practitioner evaluating this gentleman upon his
19  arrival.
20  Q.        Did you review the progress notes?
21  A.        The progress note is not an intake
22  evaluation.  Yes, I reviewed the progress notes.
23  Q.        Okay.  Did you see in the progress note,
24  "Inmate refusing medical intake.  'I don't want it.'

**Page 37**

1  Refused to cooperate.  Verbally aggressive and cursing
2  at correctional and nursing staff"?  Did you review
3  that?
4  A.        I saw that, yes.
5  Q.        Did you take that into consideration
6  before opining that there was no medical intake done
7  and that violated the standard of care?
8  A.        Well, there was no medical intake done;
9  and an intake can be done without cooperation if one
10  documents the details of how the person is ambulating,
11  what the state of consciousness is, whether they
12  are -- what the content of their speech is.
13         Clearly it's difficult in a situation
14  when a person is not cooperative, but I saw no intake
15  other than a statement of refusal and no effort later
16  to try to address that.  So I didn't see any intake
17  form that typically is used to try to document the
18  details of the person's arrival.
19  Q.        Did you see May 24th progress notes
20  noting, "Admits to spice.  Awake, alert, and oriented
21  times three.  Can't focus attention.  Begins to speak
22  about sexual things.  Scattered thoughts.  Refuses TB
23  test"?  Did you see that?
24  A.        Well, who wrote those things?  I don't

10 (Pages 34 - 37)

Page 38

1  think those are written by a doctor or a
2  nurse-practitioner. Those are nurse's notes and
3  nurse's note are not an intake. An intake is done by
4  a person that's at a high level of expertise.
5  Q.        Do you think he should have been
6  compelled to undergo an intake against his will?
7  A.        Well, I think there should have been a
8  person encountering him. I don't think that a doctor
9  or a nurse-practitioner encountered him in an effort
10  to do an intake. Perhaps you could show me that they
11  did.
12  Q.        I'm just asking you do you think he
13  should have been compelled to have a medical intake in
14  light of his behavior?
15  A.        I think he should have had a doctor or a
16  nurse-practitioner encountering him at the time of
17  intake. That did not happen, to my review.
18  Q.        Okay. And so did that lead to the cause
19  of his injuries?
20  A.        Did what lead to the cause of injuries?
21  Q.        Failure to do a medical intake because he
22  refused it.
23  A.        Which injuries are you referring to?
24  Q.        The ones which prompted his admission to

Page 39

1  Geisinger Medical Center on June 8th of 2015.
2  A.        The --
3  Q.        Did that have anything to do with it?
4  A.        The injuries were caused by the neglect
5  that happened from the 28th of May to the 8th of June.
6  That's what caused his injuries, the neglect that
7  occurred during the 8th of May -- 28th of May and the
8  8th of June, the neglect.
9  Q.        Okay. And is seeing -- being seen by a
10  psychiatrist and a nurse every two days, in your
11  opinion, constitute neglect?
12  A.        I see no documentation he was seen by a
13  nurse. As I said to you before, nurses write notes
14  based upon their actions. They don't document their
15  actions in transcripts and depositions months later.
16  There is no evidence whatever (sic) that a nurse
17  evaluated him during that time period from the 28th
18  through the 8th of June.
19  Q.        How about Dr. Mallik?
20  A.        Dr. Mallik wrote something that I could
21  not read.
22  Q.        So that makes it neglect?
23  A.        It makes it undecipherable. There are
24  one or two line notes on several days. I don't know

Page 40

1  what that really means.
2  Q.        My question is if Dr. Mallik saw
3  Mr. Whitehurst every two days between May 24th and
4  June 8th of 2015 accompanied by a nurse, Alexis
5  Moritzkat, does that, in your opinion, constitute
6  neglect?
7  A.        And my answer to you is if Dr. Mallik saw
8  this patient every two days, this patient would not
9  have been dehydrated, cachectic, hypothermic, in
10  kidney failure on the 8th of June. That's my answer
11  to you.
12  Q.        Okay. So are you disputing that
13  Dr. Mallik saw Mr. Whitehurst every two days between
14  May 24th and June 8th?
15  A.        The dispute is not my term. What I'm
16  telling you is that there's no evidence that this kind
17  of evaluation was done every two days as you're
18  alluding to. There are notes -- cryptic, one-line
19  notes on a sheet, but I can't believe that a doctor
20  would have seen this man the day before he was wasted,
21  dehydrated, and with an infection, with air under his
22  skin, with kidney failure. A doctor would have seen
23  him a day or two before and thought he was normal and
24  would have found that conclusion based on an

Page 41

1  assessment? I don't think so.
2  Q.        So do you -- that's my question. Do you
3  not believe that Dr. Mallik actually saw him the day
4  before?
5  A.        There was no -- there was no assessment
6  done on this man. He wouldn't have been in that
7  condition.
8  Q.        You saw his progress notes; correct? You
9  saw his orders?
10  A.        As I said --
11  Q.        -- and you saw his transcript; correct?
12  A.        As I said to you, I could not read those
13  details. I've told you that this man was in a
14  condition that you don't get in in 24 hours. Okay?
15  And, consequently, whatever Dr. Mallik did was not a
16  medical evaluation a day or two before this man went
17  to the hospital in that near death state.
18  Q.        So my question is are you saying by
19  virtue of the state that he was in on June 8th of 2015
20  that, because of that, Dr. Mallik could not have seen
21  him the day before?
22  A.        I'm not saying he could not have seen
23  him, but I'm saying there's no evidence that any
24  meaningful interaction occurred, meaningful medical,

**Page 42**

1 even psychiatric interaction. You can't have a
2 meaningful psychiatric interaction when the person is
3 cachectic, dehydrated, infected, with all the
4 complications this man had 48 hours before and think
5 everything is fine.
6 Q.        So that's my question. Are you taking
7 the condition he's in to move backwards and say he
8 could not have seen him the day before that, despite
9 the documentation?
10 A.        He could not have seen him in a
11 meaningful way. I mean I'm seeing you now, but I'm
12 not medically evaluating you.
13 Q.        Okay. And my question is point-blank.
14 Did you review the deposition transcript of Dr. Mallik
15 before you drafted your report?
16 A.        As I said to you I think twice, I
17 reviewed Dr. Mallik's deposition, read it thoroughly.
18 I cannot tell you -- these processes last over years.
19 I don't just do this. I've got a life, a medical
20 practice life. I cannot tell you definitively that I
21 read this before I wrote my report. I read it. It
22 did not change anything in my report.
23 Q.        Do you think it would have been important
24 that if you're going to accuse a doctor of neglect and

**Page 43**

1 not seeing a person over a span of eight days that it
2 would be important to read their deposition transcript
3 before you do that?
4 A.        I do not think that's important because
5 doctors document their details in the medical record.
6 What doctors say in a deposition, even under oath, is
7 not reflective of what actually happened. Again you
8 as a lawyer know that what's documented is what was
9 done. So what a person comes along six months later
10 and says under oath when there's a lawsuit going on is
11 not reflective of what necessarily happened. So, no,
12 I don't think that's necessary at all.
13 Q.        You don't believe that a deposition
14 transcript under oath by the person providing the care
15 that you're criticizing and calling abandonment -- you
16 don't think it's necessary to review his deposition
17 transcript before writing that opinion?
18 A.        I think the medical record stands for
19 itself. It's central. It is the documentation of
20 what happened in the jail or, in this case, a
21 hospital. In a hospital, it's the medical record that
22 stands for itself. So, no, I don't think it's a
23 matter of what happens in a legal proceeding later
24 with a bunch of lawyers around and a court reporter.

**Page 44**

1 No, it's not that. It's a matter of what the doctor
2 puts in the medical record at the time of the
3 treatment.
4 Q.        Okay. And so under your theory, if you
5 didn't write that you reviewed the deposition
6 transcript of Dr. Mallik before drafting the report,
7 then you didn't do it?
8 A.        Well, that's not a medical record, first
9 of all, and you're trying to take my statement about
10 medical records and distort it to apply to a
11 deposition.
12 Q.        Right. Well, I'm just saying you didn't
13 list it.
14 A.        Well, you're applying it inappropriately.
15 We're talking about medical records here.
16 Q.        Okay. And, in your mind, where you say
17 there's no medical record of any intervention at all
18 between May 28th of 2015 and June 8th, you're not
19 taking into consideration the progress notes of
20 Dr. Mallik; correct?
21 A.        Did I use the words, "at all," in my
22 report?
23 Q.        "The absence of medical care from May 28
24 through June 8th was below the standard of care," "The

**Page 45**

1 absence of any documentation of any nursing or medical
2 assessment." So, yeah, that's my question. Did you
3 take into consideration -- here. "The absence of
4 medical records between May 28th and June 8th of 2015
5 indicates that there was medical and nursing
6 abandonment." So my question is did you take into
7 consideration the medical records of Dr. Mallik
8 between May 28th and June 8th?
9 A.        As I said to you three times now,
10 Dr. Mallik made it clear that he was not a medical
11 provider here. He was a psychiatric provider. So
12 there are some psychiatric notes there but, by his
13 description, they are not medical notes. They're
14 psychiatric notes. He's a psychiatric consultant. He
15 made that distinction very clear in his deposition.
16          So there are psychiatric notes there that
17 I couldn't decipher. There are no medical notes and
18 no nursing notes, and both are expected to be present
19 over an eight-day period.
20          And let me just say I'd like to get a
21 bottle of water, please.
22          MR. HEALEY: Oh, yeah.
23          THE VIDEOGRAPHER: Off the record?
24          MS. FREILER: Sure.

Page 46

1       THE VIDEOGRAPHER: The time is now 10:16.
2 Going off the video record.
3       (A brief recess was taken.)
4       THE VIDEOGRAPHER: The time is now 10:22.
5 We're back on the video record.
6 BY MR. HEALEY:
7 Q.     Doctor, picking up where we left off,
8 there's a sentence in your report and it's on the last
9 page.
10 A.    Sure.
11 Q.   I don't want to fumble through your
12 papers.
13 A.    Of course.
14 Q.   And it notes, "The absence of any
15 medical, psychiatric, and nursing documentation during
16 the period May 28th to June 8th, 2015 is below the
17 standard of care." You'll agree with me there is
18 psychiatric documentation during this period; correct?
19 A.    I'll agree with you there's something
20 written that's psychiatric, although I couldn't
21 decipher it, but there's something written
22 psychiatric.
23 Q.   Okay. So --
24 A.    Pardon me. That is by a psychiatrist.

Page 47

1 Q.    Right. And we've talked about it or you
2 made mention of the fact that you couldn't read it.
3 Did you see the transcription of the notes that was
4 produced through discovery in this case?
5 A.    I did see them, yes.
6 Q.    Okay. Did you see it prior to drafting
7 your report?
8 A.    I can't answer that question. I think
9 that I did, but I cannot answer that question with
10 certainty. As I said, these things drag over months
11 and years and I don't think -- I don't keep a
12 chronological order in my head of what I -- when I see
13 what and things come in at different times. So I
14 cannot answer that definitively.
15 Q.   Okay. But at some point you did see --
16 it was attached as an exhibit, Exhibit 3 to his
17 transcript, the actual transcription of his notes;
18 correct?
19 A.    That's correct.
20 Q.   You're just not certain if you saw it
21 before you drafted the report?
22 A.    That is correct.
23 Q.   Okay. Would you agree to me that there
24 isn't an absence of psychiatric records for that

Page 48

1 timeframe?
2 A.    I would agree with that.
3 Q.    Okay. So that statement would be
4 incorrect then?
5 A.    With respect to the psychiatric records,
6 that would be incorrect.
7 Q.    Okay. Did you review the watch logs
8 generated in this case?
9 A.    Those are generated by corrections
10 officers and, yes, I did look at them.
11 Q.   Okay. And did you note there that
12 Dr. Mallik and Alexis Moritzkat, R.N. were noted to be
13 in every two days in conjunction with the progress
14 records?
15 A.    I did not review the watch records
16 closely and I can't tell you I remember that -- having
17 seen that. It may have been there.
18 Q.    Okay.
19 A.    The watch records are written by officers
20 and my primarily question was whether or not the
21 Medical Department was treating this individual as he
22 should have been treated from a medical point of view.
23 Q.    Well -- and the reason I ask, Doctor, is
24 you -- it struck me that you may have been suggesting

Page 49

1 that Dr. Mallik or Nurse Moritzkat weren't actually
2 seeing the patient. So would watch logs provide some
3 confirmation of that fact that Moritzkat and
4 Dr. Mallik are on the floor in conjunction -- or on
5 the block in conjunction with the entries in their
6 medical records?
7 A.    I shouldn't have to read corrections
8 officers' notes to see what a nurse has done. As I
9 said to you before, the medical record doesn't reflect
10 any nursing interaction with this individual,
11 Mr. Whitehurst, during that time period, the 28th of
12 May through the 8th of June to my awareness. I didn't
13 see any indication of that.
14       So if you're asking me if corrections
15 officers said that they saw the nurse, I don't frankly
16 know, but that's not how I look to find medical
17 records of nurse involvement.
18 Q.    Okay. And I apologize. What I'm driving
19 at is did you review the entire Correctional Care
20 chart, all 217 pages, before you drafted your report?
21 A.    I answered that before. I did review the
22 medical record from the jail before I drafted my
23 report.
24 Q.    All of it, all 213 pages?

13 (Pages 46 - 49)

Page 50

1 A.        Did I commit all of it memory? No. Did
2 I --
3 Q.        Did you --
4 A.        Did I read it all? Yes. Did I flip
5 through all the pages? Yes. Did I read every line on
6 every page? I doubt it.
7 Q.        Okay. So why is it then if you reviewed
8 the -- all 215 pages of the chart that you note that
9 there is no psychiatric records in the chart?
10 A.        I'm not even certain that that
11 transcription that you referred to is in the record.
12 Is it in the record?
13 Q.        No. I'm talking about the handwritten.
14 A.        Well, it's the transcription that was
15 decipherable. I'm not frankly certain what those
16 handwritten records were, as I said to you before.
17 They may have been psychiatric notes. They may not
18 have been. I couldn't even read the signature on
19 them.
20          So I don't know they were psychiatric
21 records. I saw no documentation, to my reading, of
22 psychiatric records in the chart for that period of
23 time from the 28th of May until the 8th of June. At
24 some point I saw that transcription and so I -- yes,

Page 51

1 there's some psychiatric notes there.
2 Q.        Well, that's pretty significant in this
3 type of case that a complete absence of psychiatric
4 records when in fact there are progress records and
5 orders every two days during the admission. Don't you
6 think that's pretty -- don't you think that's
7 important to have seen before drafting the report?
8 A.        Progress records written by whom?
9 Q.        Dr. Mallik. "Interdisciplinary Progress
10 Records, Correctional Care, Inc." (indicating).
11 A.        Now, where does that say psychiatry?
12 Where does that state doctor? This looks like a
13 nursing note. I can't see any evidence if this is
14 psychiatric or medical. Tell me where you see
15 psychiatric on there. Where do you see M.D. on there?
16 Where do you see doctor on there? Where do you see
17 medicine on there? I don't see those things.
18 Q.        So --
19 A.        This looks like a nursing note. Nurses
20 typically write progress notes. Okay? Nurses
21 typically write -- doctors do too of course, but
22 doctors typically write them in such a fashion you
23 could read M.D. somewhere. I don't know what that is.
24 Q.        So --

Page 52

1 A.        So that did not look to me, in my review,
2 like a psychiatric note.
3 Q.        As you sit here today, do you know this
4 to be the progress records of Dr. Mallik?
5 A.        As I sit here today, I don't know what
6 that is.
7 Q.        Okay.
8 A.        Yeah. I think any -- I think most
9 readers would not be able to make anything of this. I
10 think if you show this to a jury, I think they
11 couldn't make out a single word. So, no, I didn't
12 think this was a psychiatric note. You've shown me a
13 transcription. So now I say that perhaps there was
14 psychiatric intervention now that I've seen the typed
15 out notes and this is actually Dr. Mallik's signature.
16 I don't know what that is.
17 Q.        So, because you couldn't read it, you --
18 this interdisciplinary progress note, confidential
19 patient information, because you couldn't read it, you
20 simply discounted it and didn't take it into
21 consideration and, in fact, said there was no
22 psychiatric care provided between May 28th and
23 June 8th; is that fair?
24 A.        That's your distortion.

Page 53

1 Q.        Okay.
2 A.        Because I couldn't --
3 Q.        You explain it to me.
4 A.        Let me just finish. Yes, because I
5 couldn't read it, I saw no evidence of any psychiatric
6 documentation in the chart during that timeframe.
7 Q.        Did you follow up and see if there was a
8 transcription?
9 A.        Well, I'm reading the medical record and
10 I'm reading what I see in the record. I didn't ask
11 for transcription of things that were in the record.
12 The record of a medical provider is expected to be
13 understandable. That's the standard nowadays, quite
14 frankly. Legibility of records is considered to be a
15 medical standard. That's something The Joint
16 Commission expects, something that -- it's the
17 standard of medicine that records should be
18 intelligible.
19 Q.        Do I take it then, because you couldn't
20 read it, that you made that tandem out to a lack of
21 psychiatric care?
22 A.        Because I couldn't read it, I made a
23 statement there was no evidence of it to my read.
24 That's correct.

14 (Pages 50 - 53)

Page 54

1 Q.        Okay.  And also you didn't have
2 Dr. Mallik's transcript where he explained everything
3 he did because you didn't view that was necessary
4 before drafting the report; correct?
5 A.        The transcript wasn't in the medical
6 records provided to me and I made my report based upon
7 the medical records.  They're the ones that are in
8 your hand there.  There's no transcript in that stack
9 (indicating).  So if you want to try to cast
10 aspersions on the fact I didn't comment on things that
11 I hadn't seen yet, then that's your option.
12 Q.        I'm not casting aspersions.  I'm just
13 asking did you see them before you drafted your report
14 and, if you did, you just discounted them because you
15 couldn't read them; is that fair?
16 A.        I read the records that are there and I
17 saw a bunch of progress notes that appeared to be
18 nursing notes, as nurses typically write progress
19 notes.  I saw no M.D. behind a name.  I saw no
20 psychiatry written there at the top of that note.  I
21 saw no reason to think that was a psychiatric note.
22 So you may see that and maybe you can show that to me
23 in the note.  I don't see that in the note.
24 Q.        So if it doesn't --

Page 55

1 A.        And, consequently, I didn't think those
2 were psychiatric notes.
3 Q.        So if it doesn't say M.D. or psychiatry,
4 then you just discounted them?
5 A.        As I've said to you I think now about
6 four times, I didn't recognize those to be any
7 psychiatric notes.  There's nothing in there to clue
8 one into that fact.
9 Q.        Accusing a doctor of neglect and
10 abandonment is pretty serious; correct?
11 A.        Of course it is.
12 Q.        Right.  And accusing a physician of
13 neglect and abandonment when in fact that they saw the
14 patient every two days between May 24th and June 8th
15 and you chose to ignore that, that's -- that's
16 significant, isn't it?
17 A.        If a doctor sees a patient who's at
18 death's door a day or two days before he goes in the
19 hospital and says that he's fine, then I don't think
20 that necessarily represents an evaluation.  Maybe you
21 do, but I don't think that represents an evaluation.
22        When a person has got a condition that
23 had to have happened over several days, the loss of
24 weight, cachexia, the dehydration, the other

Page 56

1 life-threatening conditions that this man,
2 Mr. Whitehurst, went to the hospital with, to have not
3 seen any evidence of that two days before implies a
4 lack of medical interaction.
5 Q.        Are you suggesting that Dr. Mallik did
6 not see the patient?
7 A.        Well, as I said to you before, what do
8 you mean by seeing?  I'm seeing you now.  Am I
9 examining you?  No, I'm not examining you.  I'm --
10 yes, I mean he may have seen the patient.
11 Q.        These notes that you couldn't read,
12 Dr. Mallik's notes, you said you thought they were
13 nursing notes?
14 A.        Yes.  I thought they were something other
15 than doctor's notes.
16 Q.        If you thought they were nursing notes,
17 then why would you note the absence of any nursing
18 documentation between May 28th and June 8?
19 A.        Well, let me just see those notes,
20 please.
21 Q.        (Indicating).
22 A.        Yeah.  Quite frankly, I didn't know what
23 these were.  I still don't know what they are so --
24 Q.        So since you don't know what they are and

Page 57

1 couldn't read them, you just decided that there were
2 no nursing notes or psychiatric notes or medical
3 records between May 28th and June 8th?
4 A.        Nothing that I could make any sense of,
5 nothing that was decipherable to me.  That's correct.
6 Q.        So you thought it was a nursing note, but
7 then you said there were no nursing records; is that
8 fair?
9 A.        Well, I don't know what those are.
10 Q.        Okay.
11 A.        I didn't know what they are.  So if
12 that's what you consider adequate documentation, I
13 don't think so.
14 Q.        I'm just asking what you reviewed and
15 what you took into consideration.
16 A.        Well, as I've said to you five times now,
17 I reviewed the document that you're holding in your
18 hand.
19 Q.        Okay.  And then you've destroyed it?
20 A.        Those are your words.
21 Q.        You got rid of it?
22 A.        Yes.  I reviewed it.  I made my report
23 based upon it and I did not need it any further.
24 Q.        So, as we sit here today, we have no way

15 (Pages 54 - 57)

1  of recreating exactly what you had in your review?
2  A.        I had the medical records of Lackawanna
3  County Jail that applied to Mr. Whitehurst during the
4  timeframe that I referred to in my report.
5  Q.        Do you know where the case law came from,
6  who gave you that?
7  A.        It would have come from the attorney's
8  office.
9  Q.        Okay. And you didn't keep that?
10 A.        I did not keep those details.
11 Q.        Did you review the contract between
12 Lackawanna County and Correctional Care, Inc.?
13 A.        Is it on my list of documents reviewed?
14 Q.        No.
15 A.        In that case, I don't think I -- I would
16 not have reviewed it if it's not on the list.
17 Q.        All right. You took issue with some of
18 Dr. Zaloga's deposition transcript and specifically
19 the cost of medical care. Do you recall that?
20 A.        It's in my report. Yes.
21 Q.        You said he made untrue statements during
22 his deposition. How did you arrive at that?
23 A.        Well, I explained that in my report.
24 Dr. Zaloga said in his deposition that medical care

1  provided outside of a jail isn't necessarily more
2  expensive -- is not necessarily more expensive than
3  medical care provided for an inmate outside the jail,
4  and the reality is that it is more expensive to take
5  people out of the jail probably because you have to
6  escort them with at least two officers. That's one
7  thing and, secondly, because the people who provide
8  the outer care -- outside the jail care are people who
9  are not on the CCI payroll and there's going to be a
10 substantial medical expense for those individuals to
11 render their care to the patient.
12         So, consequently, it's well known that
13 medical care outside of a jail is more expensive than
14 medical care inside of a jail, and to say that it's
15 not necessarily more expensive is a misrepresentation.
16 Q.        Did you -- having not reviewed the
17 contract, were you aware that the cost of medical care
18 passed through to Lackawanna County?
19 A.        Well, that's irrelevant to the question
20 asked in the deposition. I'm responding in my report
21 to Dr. Zaloga's response to a specific question in his
22 deposition and I cite that in my report.
23 Q.        My question is are you aware that all
24 costs of medical care at any facility are passed

1  through to Lackawanna County?
2  A.        Well, that doesn't surprise me, but in
3  fact it makes -- it makes it even more of a problem
4  that Mr. Whitehurst would be allowed to get as sick as
5  he got because the taxpayer is going to pay for that.
6  The county is going to pay for it; and when you
7  monitor people and don't let them get deathly ill in
8  the jail, then the taxpayers don't -- are not faced
9  with a massive medical bill to the hospital.
10 Q.        Okay. Did you note that you reviewed
11 the Lackawanna County Prison medical records in your
12 chart -- or in your report?
13 A.        I'd have to look at the report to
14 see. Yes, it's right here (indicating). Oh, that's
15 CMC.
16 Q.        Those are CMC records. I'm talking about
17 the Lackawanna County Prison medical chart.
18 A.        I don't see it mentioned on the list.
19 Q.        Why is that?
20 A.        I cannot tell you. As I said, I reviewed
21 that list, that stack of records, but -- and perhaps
22 that's a secretarial error that I missed that on the
23 document, but the documents came in and -- in fact, I
24 think I may have asked the attorney for a list of the

1  documents he had sent to me, but that's basically a
2  clerical error.
3  Q.        Okay. So it's a mistake in your report
4  that you didn't include that in the --
5  A.        Yeah. The record is a mistake. As I
6  said, I reviewed those documents.
7  Q.        Who typed the report? Did you dictate
8  it?
9  A.        I dictate it. In fact, it's typed in
10 England. I have a service that I work with. I type
11 it up. It goes on the internet to a location and
12 comes back to me typed up, and I then review it
13 thoroughly and typically edit it and spend a lot of
14 time trying to make certain that it's accurate.
15 Q.        Okay. And, in trying to make certain
16 that it was accurate, did you take into consideration
17 psychiatric records?
18 A.        Well, we've talked about that and, as I
19 said, that is not reflective of what I now know to be
20 true. There are some records that are psychiatric.
21 Q.        But the fact that there are psychiatric
22 records and that Dr. Mallik saw the patient every two
23 days along with the nurse, that doesn't change your
24 opinions in any way in your report?

16 (Pages 58 - 61)

Page 62

1 A.      Well, as I've said to you, you can take
2 that word psychiatric out as having -- I would take
3 away the statement there was no psychiatric records.
4 That would be the change in the report.  That would be
5 the change.  So, yes, there would be a change.  I
6 would delete psychiatric from the items that are not
7 addressed in that time period from the 28th through
8 the 8th of June.
9 Q.      What else would you delete?  Anything
10 else you would delete in your report based upon the
11 Dr. Mallik records and orders?
12 A.      Well, you pointed out that there are
13 nursing notes there, nursing records, that section
14 that -- of scribble that you pointed out apparently.
15 Well, as a matter of fact, those are -- you're saying
16 those are Mallik's records.  So I don't think I'd
17 change anything else in my report.  There's nothing
18 else I would change.
19 Q.      Okay.  When you drafted your report, were
20 you under the impression that Dr. Mallik had not seen
21 Mr. Whitehurst at all?
22 A.      I knew he had seen Mr. Whitehurst because
23 it's documented he had seen him before the 28th.  He
24 had seen him when he was in the restraint chair.  So

Page 63

1 certainly there was some documented interactions
2 between the psychiatrist and Mr. Whitehurst.
3 Q.      So you would agree with me then that you
4 were aware that Dr. Mallik had seen Mr. Whitehurst at
5 some point?
6 A.      Well, I just said to you that.
7 Q.      Okay.  And the reason that Mr. Whitehurst
8 was under the care of Dr. Mallik was because of detox
9 from spice and perhaps psychiatric problems causing
10 his behavior?  Is that your understanding?
11 A.      When you say, "under the care of," what
12 do you mean by that?  Under the psychiatric care of?
13 Is that what you're saying?
14 Q.      Under the care of that due to his
15 detoxing and underlying psychiatric condition that his
16 care was referred to Dr. Mallik.
17 A.      No, I wouldn't characterize it that way.
18 Q.      How would you --
19 A.      Detox -- the detox involves physical
20 changes.  Oftentimes it can cause blood pressure
21 changes.  It can cause pulse changes.  Detox can be
22 physically even injurious on an individual.
23 Dr. Mallik made it abundantly clear that he was not
24 addressing any of those issues.  He was not addressing

Page 64

1 this man medically.  His issues were his psychiatric
2 condition.
3         So I wouldn't say that Mr. Whitehurst was
4 under the care of Dr. Mallik.  He was under the
5 psychiatric care; but with respect to his blood
6 pressure, his pulse, his weight change, his state of
7 hydration, I didn't see really anyone addressing those
8 issues, certainly not during that time period between
9 the 28th of May and the 8th of June.
10 Q.      I'm sorry, Doctor.  In going to again the
11 last page of your report, in the top paragraph,
12 "Further I found that the medical records indicate
13 that Mr. Whitehurst had no medical or nursing
14 evaluation or treatment during the eight-day period
15 prior to his hospitalization on July 9th, 2015."  Is
16 that correct?
17 A.      Yeah, no nursing evaluation during that
18 eight-day period that I could see any evidence of.
19 Q.      How about medical?
20 A.      And he had psychiatric evaluation, not to
21 be confused with medical, as per Dr. Mallik's
22 description.  Medical evaluation, as I've said before,
23 that addresses hydration.  It addresses blood
24 pressure.  It addresses pulse rate.  It addresses

Page 65

1 ambulation.  It addresses a variety of things that
2 Dr. Mallik told us he wasn't particularly concerned
3 about.
4 Q.      Okay.
5 A.      He made it very clear that he was not a
6 medical provider there.  He was a psychiatric
7 consultant.
8 Q.      So you make a distinction that medical
9 care isn't psychiatric care, that they're two
10 different things?
11 A.      He made that distinction.
12 Q.      Okay.  Do you make that distinction?
13 A.      Well, I have to follow what he is
14 describing as with respect to his role.
15 Q.      Do you make the distinction between
16 medical care and psychiatric care?
17 A.      Well, in this case, yes, because of the
18 situation in which we're dealing and because of what
19 the individual, Dr. Mallik, has stated.
20 Q.      Did -- do you make a distinction between
21 medical records and psychiatric records?
22 A.      What do you mean by a distinction?
23 Q.      Well, earlier in your deposition, you
24 said those aren't medical records.  They're

17 (Pages 62 - 65)

Page 66

1 psychiatric records. Is it your opinion that
2 psychiatric records aren't medical records?
3 A.      Well, that's not my opinion necessarily,
4 not my opinion; but as I said to you, there are some
5 psychiatric records that you pointed them out. They
6 were written in an undecipherable way. You've shown
7 me the subsequent transcript. So there are
8 psychiatric records there.
9 Q.      Are psychiatric records medical records?
10 A.      They are a type of medical record; but to
11 Dr. Mallik's description, he is providing a different
12 kind of care, not medical care, but psychiatric care.
13 Q.      In your opinion, is a psychiatric
14 progress record and corresponding physician orders --
15 are they medical records?
16 A.      Not for this case, no. Not as described
17 by Dr. Mallik, no.
18 Q.      So psychiatric progress records and
19 psychiatric physician's orders are not, in your
20 opinion, medical records?
21 A.      We're splitting hairs here and, as I said
22 to you before, I'm making my statement based on what
23 Dr. Mallik stated in his deposition that my opinion --
24 my overall opinion about what is medical and what's

Page 67

1 psychiatric and how they fit in different umbrellas, I
2 don't view that as relevant and I'm not going to give
3 you an opinion on that. I'm referring to what
4 Dr. Mallik said. He made a distinction here and, by
5 his distinction, the records that are in the record
6 are psychiatric.
7      There's no medical record, no
8 nonpsychiatric medical record, in the notes between
9 the 28th and the 8th, nothing from a doctor, nothing
10 from a nurse-practitioner, nothing from a physician's
11 assistant that's not psychiatric; and psychiatric
12 doesn't address heart, lungs, blood pressure,
13 dehydration, et cetera, et cetera.
14 Q.      In Dr. Mallik's transcript, did you see
15 where he said if there was something going on, if this
16 gentleman were seriously ill, that he would have made
17 Medical aware? Did you see that?
18 A.      I saw that, yes.
19 Q.      Okay. So that puts some responsibility,
20 hey, if there's something going on with this guy, I'm
21 going to tell Medical. He took on that
22 responsibility, did he not?
23 A.      He did not. The deposition transcript
24 may say that.

Page 68

1 Q.      It does say that.
2 A.      Yeah. Well, the reality is that the man
3 was deathly sick for days before he went to the
4 hospital or he wouldn't have been so badly ill. So I
5 read that in the transcript, but that doesn't -- that
6 doesn't refute the reality of the man's condition when
7 he got to the hospital.
8 Q.      So you simply discounted it?
9 A.      I discounted it. Of course.
10 Q.      Okay.
11 A.      It doesn't make any medical sense.
12 Q.      And same with Nurse Moritzkat, in
13 reviewing her transcript, did she say, hey, if there
14 was something acutely wrong with this guy or something
15 serious going on, certainly I would make Dr. Zaloga
16 aware?
17 A.      There was something acutely wrong with
18 him.
19 Q.      Okay. And if there were -- so you
20 discount her testimony as well?
21 A.      I'm basing that statement on the reality
22 of the man's condition.
23 Q.      Okay. But I'm --
24 A.      And the fact that I've been a doctor

Page 69

1 45 years. That doesn't happen to get in that
2 condition in a matter of a day.
3 Q.      Okay. Have you reviewed the defense
4 expert reports in this matter?
5 A.      I have.
6 Q.      Okay. Did you review Dr. Folks's
7 opinion?
8 A.      I did.
9 Q.      Okay. Do you agree with them?
10 A.      Of course not.
11 Q.      Okay. What -- what do you disagree with
12 in Folks's opinions?
13 A.      Well, Dr. Folks takes the position that
14 the absence of policies is really not a problem. In
15 fact, it's probably a good thing because policies can
16 sort of delay a person getting the treatment they
17 need. To me that makes about as much sense as saying
18 that you don't really need to have a driver's license.
19 You're a reasonable individual. Go ahead and take the
20 wheel. You can drive across country. What do you
21 need a license for? And we will give you a license if
22 you purchase it, but why do we have to test you? Why
23 do we have to have any policies? Why do we have to
24 see that you know any rules?

18 (Pages 66 - 69)

**Page 70**

1 You know, to me the absence of any kind
2 of policy and the policy of each person does what they
3 think is reasonable is a recipe for disaster. If I
4 had that same policy on the highway, you might think
5 it's reasonable to go 100 miles an hour. I might
6 think it's reasonable to go 25 on the highway. I mean
7 we can't let people just do what they think is
8 reasonable.
9 We need some guidelines, and there were
10 no guidelines for these individuals working for CCI
11 and that is the problem because you have individuals
12 -- nurses with little experience, nurses who are sort
13 of the low people on the medical totem pole without
14 guidance.
15 Now, he may think that's okay, but you
16 couldn't pay me enough to say that in my report
17 because I know that's not okay; and that's why the
18 National Commission has standards, required standards,
19 expected standards that a jail should have that guide
20 the care given by medical providers; and I think that
21 if such were the case in the case of CCI, this man
22 wouldn't have gone for eight days with no nursing
23 notes, no vital signs, no documentation of his
24 physical condition because it would have been a

**Page 71**

1 violation of the rules of the facility, but there were
2 no rules.
3 Q. Do policies and procedures replace
4 clinical judgment?
5 A. Of course not.
6 Q. Okay. What else do you take issue with
7 in Dr. Folks's report?
8 A. Well, I don't have his report before me.
9 If you'd like to show me, I can make the comment -- I
10 can make further comments.
11 Q. Yeah, sure.
12 MR. PARKINS: Jodi, do you need a copy?
13 I have one.
14 MR. HEALEY: Yeah, if you don't mind.
15 BY MR. HEALEY:
16 Q. Just generally, Doctor. You don't have
17 to --
18 A. Yeah, sure.
19 Q. Yeah. We don't have to do it line by
20 line. I'm just looking large picture your
21 essential -- your disagreements with Dr. Folks's
22 opinions.
23 A. Well, on page 28 of his report, Dr. Folks
24 disagrees with Dr. Joy and that Dr. Joy has made the

**Page 72**

1 statement that Mr. Whitehurst had not been eating. He
2 takes offense -- takes opposition of that, stating
3 that it's documented that he refused 5 meals of the
4 more than 45 meals served. Well, to me, the fact that
5 he was not eating is pretty obvious. I mean he became
6 so cachectic, as they described in the hospital.
7 So when a person doesn't consume adequate
8 nutrition in a jail, then we take action to get them
9 out of the jail to a place where they can be given
10 intravenous hydration, intravenous nutrition and -- so
11 this is something that Dr. Joy I think appropriately
12 addressed and he took issue with.
13 Q. If I could stop you there, the --
14 THE VIDEOGRAPHER: Counsel, your
15 microphone.
16 MR. HEALEY: Oh.
17 BY MR. HEALEY:
18 Q. The watch logs document all of the meals
19 eaten by Mr. Whitehurst during that timeframe and any
20 time it was refused. Did you -- you didn't review
21 those, however?
22 A. As I said, I saw the watch logs. I
23 didn't study them.
24 Q. Okay.

**Page 73**

1 A. Yep.
2 Q. So do you rely on any written
3 documentation to say that he was not eating?
4 A. The written documentation from the
5 hospital calls him cachectic and that's medical speak
6 for wasted. You don't get wasted if you're eating as
7 you should eat. You only get wasted if your calorie
8 intake is insufficient.
9 Q. So, looking back, we're arriving at the
10 conclusion by virtue of the Geisinger records as
11 opposed to what's in the watch logs; correct?
12 A. The Geisinger records that were taken
13 upon his arrival from the jail.
14 Q. Okay. Anything else generally in
15 Dr. Folks's report that you take issue with? We
16 talked about policies and procedures. We talked about
17 meals. Anything else?
18 A. Nothing specific that I can --
19 Q. Okay.
20 A. -- comment on at this point.
21 Q. Thank you.
22 A. Sure.
23 MR. HEALEY: Doctor, I think those are
24 all the questions I have for you. Some of the other

19 (Pages 70 - 73)

Page 74

1 lawyers may have some.
2          THE WITNESS: Sure. Thanks.
3          MR. HEALEY: Thanks.
4          MR. FRANCIS: Do you want to switch over
5 to the other tape?
6          THE VIDEOGRAPHER: The time is now 10:55.
7 This ends media unit one.
8          (A brief recess was taken.)
9          THE VIDEOGRAPHER: The time is now 10:57.
10 This begins media unit number two.
11          - - -
12          EXAMINATION
13 BY MR. FRANCIS:
14 Q.     Good morning, Doctor. My name is
15 Christian Francis.
16 A.     Good morning.
17 Q.     And I represent Dr. Mallik in this case.
18 My colleague was very thorough here. So I'm going to
19 try not to be too redundant but --
20 A.     Sure.
21 Q.     -- let's start with a few
22 generalizations. I assume you've been an expert
23 before in a legal matter?
24 A.     That is correct.

Page 75

1 Q.     Okay. Would you agree generally that the
2 purpose of your job as an expert is to review the
3 records and whatever other documents are provided to
4 you and formulate opinions based on what is provided?
5 A.     Yes.
6 Q.     And, if something isn't provided to you,
7 then you can't consider that in making your opinion?
8 A.     Well, if it's not provided, I can't
9 consider it. That's correct.
10 Q.     Obvious; right? So, with that said,
11 would you agree that it's important for you to receive
12 all the relevant documents in a case?
13 A.     Well, relevant documents I think
14 sometimes happen over time. For example, depositions
15 are relevant, but oftentimes a report is written
16 before a deposition is done. So it's impossible to
17 get those records before one writes a report.
18 Q.     Understood, and I appreciate that
19 clarification because that is a good point. As
20 another generalization, would you agree that all the
21 opinions that you have in this matter are contained in
22 your report, which I believe is I think nine pages?
23 A.     I would not agree with that.
24 Q.     Okay. So what opinions do you have that

Page 76

1 aren't contained in the report?
2 A.     Well, I have the opinion that the
3 relationship that I saw from my readings, including
4 the depositions that I read after this report, lead me
5 to conclude that CCI had a relationship with the
6 Lackawanna County based on statements made in
7 2008 and promises and commitments that were not met;
8 and there were descriptions, for example, about the
9 important role of the National Commission on
10 Correctional Health Care. There's a report card for
11 quality of medical care and a statement of the intent
12 to exceed those standards and it's clear that it was a
13 matter of what was in effect bait-and-switch and
14 nothing along that line was done.
15          And so that's an opinion that I have that
16 the contract was -- by Dr. Zaloga's deposition
17 transcript, it was entered in conjunction or around
18 time of statements made about what would be done or
19 what would be achieved by CCI; and when we assess the
20 condition of the status of those achievements at the
21 time of the deposition, which I think was 2018, none
22 of those things were done. That's important.
23          It's also my opinion that the losers in
24 that game are the taxpayers, the public, because when

Page 77

1 people are being treated in a jail without any
2 policies and when a medical group promises to develop
3 a set of guidelines to provide for all things that
4 Dr. Zaloga described that the NCCHC does when he
5 talked about it in 2008 and then the absence of those
6 things, things happen that are preventable. People
7 like Whitehurst go to the hospital deathly ill and
8 someone's got to pay for that and that's the
9 taxpayers. That's an opinion of mine.
10 Q.     Okay. And, if I understand you
11 correctly, that information was gleaned from
12 Dr. Zaloga's deposition transcript?
13 A.     In large part, yes.
14 Q.     Okay. Do you recall what other documents
15 you reviewed that led you to those opinions?
16 A.     To that opinion? Well, to the opinion
17 that CCI engaged in one set of communications in 2008
18 describing what they would achieve and then at a later
19 time acknowledged having done none of it, that was I
20 would say exclusively from Dr. Zaloga's deposition.
21 Q.     Okay. And that leads me to my next
22 question because I'm a little curious because you had
23 Dr. Zaloga's deposition transcript prior to authoring
24 the report dated December 18, 2018, but that

20 (Pages 74 - 77)

Page 78

1  information was not -- that information and that
2  opinion was not included in this report. Do you know
3  why you didn't include that?
4  A.        Sure. Because further thinking on this
5  and further reviewing of this -- I've continued to
6  review this material since that report was written,
7  and this is actually a larger opinion than the
8  opinions stated in the report. The opinions in the
9  report are largely about Whitehurst and whether his
10 treatment was appropriate, but on a larger sense this
11 isn't just about Whitehurst. This is about the way
12 the jail was run and the way the public was served or
13 not served.
14 Q.        And then I'll just go back to, you know,
15 you've been an expert before. You're aware that, you
16 know, what you include in these reports is --
17 essentially the purpose of it is to tell the other
18 side what you're going to testify to. You understand
19 that?
20 A.        No, I don't understand that necessarily.
21 I don't -- it's not my opinion that the report limits
22 my opinions. Is that what you're saying?
23 Q.        Well, let me just back up then. What is
24 the purpose of serving an expert report, in your

Page 79

1  understanding?
2  A.        Well, the report is to give opinions
3  based upon review of information.
4  Q.        Okay. Can we agree, in this case at
5  least, you were not physically present for any of the
6  care provided to Mr. Whitehurst?
7  A.        We can agree to that.
8  Q.        So, therefore, I think it's pretty clear
9  that your opinions are based on, again, the documents
10 you reviewed, the medical records you reviewed, and
11 then any -- you know, when I say documents, I mean
12 transcripts as well as depositions; correct?
13 A.        We can agree to that.
14 Q.        Now, I know Attorney Healey went over
15 there already; but the documents listed on page 2 of
16 your December 18, 2018 report, is that everything you
17 reviewed for this case?
18 A.        Well, as Attorney Healey pointed out,
19 it's not an exhaustive list because the medical
20 records of Lackawanna County Jail apparently was not
21 on the list.
22 Q.        Okay.
23 A.        You heard that testimony.
24 Q.        I did, correct. I wanted just to clarify

Page 80

1  and make everything kind of simple for myself.
2  A.        Sure.
3  Q.        So outside of the -- those records
4  anything else that you can think of that you reviewed
5  that are not listed for whatever reason on page 2?
6  A.        There's nothing else that I can think of,
7  no.
8  Q.        Now, if you can take a second, you have a
9  copy of your report in front of you; correct?
10 A.        I do.
11 Q.        There was some discussion of this, but I
12 wanted you to specifically point out anywhere you
13 reference Dr. Mallik's deposition in your report. So
14 if you can just take a second to review that because I
15 know there's specific references to Dr. Zaloga's
16 deposition transcript, but I didn't see any for
17 Dr. Mallik. So if you want to take a second to look
18 over that.
19 A.        (Witness complies.) I did look over this
20 at the beginning of this deposition, and at that time
21 I did not see a reference to Dr. Mallik's deposition
22 testimony --
23 Q.        Okay.
24 A.        -- in my transcript, in the actual report

Page 81

1  itself.
2  Q.        What we could do, Doctor, is I'll move
3  along and, if you happen to come across something as
4  we're talking about the report or something jogs your
5  memory, you can certainly point it out to me. Is that
6  fair?
7  A.        That's fair.
8  Q.        Now, I believe there was testimony
9  that -- quite exhaustive that the progress notes that
10 were handwritten from Dr. Mallik you said were
11 illegible. You couldn't read them?
12 A.        That's correct.
13 Q.        Is it also safe to say that if you can't
14 read something, whether it be a record or whatever,
15 you can't formulate an opinion based on that because
16 you can't rely on any of the information that's
17 contained in that?
18 A.        Cannot formulate an opinion based upon
19 something that's illegible.
20 Q.        Correct. Do you recall -- I believe you
21 said that you may have reviewed the deposition
22 transcript of Dr. Mallik. Do you recall any of the
23 exhibits attached to that?
24 A.        Let me ask you to hold on just a moment,

21 (Pages 78 - 81)

Page 82

1  please.
2  Q.        Sure.  No problem.
3  A.        If I may, on page 5 of my report, in
4  response to your earlier question --
5  Q.        Sure.
6  A.        -- there's a statement here that I don't
7  directly attribute to Dr. Mallik's deposition, but I'm
8  certain that this information came from his
9  deposition.
10         It says in the second full
11  paragraph, "Dr. Mallik only saw inmates who were
12  referred to him by a nurse, a corrections officer, or
13  who were self-referred."  That information came from
14  my review of his deposition.  That's by his
15  description.  That's how people got to see him.
16  Q.        Okay.  Thank you for that.
17  A.        Sure.
18  Q.        So let's go back.  I think the last
19  question was regarding his deposition and whether or
20  not you recalled any of the exhibits that were
21  attached to that deposition, Dr. Mallik's.
22  A.        Do I recall the exhibits attached?  No, I
23  don't recall the exhibits attached.
24  Q.        Okay.  I'll represent to you that

Page 83

1  Exhibit 3 of that deposition transcript was the
2  progress notes of Dr. Mallik, the ones that you had
3  reviewed that you said were ineligible -- or
4  illegible?
5  A.        Yes.
6  Q.        And also behind that were typed notes.
7  Essentially what they were was the reproduced progress
8  notes so that people could read them --
9  A.        Yes.
10  Q.        -- because you couldn't read his
11  handwriting.  Do you recall reviewing those?
12  A.        I don't recall reviewing them.  No, I
13  don't specifically recall, but I may have reviewed
14  them.  I expect that I did when I read his deposition.
15  Q.        Would you agree that in the handwritten
16  progress notes that you weren't able to read that some
17  of the information in there could have affected what
18  some of your opinions were?
19  A.        Yes.  I've already addressed that with
20  the earlier attorney.  I pointed out that my reference
21  to the absence of any psychiatric note between the
22  28th of May and the 8th of June, I think that should
23  be amended be removed because there are some
24  psychiatric notes that have been typed up that I now

Page 84

1  can see were representing something recorded by the
2  psychiatrist.
3  Q.        Okay.  And I appreciate that
4  clarification.  I'll go right to the next sort of
5  question I have about that, and I think I know the
6  answer; but you're very careful with your wording in
7  your report and I think that when you talk about
8  medical care, nursing care, and psychiatric care,
9  you're doing that on purpose; correct?
10  A.        I'm doing that on purpose based upon the
11  distinctions made by Dr. Mallik in his deposition.
12  Q.        Okay.  So parts where you say -- for
13  instance, on page 3, "The absence of medical care from
14  May 28th, 2015 through June 8th was below the standard
15  of care," et cetera, et cetera, you're referring only
16  to the medical care?
17  A.        I'm referring to the medical care.  I'm
18  not a psychiatrist and I don't hold myself out to be
19  able to evaluate psychiatric care.
20  Q.        Okay.
21  A.        I'm a medical doctor.  I was a medical
22  director of a jail for 21 years.  I'm board certified
23  in internal medicine and addiction medicine and
24  occupational medicine and was board certified in

Page 85

1  emergency medicine for 30 years.  So that's my
2  background.  I'm not a psychiatrist.
3  Q.        Okay.  And I appreciate that because that
4  was going to be one of my questions as well.  So we're
5  doing pretty good here.  With that said, have you ever
6  been an expert in a case where you've been asked to
7  opine as to psychiatric care that was provided?
8  A.        I would not opine -- not intentionally
9  opine on psychiatric care.
10  Q.        Okay.  And going back, I think I meant to
11  ask this earlier; but you agreed that you weren't
12  physically present for any of the care in this case,
13  but you did make a statement at some point in your
14  testimony that it was your opinion that Mr. Whitehurst
15  was obviously sick for days prior to I believe
16  June 8th.  Do you remember saying that?
17  A.        Something to that effect.  Do you mean in
18  my report or in this deposition?
19  Q.        In this deposition.
20  A.        Yes.
21  Q.        Okay.  But I think we can agree that you
22  don't know for sure.  You're just going based off your
23  experience and what's in the medical records and
24  you're drawing that conclusion, but you're not sure

22 (Pages 82 - 85)

Page 86

1 for certain whether he was sick for an hour or 10 days
2 or 10 months?
3 A.        Oh, I'm certain he wasn't sick for just
4 an hour.
5 Q.        Okay.
6 A.        And the reality is that certain things in
7 the human body are fairly consistent. You don't -- a
8 baby isn't born in an hour. It takes nine months.
9 There are certain things that take certain lengths of
10 time. This man was very sick. You don't get -- you
11 don't lose weight and get cachectic in 24 hours.
12 There are things that he had. His rhabdomyolysis, his
13 dehydration, those things take a while to develop and
14 he wasn't -- he wasn't in a setting where those things
15 would have been recognized as they should have been.
16        That's a part of the issue here that he
17 was allowed to progress to an extreme state that
18 resulted in a long, extensive hospitalization and that
19 didn't just happen in 24, 48 hours.
20 Q.        I think one of the statements you said
21 before as well -- and correct me if I'm wrong; but you
22 said, regarding medical records, what's documented is
23 what's done. Do you recall saying that?
24 A.        I think I said what's not documented

Page 87

1 wasn't done is what I believe I said but --
2 Q.        I think it works both ways; right?
3 A.        Well, not necessarily but --
4 Q.        If you could explain that.
5 A.        That's debatable.
6 Q.        Okay. In your career, have you ever had
7 a situation where -- you know, I believe you said you
8 worked in emergency services; correct?
9 A.        That's correct.
10 Q.        Where every single thing that's done
11 wasn't documented?
12 A.        No one can ever document every single
13 thing they do. If I did that, I'd be documenting
14 every eye blink. So you do what -- you document what
15 matters.
16 Q.        Okay.
17 A.        And interacting with a patient or talking
18 with a patient matters. Seeing a patient's state of
19 alertness matters. Checking the blood pressure
20 matters. There's a variety of things of course that
21 we -- standards that we document in healthcare.
22 Q.        So the medical professional, whether it's
23 a nurse or a doctor, has to use some professional
24 judgment in that respect?

Page 88

1 A.        That's correct. Well, use professional
2 judgment, but still there's certain things that are
3 standard.
4 Q.        Sure. I think you made the statement --
5 and, again, I might be paraphrasing, but you said
6 something along the lines the medical record stands
7 for itself. Would you agree then if you couldn't read
8 a medical record that you couldn't necessarily reach a
9 conclusion about what type of care was provided; is
10 that correct?
11 A.        I would agree with that, yes.
12 Q.        Would you agree that a person's status
13 going through detox can affect their mental status?
14 A.        Yes.
15 Q.        And I wanted to skip to the final page of
16 your report, the second paragraph. You state that,
17 "Amir Whitehurst suffered through the neglectful
18 medical, nursing, and psychiatric services at
19 Lackawanna County Jail until he developed severe
20 life-threatening medical conditions." Do you see
21 that?
22 A.        I do.
23 Q.        Everything we've talked about so far and
24 considering the fact that you weren't able to review

Page 89

1 the progress notes and the psychiatric records of
2 Dr. Mallik, would you want to change that statement at
3 all?
4 A.        I would not change that statement
5 because, as I've said before, a doctor -- a
6 psychiatrist seeing a patient 48 hours before this --
7 before a patient is in the condition that
8 Mr. Whitehurst was in would have to be neglectful not
9 to say this person is not well. You don't get that
10 sick so fast as to be normal appearing 48 hours before
11 you come to the hospital with all the problems that
12 were described by the Geisinger Hospital staff.
13 Q.        Okay. Would it be safe to say then, at
14 least in respect to the psychiatric care, that you're
15 basing your opinion on the result of what happened to
16 Mr. Whitehurst?
17 A.        That would be fair.
18 Q.        Doctor, have you had an opportunity to
19 review the expert reports of Dr. Zurad?
20 A.        I've reviewed several defense expert
21 reports. I don't recall that name. Spell that name,
22 please. Spell it.
23 Q.        Zurad, Z-U-R-A-D.
24 A.        Yes, I read that report.

23 (Pages 86 - 89)

Page 90

1  Q.         Okay.  Do you have a copy with you?
2  A.         I do not.
3         MR. PARKINS:  I have copies.
4         MR. FRANCIS:  You have copies?  Can you
5  provide him one?
6         MS. FREILER:  I can get copies also if we
7  need -- if anyone else needs one.
8  BY MR. FRANCIS:
9  Q.         Now, this is an extensive report.  I
10  believe it's 33 pages.  So we're not going to go
11  through each page; but, if you can, Doctor, what
12  criticisms do you have of Dr. Zurad's opinion
13  contained in his expert report, if any?
14  A.         I have to look at this report more
15  closely.
16  Q.         Sure.
17  A.         I've read it before.  I don't think I
18  made a specific reference as to any problems with it.
19  This is a psychiatrist evaluating a psychiatrist.  I'm
20  not a psychiatrist.
21  Q.         No.  Dr. Zurad is actually an internal
22  medicine doctor.
23  A.         I'm thinking of another -- one of the
24  other experts.

Page 91

1  Q.         Yeah.  That's Dr. Williams.
2  A.         Sure.  Do you want me to take 15 minutes
3  to take a look at this?  I'll be happy to.
4         MR. FRANCIS:  Yeah.  We can go off the
5  record.
6         THE WITNESS:  Sure.
7         THE VIDEOGRAPHER:  The time is now 11:17.
8  Going off the video record.
9         (A brief recess was taken.)
10         THE VIDEOGRAPHER:  The time is now 11:42.
11  We are back on the video record.
12  BY MR. FRANCIS:
13  Q.         Thank you for taking that time, Doctor,
14  to review that extensive report.  As a little
15  housekeeping, can I just ask if that last phone call
16  that you took was related to this case?
17  A.         Totally unrelated.
18  Q.         Okay.
19  A.         Totally unrelated.
20  Q.         Okay.  No problem.  I have to ask.  So,
21  Doctor, going back to Dr. Zurad's report, what
22  criticisms do you have of the opinions he expressed?
23  A.         Well, in about 20 minutes, I took a quick
24  look through Dr. Zurad's 33-page report here and some

Page 92

1  sections of the report are just verbatim quotes from
2  depositions, but there are many things in this report
3  that I take issue.  If you'd like me to detail them, I
4  can go through them.
5  Q.         Yeah.  If you just point out the
6  important ones that you think you have issue with, I
7  would appreciate that.
8  A.         On page 6 of Dr. Zurad's report, he says,
9  last paragraph, "Dr. Mallik noted that he had traveled
10  through the prison with other professionals.  He does
11  not see any patients alone," and then further down he
12  says, "Accompanied by a corrections officer as well as
13  an LPN who's documenting any orders that he may
14  initiate."
15         Well, the nursing boards do not consider
16  LPNs to be professionals.  R.N.s are considered
17  professionals, but LPNs are not.  So that's really not
18  an appropriate reference to an LPN.  The doctor is
19  traveling with a medical staff member, but that's
20  not -- certainly not a professional of equal standing,
21  but not really a professional at all as regarded by
22  nursing boards that I've read comments from.  So I
23  consider that a misrepresentation.
24         Looking at page 8, so on page 8 I don't

Page 93

1  really take issue with this.  It's just an informative
2  list that he has here of all the documented diagnoses
3  that Mr. Whitehurst had while he got to the medical
4  center, and I mean this exhaustive list sort of echoes
5  the fact that he didn't get all this in 24 hours.  I
6  think the doctor has listed about 15 different issues
7  here, some of which are not acute, but many of which
8  are acute, many of which were reasons for his
9  admission.
10         Now, on page 10 -- and this is from
11  Dr. Mallik's deposition.  This is a quote.  He says,
12  "I do not see this as a matter for the nursing staff
13  controlling the number of the patients that are seen.
14  I see this as a matter of a professional thing that
15  anybody that needs to be seen, they get seen."
16         Well, that's what Dr. Mallik stated in
17  his deposition, but it's not really true and it's not
18  true because people come into the jail.  As this is
19  set up, as he's describing, they get seen by a
20  psychiatrist if they ask for a psychiatrist, if they
21  are seen by staff members to be in need of psychiatry;
22  and I think those are the only two ways, but the
23  problem is the staff members who are seeing him have
24  no psychiatric training.

24 (Pages 90 - 93)

Page 94

1        So if you come into this jail and you
2   don't think you need psychiatric care and the
3   untrained nurses don't think you need psychiatric
4   care, you don't get any psychiatric care. That's
5   really below the standard of care. The standard
6   should have a psychiatrically trained person, be it a
7   psychiatric social worker or a psychiatrist, someone
8   screening the patients at or about the time of their
9   admission.
10       By this jail standard, a person coming
11  into the jail who a trained person would recognize as
12  needing care -- but if an untrained person doesn't
13  recognize this and the patient doesn't ask for it,
14  they don't get any care the whole time they're there.
15  They don't get any psychiatric attention.
16  Q.       Can I ask for a clarification on that?
17  Is it your position that nursing staff cannot be
18  trained to provide psychiatric care?
19  A.       No. It's my position that these nursing
20  staff were not trained, as Dr. Zaloga told us in his
21  deposition.
22  Q.       Okay. So you're basing that off what
23  Dr. Zaloga said in his deposition. Is there anything
24  else that you reviewed that says that they weren't

Page 95

1   trained to --
2   A.       I can't tell you if there's anything else
3   or not, but Dr. Zaloga is the principal of the
4   company. I would think he would know what his staff
5   members have been trained in; and I would think if
6   they were trained, he wouldn't hesitate to tell us
7   that.
8   Q.       Okay. Fair enough.
9   A.       Let's look at page 16. So Dr. Zurad says
10  that, "Despite the frequent and regular direct
11  observations made by Dr. Mallik, Mr. Whitehurst became
12  ill without any outward manifestation of physical
13  illness or injury. There were categorically no
14  displays or appearances of evolving systemic disease.
15  There were certainly no indicators of deterioration
16  that would suggest any changes in Mr. Whitehurst's
17  general state of health."
18       I mean that's not medically believable.
19  When you look at how this man -- this man's condition
20  when he got to the hospital, I mean I can't fathom how
21  someone could write he's perfectly fine until the
22  moment that he got sick and was sent to the hospital.
23       Further down on the same page, "In
24  addition, Nurse Moritzkat noted that any prisoner

Page 96

1   showing acute signs or symptoms of a medical disorder
2   would be referred to sick call with Dr. Zaloga." I
3   don't know how often Dr. Zaloga came to the jail. I
4   don't know how often he came. I may have known at one
5   time but, secondly, according to another nurse's
6   deposition, Dr. Zaloga did not want to be bothered,
7   did not want to be called, so she stated in her
8   deposition. So I'm not so certain there would be a
9   quick call given out at the point of concern. Let's
10  look at page --
11  Q.       Can we just stop right there?
12  A.       Sure.
13  Q.       I just want to back up to the statement
14  about Dr. Mallik. So again, just to clarify, because
15  I think you said it before, your conclusions about the
16  care provided by Dr. Mallik, the psychiatric care,
17  they're based on essentially the result of what
18  happened to Mr. Whitehurst because, again, we talked
19  about you didn't know what was contained in the
20  progress notes. That's still -- that's what you're
21  referring to when you're reciting this statement by
22  Dr. Zurad?
23       THE WITNESS: Could you read that
24  question back to me, please?

Page 97

1        MR. FRANCIS: I'll just clean it up.
2        THE COURT REPORTER: Sure.
3        MR. FRANCIS: Why don't we do that.
4   BY MR. FRANCIS:
5   Q.       So your criticisms of that statement by
6   Dr. Zurad on page 16, again, they're not based on
7   knowing what the content of the psychiatric care was
8   during that time period because you didn't know that;
9   correct?
10  A.       As I said to you before, I'm not
11  addressing psychiatric care.
12  Q.       Okay.
13  A.       I'm not a psychiatrist.
14  Q.       Okay.
15  A.       I'm not making any comments about the
16  nature of -- the quality of the appropriateness of
17  psychiatric care.
18  Q.       Okay. So your criticisms of that are
19  based on what you said before, that the state that he
20  was in while he went to -- when he went to Geisinger,
21  you said previously that doesn't happen in a matter of
22  minutes or hours. I think you said several days;
23  correct?
24  A.       My criticism of what?

25 (Pages 94 - 97)

1 Q.        Of what Dr. Zurad says on page 16. And
2 you can clarify it if I'm not saying it exactly how
3 you're thinking it.
4 A.        On page 16 what I'm reading is
5 Dr. Zurad's quote from Nurse Moritzkat's deposition.
6 That's what I'm reading on the bottom of the page on
7 page 16.
8 Q.        Yep. I was talking about the middle of
9 the page.
10 A.        Okay. So he says, "Despite the frequent
11 and regular direct observations made by Dr. Mallik,
12 Mr. Whitehurst became ill without any outward
13 manifestations of physical illness or injury. There
14 were categorically no displays or appearances of
15 evolving systemic disease. There were certainly no
16 indicators of deterioration that would suggest any
17 changes in Mr. Whitehurst's general state of health."
18        Yes, I take issue with that. People
19 don't suddenly get cachectic. People don't suddenly
20 get in the state this man was in when he went to the
21 hospital and that's what is being stated here. That
22 doesn't make any medical sense. I think lay people
23 can see that, too. I don't think you have to be a
24 doctor to know that a person doesn't suddenly get

1 dehydrated or suddenly get wasted with muscle loss and
2 other manifestations of cachexia.
3 Q.        Okay. And so your disagreement with that
4 statement again is based on the results of what
5 happened to Mr. Whitehurst?
6 A.        Of course.
7 Q.        Okay. And, again, it's not based on the
8 progress notes of Dr. Mallik because you didn't review
9 those, the illegible ones; right?
10 A.        Well, it's not based on the progress
11 notes of Dr. Mallik. That's correct.
12 Q.        Okay. I just wanted clarification. I
13 appreciate that, doctor. You can continue.
14 A.        So if we look at page 20 -- well, let's
15 look at page 17. Nurse Moritzkat -- this is not a
16 disagreement. It's an interesting observation. On
17 page 17, middle of the page, in response to the
18 question of, "Are you aware if he was eating," nurse
19 Moritzkat says, "No, I'm not aware if he was eating,"
20 and the response is, "Okay," and then she goes on to
21 say, "We didn't have him on any type of monitoring for
22 that," which fits with my contention. "We did not
23 have him on any type of monitoring for that," that's
24 her statement.

1        So a person who's withdrawing, a person
2 who's mentally not normal, I would think it would be
3 appropriate to do some sort of monitoring of their
4 food intake, and the absence of any type of monitoring
5 for that would help support and help us understand why
6 the man became wasted. Nobody's laundering anything
7 along that line of what she's saying here.
8 Q.        My only question with that, are you
9 also -- are you disregarding then the records that
10 showed what meals he refused?
11 A.        Well, I'm simply reading what Nurse
12 Moritzkat said.
13 Q.        Sure. So you're reading it in a vacuum?
14 A.        You asked me to review this chart and I'm
15 pointing out some details here.
16 Q.        Okay.
17 A.        Turning to page 20, this is a -- this is
18 from Dr. Zaloga's deposition. The question was, "But
19 can you show me anywhere as far as documentation that
20 exists where any CCI staff saw Mr. Whitehurst on
21 May 28th, 29th, 30th, all the way up until June 9th?"
22        His response, "Sure. Well, you don't
23 have the medication administration records in here,
24 but he was seen every day by the nurses who went

1 around passing meds. So you left that out of this
2 binder. If you put the MARs in here, it would show
3 that he was seen at least four times a day." Well,
4 that along with my observation that the medical
5 nurse -- the medical -- the nursing documentation is
6 not there.
7        Looking at page 21, in response to --
8 this is Dr. Zaloga stating. "So does the absence of
9 that notation mean that there's no type of physical
10 examination or diagnostic testing conducted of
11 Mr. Whitehurst during that time period?
12        "Response: No. It means that there is
13 nothing documented.
14        "Question: So maybe it happened, maybe
15 it didn't happen is the best we can do?
16        "Answer: No. The best we can do is, if
17 it was clinically indicated, the nurse would have done
18 it. If she is concerned about his hemodynamic status
19 or anything else, she would have examined him."
20        So that leads me to believe that if she
21 was concerned about his hemodynamic status or anything
22 else, she would have examined him. She didn't examine
23 him. So apparently she wasn't concerned about his
24 hemodynamic status or anything else. This is -- this

26 (Pages 98 - 101)

Page 102

1 is from the record and I mean this fits with what I'm
2 pointing out here.
3 Q.        Okay.
4 A.        That there is --
5 Q.        Doctor --
6 A.        -- neglect.  There is a lack of concern
7 about the things that matter.
8 Q.        I don't want to cut you off.  I --
9 A.        I'm halfway through here.
10 Q.        Okay.  But to streamline things, sort of
11 what you're doing is you're kind of pointing out some
12 of the factual stuff that Dr. Zurad had included in
13 his report, but what I was concerned with is
14 Dr. Zurad's opinions, if you don't agree with those.
15 A.        I will get to that.
16 Q.        Okay.  Fair enough.
17 A.        Well, Dr. Zurad stated his opinion on
18 page 26, last paragraph.  "Dr. Evans obviously did not
19 carefully review the records.  If he had done so, he
20 would have realized that Mr. Whitehurst was housed in
21 a camera cell and he was under constant observation by
22 the staff and nurses."
23         Well, I think that's a misrepresentation.
24 He was not under constant observation by nurses; and

Page 103

1 if he was under a constant observation by staff, they
2 were corrections officers whose job is to -- is
3 custody and control and not medical observation and,
4 by their own admission, had no training in medical
5 evaluation.
6 Q.        And, if I can just ask, where do you get
7 the information to draw that conclusion that he was
8 not observed by nurses?
9 A.        Well, there's nothing in the record to
10 suggest that he was constantly observed by nurses, as
11 this is stating.
12 Q.        Okay.
13 A.        On 27 Dr. Zurad makes the statement
14 that -- let me just quote him.  "Although there are no
15 written policies or guidelines available for the
16 nurses or physicians to which they could refer, the
17 absence of such guidelines did not impact that care
18 which Mr. Whitehurst received."
19         The absence of policies and guidelines
20 and the existence of no written policies or guidelines
21 in a medical care system is totally below the standard
22 of care; and he can attempt to justify that, but as
23 I've said to you before, it's kind of like giving
24 people licenses without testing them to see if they

Page 104

1 know the rules of the road.  I mean that is illogical.
2 So I disagree with that.
3 Q.        When you say, "below the standard of
4 care," who are you referring to?  The physicians
5 themselves?
6 A.        I'm referring to what a reasonable --
7 Q.        You could take that.
8 A.        I'm not taking it.  I am referring to
9 what a reasonable medical contractor would provide.
10 That is the standard of care.
11 Q.        Okay.
12 A.        Moving on to page 30, page -- second
13 paragraph, "I agree with Dr. Joy that there are not
14 written policies and procedures regarding healthcare
15 delivery at the prison, as Dr. Zaloga testified in his
16 deposition; however, I do not believe that the lack of
17 written policies and procedures had anything to do
18 with Mr. Whitehurst's physical decompensation, as I
19 outlined previously.  Despite the nonexistence of such
20 policies and procedures, the staff acted quickly and
21 appropriately when Mr. Whitehurst decompensated."
22         I don't want to repeat what I said
23 before.  I think I've stated my opinion on that.
24 Q.        Okay.

Page 105

1 A.        Page 31, on page 31 Dr. Zurad kind of
2 attempts to tie Mr. Whitehurst's multiple medical
3 problems that he arrived at Geisinger with to
4 something that happened before he came to Lackawanna
5 County.  He attempts to say -- let me just read what
6 he's saying here.  "Dr. Zaloga, Dr. Mallik, and the
7 nursing staff at the Lackawanna County Prison could
8 reasonably expect medical professionals at the Moses
9 Taylor ER to have cleared Mr. Whitehurst of any
10 existing medical issues that could possibly lead to
11 his deterioration where he was seen on May 23rd just
12 prior to his incarceration.  There is absolutely no
13 way that these professionals could suspect any
14 internal injuries related to Mr. Whitehurst's prior
15 fall.  Therefore, Dr. Mallik had no reason to suspect
16 that Mr. Whitehurst had any ongoing medical issues at
17 the time he was in prison."
18         I mean that's a specious argument that
19 Mr. Whitehurst's condition occurred as a result of
20 something that happened prior to his evaluation in the
21 Emergency Department on the 23rd.  There's absolutely
22 nothing to support that concept.  Mr. Whitehurst
23 arrived in the hospital with a very high evidence of
24 rhabdomyolysis.  That kind of evidence doesn't linger

27 (Pages 102 - 105)

1  around for two weeks.  CPK has a half-life of about
2  two or three days.  So this attempt to somehow blame
3  the doctors in the Emergency Department that evaluated
4  Mr. Whitehurst before he got to Lackawanna is just
5  ludicrous.
6  Q.      Okay.
7  A.          In the next paragraph, he says,
8  "Dr. Mallik is a psychiatrist who does not hold
9  himself to be an expert in medical matters," and
10  that's what I had stated earlier in this deposition.
11  Mr. -- Dr. Mallik makes it very clear he's not an
12  expert in medical matters.
13          "Dr. Mallik functioned as a prison
14  psychiatrist for the Lackawanna County Prison.  He
15  does not perform general medical services and is not
16  equipped or trained to provide said services."  So
17  that is why I make a distinction between psychiatric
18  records and medical records.  He's told us he doesn't
19  provide medical services.
20          Going on to page 32, "Based on the prison
21  records and the testimony of Dr. Mallik and the nurses
22  who managed Mr. Whitehurst, there's absolutely no
23  evidence that Mr. Whitehurst was suffering from poor
24  nutrition or dehydration at any time prior to the

1  moment that he was found on the cell floor."
2          Further down, "Dr. Mallik and the prison
3  nurses complied with the standard of care in their
4  assessment and management of Mr. Whitehurst until
5  Mr. Whitehurst was transferred to CMC Hospital on
6  June 9th, 2015.  There were no outward signs, no
7  historical data which would support Mr. Whitehurst's
8  previously sustained internal injuries.  There were
9  also no signs indicative of dehydration or
10  malnutrition."  So I don't agree with any of that of
11  course.  Mr. Whitehurst deteriorated because he was
12  neglected for nine days in the jail.
13          Going on to page 33, "There's no evidence
14  of disregard for Mr. Whitehurst's care or any
15  deviation from the standard of care exhibited by
16  either Dr. Mallik, Dr. Zaloga, or the staff at the
17  Lackawanna County Prison.  Nothing that the staff did
18  or did not do resulted in Mr. Whitehurst's suffering,
19  harm, or subsequent hospitalization."
20          Further down he says, "As I outlined in
21  my prior discussion, there's no certainty about the
22  issue of circumstances or events which resulted in the
23  pneumomediastinum and the pneumoretroperitoneum
24  discovered on June 9th, 2015."  So he's attempting to

1  say that these events, the pneumomediastinum and the
2  pneumoretroperitoneum, were a result of something that
3  happened before the man came to the jail.  That makes
4  no medical sense whatsoever.  That's totally out of
5  contact with the reality of the time of the events and
6  the status of the patient.  He would not have lasted
7  in the jail for two weeks if he had pneumomediastinum
8  and pneumoretroperitoneum.  It wouldn't have happened.
9          Furthermore, he says, "I am certain
10  there's been no lasting impact on Mr. Whitehurst's
11  quality of life or functional status either related or
12  subsequent to these injuries.  I am convinced and
13  completely assured to a reasonable degree of medical
14  certainty that the events which resulted in
15  Mr. Whitehurst's June 2015 hospitalization have had no
16  significant effect on Mr. Whitehurst's longevity or
17  quality of life."
18          Well, if we go back to the list of
19  conditions that Mr. Whitehurst was discharged with,
20  which I think is on page 8, on page 8 we see that
21  Mr. Whitehurst had sustained uremia, acute renal
22  failure and rhabdomyolysis, hyperphosphatemia.  Those
23  are all indications of kidney damage and, in the
24  coming years, he will not have the kind of kidney

1  resilience that a normal person would have.  So for
2  this doctor to say that this is going to have
3  absolutely no impact on his future is premature and it
4  cannot be known, but he clearly has several conditions
5  that are likely to cause him to have renal problems
6  going forward.
7  Q.      Just to confirm -- I think I know the
8  answer, but you've never examined Mr. Whitehurst?
9  A.      That is correct.
10  Q.      You've never met him?
11  A.      That is correct.
12  Q.      If that's all you have, Doctor, that's
13  all I have with regard to Dr. Zurad.  Now, I might be
14  able to streamline this; but with regards to
15  Dr. Williams, who is a psychiatrist who provided an
16  opinion from that point of view, can I assume that you
17  have no criticisms of his opinion?
18  A.          I'd have to look at his opinion again,
19  quite frankly.  I don't know how broad he made his
20  opinion.  If he made, for example, the statement that
21  the absence of policies was not a problem and was
22  within the standard of care, I would disagree with
23  that; but as I said, I'm not a psychiatrist and I
24  don't have an opinion with regard to the specifics of

1 psychiatric care.
2        MR. FRANCIS: Okay. That's all the
3 questions I have.
4        MR. HEISLER: I have no questions.
5        - - -
6        EXAMINATION
7 BY MR. PARKINS:
8 Q.      Doctor, just briefly, before I get into
9 it, Attorney Francis asked you if your opinions in
10 this matter are limited to what is contained in your
11 report. Do you recall that?
12 A.      I do.
13 Q.      And I'd like to make that a little
14 broader. Would you agree with me that your opinions
15 in this matter are limited to what's contained in your
16 report and to the opinions that you expressed
17 throughout the course of this deposition?
18 A.      That is correct.
19 Q.      And further -- well, I guess it's not
20 entirely true. I've asked you -- I provided you with
21 the expert reports from the defense in this case and
22 I've asked you to put together at some point a
23 supplemental report based on their reports.
24        So would you agree that any opinions that

1 you're going to express at trial in this case would be
2 limited to your initial report, this deposition, and
3 any supplemental report you put forth?
4 A.      Yes.
5 Q.      Okay. And you were asked a lot about
6 documents that you reviewed and Attorney Healey was
7 asking you about whether they were reviewed before
8 issuing a report or after issuing a report. Okay?
9 Regardless of when you reviewed them, would you agree
10 with me that you've reviewed all of the documents that
11 have been discussed in this deposition at some point?
12 A.      Yes.
13 Q.      And regardless of whether you reviewed
14 them before or after making your report, have they --
15 any information that came after, has it affected the
16 opinions in your report --
17 A.      Nothing --
18 Q.      -- in any way?
19 A.      Nothing has changed my opinions as stated
20 in the report.
21 Q.      Okay. I'd like to go through some of
22 these expert reports with you. I think -- do you
23 still have Dr. Folks's report up there with you?
24 A.      Let me just comment on what I just said a

1 moment ago --
2 Q.      Sure.
3 A.      -- that nothing has changed my opinions
4 stated in the report.
5 Q.      Sure.
6 A.      Well, clearly my reference to absence of
7 psychiatric records has been changed. I made that
8 real clear earlier in this deposition.
9 Q.      Sure. Can you -- can you pull up
10 Dr. Folks's report? I think it's the first report you
11 went over and, if you can, turn to page 23.
12 A.      (Witness complies.)
13 Q.      Are you there?
14 A.      Yes.
15 Q.      Now, this is where he starts commenting
16 on the reports of our experts. Okay?
17 A.      Yes.
18 Q.      And I want to talk about some of these
19 comments with you. The first comment is that, you
20 know, jails don't really utilize the NCCHC guidelines.
21 What's your opinion regarding that?
22 A.      Can you tell me where you're quoting
23 from?
24 Q.      The first paragraph where he discusses

1 only a small portion of jails in the United States are
2 accredited by the NCCHC or use their guidelines.
3 A.      Well, he says, "Only a small portion of
4 jails in the United States are accredited by the
5 NCCHC." I don't know if that's true or not. It may
6 be true. I know that not every jail is accredited.
7 Our jail wasn't. It's a process, but I don't think he
8 makes any -- I don't see any reference about the use
9 of the guidelines. Is there something in here about
10 that, too?
11 Q.      Well, that's what I'm going to ask you.
12 Whether or not a jail is accredited, what's your
13 opinion on the NCCHC guidelines and whether or not
14 they should be followed?
15 A.      Well, my opinion with respect to CCI and
16 Lackawanna County is of course they should be followed
17 because in 2008 CCI held themselves out as being on a
18 path to adhere to those standards and they pointed out
19 those standards were an excellent -- or were a report
20 card on the quality of care provided in correctional
21 settings.
22        So when the principal of the organization
23 makes a statement to the county the purchasing entity,
24 the entity that's going to contract with them, that

Page 114

1  this is a high quality -- this is a report card on
2  medical care, we're going to be meeting it and
3  exceeding it, then the fact that that isn't done years
4  later is -- it's a misrepresentation. It's a
5  deviation from the standard that was set by the
6  company.
7  Q.       Paragraph 2 there, "To the extent that
8  plaintiff's experts imply or suggest that
9  Mr. Whitehurst remained in physical restraints or a
10 restraint chair beyond 5-27 of 2015, they're
11 mistaken." Do you agree with that?
12 A.       Do I agree that he was kept in a
13 restraint chair beyond the 27th of May?  Is that what
14 you -- is that the question?
15 Q.       Well, do you agree -- he's saying that
16 you're mistaken in that there's no evidence that he's
17 in the restraint chair beyond 5-27.  Is that accurate?
18 A.       I'm not sure I understand the question.
19 You're referring to a certain section here in this
20 report?
21 Q.       What was your understanding of the record
22 in terms of how long he was in the restraint chair or
23 when?
24 A.       Well, I think it was kind of fuzzy, quite

Page 115

1  frankly. He was in isolation apparently for a long
2  time from the 28th through the 8th. I do believe that
3  whole time was isolation. How much of that was
4  restraint time I don't think we can really tell from
5  the record. I couldn't tell from the record. He was
6  certainly in the restraint chair two previous times
7  and they were times that were like -- I don't recall
8  offhand. There were two previous times he was in the
9  restraint chair prior to the 28th, and after that it
10 was kind of nebulous. He was in isolation, but I
11 don't know about the restraint chair usage.
12 Q.       Do the records indicate if and when he
13 was ever removed from the restraint chair?
14 A.       I don't know. I can't answer that. If
15 it's not in my report, I can't answer that.
16 Q.       Okay. That's fine. Paragraph 3, "To the
17 extent that plaintiff's experts imply or suggest that
18 Mr. Whitehurst did not receive frequent evaluations
19 and treatment orders by a psychiatrist, they are
20 mistaken." I want to talk to you a little bit about
21 that.
22 A.       Okay.
23 Q.       Because that's been discussed a lot in
24 the deposition today; right?

Page 116

1  A.       Yeah, certainly.
2  Q.       Is there a difference between seeing a
3  psychiatrist and receiving meaningful treatment?
4          MR. FRANCIS: Objection to the form.
5  BY MR. PARKINS:
6  Q.       You can answer.
7  A.       Again, as I've said, I'm not a
8  psychiatric specialist, but I would say that seeing is
9  subject to interpretation. I mean if you pass a
10 psychiatrist in a hall, you've seen him; but seeing is
11 typically used to mean, in referring to a
12 psychiatrist, some interaction between the two and so
13 it's difficult to -- even with those notes that were
14 transcribed to know what exactly happened between
15 Dr. Mallik and Mr. Whitehurst.
16          Again I'm not a person who can critically
17 assess the nature of that interaction from a
18 psychiatric perspective. I'm not a psychiatrist, but
19 there were very brief notes there that didn't tell me
20 much about what actually happened.
21 Q.       And it was also noted obviously
22 Dr. Mallik is a medical doctor; correct?
23 A.       That is correct.
24 Q.       But he noted in his deposition that he

Page 117

1  only provided psychiatric care; is that correct?
2  A.       He was a psychiatric consultant. He made
3  that very clear, not a medical doctor -- not a medical
4  provider in this setting.
5  Q.       So let me ask you this. Is there any
6  evidence in the record, from your review of the
7  record, that indicates that Mr. Whitehurst ever
8  received a meaningful medical evaluation after 5-27 of
9  2015?
10 A.       No. I saw no evidence --
11          MR. FRANCIS: Object to the form.
12          THE WITNESS: -- that Mr. Whitehurst had
13 any nonpsychiatric evaluation medically during the
14 time period the 28th of May through the time he went
15 to the hospital.
16 BY MR. PARKINS:
17 Q.       And is there evidence in the record to
18 indicate that there was not a meaningful medical
19 evaluation?
20 A.       Well, there's evidence --
21          MR. FRANCIS: Object to the form.
22          THE WITNESS: -- in the absence of
23 records, and Dr. Zaloga was asked to address that and
24 it was pointed out in his deposition that the records

30 (Pages 114 - 117)

Page 118

1 were absent because so yes.
2 BY MR. PARKINS:
3 Q.        And you discussed Mr. Whitehurst's
4 condition when he left the prison and went to
5 Geisinger to the ER. The symptoms that were present
6 at that time, would they have been -- are they
7 something you would detect if you received a
8 meaningful medical evaluation?
9 A.        May I refer --
10          MR. FRANCIS: Can I stop you for a
11 second? What -- are we referring to his status based
12 on the records at the prison before he left or when he
13 was at Geisinger, just so I can clarify?
14          MR. PARKINS: When he went into the --
15 based on the Geisinger records.
16          MR. FRANCIS: Okay.
17          THE WITNESS: May I refer to my report?
18 BY MR. PARKINS:
19 Q.        Sure.
20 A.        So upon his arrival from the Lackawanna
21 County Prison directly into Geisinger, Mr. Whitehurst
22 was recognized at Geisinger as appearing lethargic.
23 He appeared cachectic and, as I said before in this
24 deposition, cachectic means wasted, weight loss. It

Page 119

1 means that a person -- it reflects a lack of nutrition
2 for a period of time. You can't miss three meals and
3 get cachectic. It takes a while. He had a sickly
4 appearance. This is reading from the medical record
5 at Geisinger.
6          It goes on to say that his rectal
7 temperature was noted to be 87.7. As I said earlier,
8 I've been a doctor for a long time. I don't think
9 I've ever seen a patient with a temperature of 87.7
10 rectally. The rectal temperature is core temperature.
11 Core temperature should be about 98.6. To get your
12 core temperature 11 degrees down, you are very sick
13 and that didn't happen in 24 hours. That's a
14 distinctly abnormal and life-threatening condition to
15 have your body temperature 11 degrees below in your
16 core, the rectal temp.
17          It goes on to say that the radiologist,
18 the x-ray specialist, found that he had a rupture that
19 had caused an air leak and the air had dissected under
20 his skin, into his muscles, and into his chest cavity,
21 even into his spinal canal. Again, in my 45 years of
22 practice, I've never seen a patient with air
23 dissecting into his spinal canal. I mean that's air.
24 Air has to come from either the gut or the lungs.

Page 120

1 That's how we have -- those are places we have air in
2 our bodies. We inhale it or we swallow it. It's got
3 to somehow get from his gut or his lungs through his
4 tissue, through his muscles, get to his spine, and get
5 into his spinal canal where the spinal fluid is.
6 That's -- that doesn't happen overnight.
7          It goes on to say he has -- the
8 radiologist says, "This may be seen in the setting of
9 extensive vomiting." He is postulating that this air
10 would have occurred as a result of extensive vomiting,
11 which people withdrawing often vomit. So those are
12 the findings on arrival at Geisinger.
13 Q.        Okay. If you go to part B where he's
14 talking about your report, let's go paragraph by
15 paragraph.
16 A.        Which page are we on?
17 Q.        Twenty-three of Folks's report.
18 A.        Yeah.
19 Q.        At the bottom, page 2, second paragraph,
20 "He was put into a restraint chair, but I see no
21 evidence that he underwent a mental health evaluation
22 prior to his being put in a restraint chair.' I
23 disagree. He had a mental health screening by the CCI
24 nurses prior to the first use of the restraint chair."

Page 121

1          Based on your review of the records, were
2 the nurses at C -- at the Lackawanna County Prison
3 working for CCI, were they qualified to conduct a
4 mental health screening?
5 A.        Based on all the information, they were
6 not qualified. They had no training in mental health
7 screening and mental health evaluation. I do believe
8 Dr. Zaloga attested to that in his deposition. I'm
9 certain that's in the medical -- that's in the records
10 of this case that these individuals had no training,
11 and it may have been stated by the nurses in their
12 deposition. I think Nurse Reed I believe was one
13 nurse who gave testimony; but in any event, the short
14 answer is, no, they were not qualified to do
15 psychiatric evaluations.
16 Q.        And if you go to the next page, same
17 paragraph, "In addition, Mr. Whitehurst is placed into
18 the restraint chair by LCP security staff due to
19 security concerns. The CCI staff did not order the
20 use of the restraint chair." In your experience in
21 correctional care, which you said you worked for about
22 27 years, 26 --
23 A.        Twenty-one.
24 Q.        -- years? Twenty-one?

31 (Pages 118 - 121)

Page 122

1 A.       Well, actually altogether 27; but the
2 last large period of time when I was a medical
3 director, it was a 21-year period. I had done some
4 corrections work before that.
5 Q.       Okay. In your experience as a medical
6 director at a prison, does the fact that corrections
7 officers place somebody in a restraint chair for
8 security concerns -- does that relieve medical of
9 their obligation to properly care for that person
10 while they're in the restraint chair?
11 A.       Absolutely not. In fact, it increases
12 medical responsibility compared to the responsibility
13 of the individual before he was put in the restraint
14 chair. So once a person is put into a restraint
15 chair, there's an obligation to monitor them closely.
16 Q.       Paragraph 2, "The current standard of
17 care requires several times per day nurse monitoring
18 of inmates confined to restraint chairs. The medical
19 record indicates that the monitoring of
20 Amir Whitehurst was below the standard of care.'
21            I disagree that the monitoring of
22 Mr. Whitehurst while he was in the restraint chair was
23 below the standard of care. The nurses were
24 monitoring Mr. Whitehurst every few hours while he was

Page 123

1 in the restraint chair and both times he was in the
2 restraint chair for less than a full day."
3            Is -- from your review of the medical
4 records, is there any indication in the medical
5 records that the nurses were frequently monitoring
6 Mr. Whitehurst while he was in the restraint chair?
7 A.       No.
8 Q.       And, furthermore, that paragraph goes on
9 to say, "There is no indication in the record that the
10 two" -- he characterized them as brief uses of the
11 restraint chair -- "in May 2015 are causally related
12 to Mr. Whitehurst's illness on 6-9-2015." Can you
13 opine as to whether or not restraint chair use is
14 causally related to the kidney failure?
15 A.       Restraint chair use can be related to
16 kidney failure in that rhabdomyolysis, which is the
17 condition that caused kidney problems here, is the
18 result of muscle enzymes, muscle material being
19 released from muscle into the bloodstream. The
20 muscles are overused and people who strain and pull
21 against restraint chairs or fight against them or use
22 their muscles against the restraint can develop
23 some -- can have some muscle release of that material
24 that causes the kidney damage. So that has been seen

Page 124

1 to happen. I cannot know exactly how that evolved in
2 the case of Mr. Whitehurst.
3 Q.       Without opining as to whether or not it
4 was the cause, do you believe it was a contributing
5 factor to the -- say the R word.
6 A.       Rhabdomyolysis.
7 Q.       Okay. I say it wrong every time. Was it
8 a contributing factor in this case?
9 A.       I think it's probably -- it probably was
10 a contributing factor. As I said, I cannot know.
11 Q.       Paragraph 5 he says, "The nursing staff
12 did not abandon Mr. Whitehurst on May 28th, 2015."
13 Based on your review of the record, would you still
14 characterize the nursing care as abandonment?
15 A.       Yes, I would. I see no evidence that
16 there was any nursing attention to this man from the
17 28th, 29th, 30th, up until the 8th of June.
18 Q.       To the extent that the nurses testified
19 that they saw him, do you agree with -- do you have an
20 opinion on that testimony?
21 A.       Well --
22            MR. HEALEY: Objection.
23            THE VIDEOGRAPHER: The time is now --
24            THE WITNESS: Any -- any testimony after

Page 125

1 the fact I consider to pale compared to the medical
2 record. The medical record is the authoritative
3 record of what has happened; and just as nurses can't
4 go in and add something to the record the next day and
5 sort of act as though they wrote it when it happened,
6 when you have a deposition that you talk about what
7 you did months earlier, it has little weight when
8 compared to what you documented because nurses are
9 expected to document. That's a standard for nursing,
10 standard for healthcare, document what's important,
11 and seeing a patient is important.
12 BY MR. PARKINS:
13 Q.       So it's your opinion then that the
14 standard of care is, if you see a patient, you have to
15 document it?
16 A.       Yes.
17 Q.       Okay. And was there a deviation from
18 that standard in this case?
19 A.       Let me just say this, and this answers
20 your last question. If you see a patient and interact
21 with them, you should document it. I mean if you're
22 passing a patient in the hall, of course that's
23 different, but again seeing has different meaning. So
24 if you have a meaningful interaction with a patient,

32 (Pages 122 - 125)

Page 126

1  it should be documented.
2  Q.      All right. Could you -- I want to ask
3  you one of Dr. Folks's opinions. If you go to page
4  21, I'll read from the second paragraph there.
5  "Mr. Whitehurst had been refusing the Risperdal twice
6  a day and had been described in a similar state on
7  most prior visits by Dr. Mallik. He likely had not
8  been sleeping normally. Dr. Mallik changed his
9  medication to Navane, which is a high potency first
10  generation antipsychotic. Mr. Whitehurst is recorded
11  as having taken the first does of Navane at 9 p.m. on
12  the evening of 6-8-2015. It is likely that this dose
13  of medication caused Mr. Whitehurst to become sedated
14  and fall deeply asleep overnight. Lying motionless
15  overnight on a concrete floor or even a steel bed
16  likely caused him to develop rhabdomyolysis" --
17  A.      Close.
18  Q.      -- "and many of the other findings upon
19  presentation." Dr. Folks's opinion that Navane caused
20  that medical issue, is that plausible?
21  A.      No.
22  Q.      Why?
23  A.      I've seen patients treated with Navane
24  many times over the past 40 plus years and I've never

Page 127

1  seen anybody go into a deep sleep where they couldn't
2  move and they came into the hospital because they were
3  in kidney failure. That's a ridiculous claim and,
4  furthermore, here we have Dr. -- is this Folks?
5  Q.      Folks.
6  A.      Folks saying that the patient gets the
7  medicine at 9 p.m. on the 8th and the 9th he's got all
8  these problems. He's dehydrated. He's cachectic.
9  He's everything else we listed here. That doesn't
10  make any medical sense. This doesn't happen because
11  the man got a pill the night before.
12  Q.      Is it, in your opinion, medically
13  possible for Navane -- one dose of Navane to put
14  Mr. Whitehurst in the condition he was in --
15  A.      Absolutely not.
16  Q.      -- on the 9th?
17  A.      Absolutely not.
18          MR. HEALEY: Objection.
19          MR. FRANCIS: Objection.
20          THE WITNESS: Absolutely not, no.
21  BY MR. PARKINS:
22  Q.      The bottom of that page where they're
23  talking about the air collections in his chest --
24  A.      Yes, yes.

Page 128

1  Q.      -- "There are several possible causes of
2  these abnormal air collections. The medical team at
3  GCMC was not ever able to determine the etiology. The
4  possibility which seems most likely to me is that
5  vomiting or wrenching caused a very small hole in the
6  esophagus." You agree with that conclusion?
7  A.      I would agree with it, yes.
8  Q.      Is that correct?
9  A.      Yes.
10  Q.      Does the fact that vomiting caused these
11  air pockets or could have caused these air pockets --
12  does that have any effect on your conclusions as to
13  the medical care he received?
14  A.      Well, if he was vomiting so much as to
15  cause a tear that led to air, one thing it implies is
16  that he's vomiting excessively and we have ways to
17  give patients medications. We can give them an
18  injection. We can give them medicines they don't
19  have to swallow. They can quell vomiting, settle
20  vomiting.
21          That's one thing but, secondly, as I
22  mentioned earlier, the air that was released was given
23  a lot of time to go very far around his body and that
24  doesn't happen in the matter of an hour or two to have

Page 129

1  it get into his spinal canal, which is almost unheard
2  of.
3          So I mean this is a severe condition that
4  has all the markings of something that progressed over
5  time and was the result of lack of any nursing or
6  medical interaction in a man who was basically allowed
7  to just get sicker and sicker until the point that
8  someone found he was lying on the floor, not moving,
9  and they said, "Well, let's get him checked out."
10  Q.      If you go on to page 22, I'm not going to
11  read directly, but they discuss the claim that
12  Dr. Mallik was making rounds three times a week; and
13  I'll put in this a hypothetical because I don't want
14  to misrepresent what's in the record or depositions,
15  but if Dr. Mallik had seen Mr. Whitehurst, say, five
16  minutes each time he met with him, is that -- is five
17  minutes three times a week -- is that an adequate
18  amount of time to provide medical, not psychiatric,
19  but medical care to somebody in Mr. Whitehurst's
20  condition?
21          MR. FRANCIS: Objection.
22          MR. HEALEY: Objection.
23          THE WITNESS: Well, first of all,
24  Dr. Mallik made it very clear that he wasn't providing

33 (Pages 126 - 129)

Page 130

1  medical care.
2  BY MR. PARKINS:
3  Q.        But if he -- assuming he were providing
4  medical care for this patient, because he's the only
5  doctor that saw him, is that a sufficient amount of
6  time to treat somebody in this condition?
7  A.        In this condition?
8        MR. FRANCIS: Objection.
9        THE WITNESS: No. You know, if you walk
10 into a medical interaction with a patient who's lying
11 on the floor then, you know, the amount of time it
12 would take to evaluate the person would depend on many
13 things. If you're lying on the floor and you say,
14 "How are you feeling," and he sits up and says, "Oh,
15 I'm doing great. How are you," and you're asking him
16 a couple of things, he quickly responds to them, "I'm
17 having no pain. Sure, today's date is whatever and I
18 know where I am," you know, he's alert and oriented
19 and he's denying discomfort, I mean that can be done
20 in two, three minutes.
21       Five minutes could be adequate for that,
22 but you have to -- you have to ask questions and have
23 to interact in order to see what the patient's needs
24 are. All the indications are that this man wasn't

Page 131

1  that person, wasn't that person who's fine with no
2  problems and functionally and cognitively and fully
3  oriented, et cetera two days before this happened and
4  he has too many things going on when he gets to the
5  hospital.
6  Q.        Dr. Mallik's notes indicate that he saw
7  Mr. Whitehurst on the 8th, the day before the
8  hospitalization. Based on what Mr. Whitehurst was
9  suffering from, would it have been obvious to anyone
10 seeing Mr. Whitehurst the day before his admission
11 that he was in need of emergent care?
12 A.        Well --
13       MR. FRANCIS: Object to the form.
14       THE WITNESS: -- I'm curious to know what
15 Dr. Mallik's note of that day said. As I said, I
16 don't recall what his transcribed note said of
17 May 28th -- I'm sorry, June 8th, but it wouldn't
18 necessarily be obvious. If the person is lying on the
19 floor and you see him lying on the floor, it's not
20 obvious that he has anything wrong with him. If you
21 don't talk to him, you don't engage him, you can look
22 at him. He can look like he's sleeping on the floor
23 and you can walk right by, make a note he's sleeping
24 on the floor, sleeping peacefully, and walk on.

Page 132

1        I mean you can't tell when a person is
2  lying on the floor they're dehydrated, that they are
3  in muscle damage, rhabdomyolysis, or they're in kidney
4  failure or they have an infection. You can't tell the
5  kinds of things that they've got passing through. You
6  need some medical interaction to make those kinds of
7  determinations.
8  Q.        So would it be your opinion then that
9  there was no medical interaction --
10 A.        That's correct.
11 Q.        -- on the day before the admission to the
12 hospital?
13 A.        That's correct.
14       MR. FRANCIS: Object to the form.
15       MR. HEALEY: Same objection.
16 BY MR. PARKINS:
17 Q.        One of the things -- and I'm not going to
18 go through -- you went through Dr. Zurad's report
19 carefully, but I think you mentioned it when Attorney
20 Francis was questioning you is that there was a claim
21 in his report that the air pockets in the lungs were
22 caused by a fall during his arrest. Do you recall
23 reading that?
24 A.        Well, I wouldn't say that I went through

Page 133

1  them carefully, but I did go through them and I do
2  recall making that statement.
3  Q.        Is that a possible cause for the
4  condition he presented with at Geisinger on the 9th of
5  June?
6  A.        The fall that happened on about the 23rd
7  of May?
8  Q.        Yes.
9  A.        No.
10 Q.        Why?
11 A.        Because the time course doesn't make any
12 sense, one thing. You wouldn't have rhabdomyolysis
13 for two weeks and the indications of rhabdomyolysis
14 tend to dissipate in the bloodstream over the course
15 of about three or four days. I mean the half-life of
16 CPK is very short.
17       And, furthermore, he would have been
18 expected to develop problems, kidney problems, that
19 would have made him much sicker much sooner. During
20 the first five or six days of his hospitalization,
21 people were putting him in a restraint chair. He was
22 apparently physically able to function normally. It's
23 what happened after the 28th of May that seems to be
24 the downward slide of him physically.

34 (Pages 130 - 133)

1  Q.        Specifically you talked about the
2  rhabdomyolysis.
3  A.        Rhabdomyolysis.
4  Q.        I'm never going to get that.
5  Specifically in regards to the air pockets in his
6  chest, is that a potential cause of that?
7  A.        No.  Rhabdomyolysis would not cause air
8  pockets.
9  Q.        No, no, no.  I mean the fall that we were
10  discussing.  Is that a potential cause of the air
11  pockets that he was suffering from?
12  A.        I've never seen a fall cause -- I don't
13  think I've ever seen a fall cause subcutaneous
14  emphysema, which is what this air -- it's air under
15  the skin, except in people who've had a lung puncture
16  from a rib that damaged the lung and caused some
17  release of air.
18        I've never seen that from a fall.  I
19  don't think that happens commonly at all from falls.
20  I don't see any reason to think it happened in this
21  man.  I think if he had had a fall that was so severe
22  as to break a rib, he would have known that.  There's
23  never been any indication that he had a fractured rib.
24  Q.        And is something that would have been --

1  would have been or should have been noted in the
2  Geisinger records from May 23rd --
3  A.        Well, certainly --
4  Q.        -- if it existed at that time?
5  A.        -- if there was damage, yes.
6  Q.        What is your -- you've given many
7  opinions today as to the care at that prison, but can
8  you give an opinion specifically as to the cause of
9  the conditions that Mr. Whitehurst presented with at
10  Geisinger on June 9th of 2015?
11  A.        Well, I think a big part of the cause is
12  what Nurse Moritzkat said in her deposition, anything else
13  weren't monitoring him for intake or anything else
14  basically.  I'm paraphrasing her.  He wasn't being
15  monitored and so he slipped into a state of severe
16  illness and was very close to death with a variety of
17  that's almost un-survivable and with a variety of
18  medical complications and problems chiefly because
19  nobody interacted with him between the 28th and the
20  8th, from what I can see in the medical record.
21        And so he wasn't eating apparently.  He
22  had to have not been eating or drinking much in order
23  to be so wasted when he got to the hospital.  He had
24  some air release, as we know about, that not only was

1  released.  It was all over his body into his spinal
2  canal.  He had kidney damage, several issues related
3  to his kidney status.
4        Those things, as I said a couple times in
5  this report -- in this deposition, rather, they take a
6  while and if you're not interacting with people and
7  not seeing how they communicate, how they ambulate,
8  how their vital signs are.  If you're not doing
9  anything to sort of medically assess them on a
10  day-to-day basis, then this kind of thing can happen
11  and it can progress to the point as his progressed and
12  the person can almost die.
13  Q.        When you talk about the monitoring, to
14  the extent that there was a corrections officer
15  monitoring intake and things like that, is that a
16  valid substitution for a trained medical professional?
17  A.        Well, I have a lot of respect for
18  corrections officers.  I've worked with them for a
19  long time, but the reality is the corrections officers
20  -- obviously there's a spectrum, but in general their
21  role is to -- custody and control.  They're making
22  certain that the inmates are not hurting each other,
23  not hurting themselves, that they're staying out of
24  physical trouble.

1        They quickly leave the medical to the
2  medical people; and I mean certainly if they see that
3  a person is obviously not able to stand up, for
4  example, and falling down, I mean typically a
5  corrections officer will call a nurse; but when a
6  person is lying on the floor and he's quiet and he's
7  not complaining, there's a -- there's not a great
8  obvious indicator to a corrections officer that a
9  nurse needs to be called.  People sleep.
10  Q.        So is -- would a corrections officer be
11  qualified to do the type of monitoring that you're
12  saying was lacking in the prison?
13  A.        Of course not, no.
14  Q.        There's a lot of talk in the defense
15  experts' reports about spice use and spice withdrawal.
16  A.        Yes.
17  Q.        Do you recall reading about that?
18  A.        I do, yes.
19  Q.        Does the fact that somebody voluntarily
20  took an illegal drug and was in withdrawal from
21  that -- does have any bearing on the type of medical
22  care that they should receive?
23  A.        Absolutely not and, in fact, nowadays
24  with this opiate -- I guess you could call it

Page 138

1  epidemic. Anybody's kids could wind up in jail.
2  Anybody's husband or wife could wind up in jail
3  because people get on this stuff and they wind up in
4  trouble. So, you know, I wouldn't want any relative
5  of mine to be in the hospital -- in the jail, rather,
6  for 10 days with nobody doing any nursing assessment,
7  nobody doing any kind of medical interaction with him
8  when they're having him in isolation without any
9  medical person looking in on them for eight or nine
10 days.
11        That's just not -- it's not appropriate.
12 It's not -- I mean any layperson would say that's not
13 -- that's not reasonable so -- and no. Definitely
14 people who use drugs and have drug issues and drug
15 charges are not people who should be treated less or
16 people who should be regarded less.
17 Q.       In a prison whose responsibility is it to
18 manage detox from a controlled substance?
19 A.       Well, it varies with -- well, someone
20 medical is responsible, but as far as who -- which
21 person in the medical -- under the medical tent -- in
22 this case I'm talking about medical as I would
23 describe it, including psychiatry; but if you include
24 the entire medical tent, psychiatry and medicine, it

Page 139

1  varies.
2        In my experience, I was responsible for
3  managing detox for 10 years and the psychiatrist was
4  responsible for another 10 years, but even when they
5  were responsible for managing with respect to the --
6  whatever treating was being given for the symptoms
7  that people experience in detox, I was still
8  responsible for the issues with respect to their blood
9  pressure or their pulse abnormalities due to detox or
10 their hydration status. Those are all still under the
11 medical -- under my umbrella as the nonpsychiatric
12 doctor.
13 Q.       So to the extent that the defendants are
14 claiming that he was having spice withdrawal, did he
15 receive appropriate detox care -- did Mr. Whitehurst
16 receive appropriate detox care in the Lackawanna
17 County Prison?
18 A.       Well, that's probably a question that's a
19 psychiatric question I would guess. I practiced for
20 many years with the perception that -- and with the
21 perception that detox is not a dangerous entity in and
22 of itself, including heroin detox. I've had many
23 patients withdraw from heroin under close observation
24 without any medication and they did well. We never

Page 140

1  had to send anybody to the hospital because of heroin
2  withdrawal. It makes people feel bad. They feel
3  terrible, but they get over that.
4        But in many hospitals -- many jails,
5  rather -- in many jails, a psychiatrist will give
6  medication and, when they do that, then of course
7  that's under the psychiatric umbrella and whether or
8  not it's appropriate treatment depends on what a
9  reasonable psychiatrist would conclude.
10 Q.       The policies and procedures from
11 Lackawanna County Prison that Attorney Healey asked
12 you about and showed you, I recently provided those to
13 you. Did they have any effect on the opinions that
14 you made in your report?
15 A.       No, they did not have any effect on my
16 opinions.
17 Q.       And based on -- and did you have a chance
18 to review those policies?
19 A.       I did review them. I didn't read them
20 thoroughly, but I reviewed them, yes.
21 Q.       Based on your review, are those policies
22 adequate medical policies for a prison medical
23 facility?
24 A.       No. Most of those policies are directed

Page 141

1  towards corrections officers. There are some medical
2  references there, but they're not -- as I read them,
3  not written by a Medical Department. They're not
4  written to be guidelines for medicine and,
5  furthermore, I don't see any evidence that they're
6  CCI's policies. I mean if you have a medical group
7  and you have employees who are nurses and doctors,
8  then those nurses and doctors follow the policies of
9  their employer and I don't see that those are CCI's
10 policies.
11 Q.       So would you describe those policies as
12 adequate or defective?
13 A.       I would consider them not adequate.
14 Q.       You were asked about the intake and
15 Mr. Whitehurst refusing intake and potentially
16 refusing care at some point. Does a patient's refusal
17 to cooperate relieve the Medical Department of their
18 duty to provide care?
19 A.       Of course not.
20 Q.       Why?
21 A.       Well, because the patient is still in the
22 facility and it's still the responsibility of the
23 medical care providers. I think that the intake this
24 man was offered I believe was an evaluation by a

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 142

1 nurse. I do believe. I didn't see any -- I don't
2 recall seeing anything that said that a doctor was
3 trying to do an intake evaluation of him.
4 Q.        And is that something that, in your
5 opinion, is necessary?
6 A.        Yes.
7 Q.        And is that based on your decades of
8 experience in correctional care?
9 A.        Well, that, but also based upon what I've
10 seen in other jails and what I've seen in The National
11 Commission's standards; and also, quite frankly, in
12 New Jersey there's a requirement that a patient -- an
13 inmate be seen by a nurse -- actually by a
14 nurse-practitioner or a physician in the first
15 72 hours.
16 Q.        Obviously we're not in New Jersey.
17 A.        Sure.
18 Q.        But is that -- regardless of what's
19 legally required, is that appropriate practice here in
20 the State of Pennsylvania?
21 A.        Is it appropriate practice to have --
22        MR. FRANCIS: Objection to form.
23        THE WITNESS: -- a patient -- an
24 inpatient -- a patient see a doctor or

Page 143

1 nurse-practitioner or --
2 BY MR. PARKINS:
3 Q.        Yes.
4 A.        -- a physician's assistant in the first
5 three days?
6 Q.        Yes.
7        MR. HEALEY: Just an objection.
8        MR. FRANCIS: Join.
9        THE WITNESS: Within a short span of
10 time. I wouldn't say it would necessarily have to be
11 within three days, but certainly within a few days,
12 yeah.
13 BY MR. PARKINS:
14 Q.        And would you characterize that as a
15 standard of care?
16 A.        I would, yeah.
17 Q.        And was that met in this case?
18 A.        It was not met in this case. I didn't
19 see any evidence that he saw a doctor other than a
20 psychiatrist, who clearly states he's not a medical
21 doctor, at any time during his stay.
22        Let me just correct my last statement.
23 He didn't clearly state he wasn't a medical doctor.
24 He clearly stated he didn't give medical care.

Page 144

1 Q.        And, just briefly, one more -- you were
2 talking about the cause of these injuries and you
3 point to medical neglect as the cause of his
4 conditions; is that correct?
5 A.        Well, medical neglect is the cause of his
6 progression of his condition. I mean if a person is
7 vomiting because of withdrawing, they're naturally not
8 a medical person's fault; but if a person doesn't get
9 something to quell that, then that's a medical
10 person's fault. If a person isn't being recognized as
11 not eating or not drinking, then that's a medical
12 person's fault.
13        So the progression of a condition to the
14 point that a person is near death in a setting where
15 there are nurses whose job it is to keep an eye on
16 patients medically and a doctor whose job it is to
17 medically care for the inmates, then that's a problem.
18 Q.        To the -- last question.
19        THE VIDEOGRAPHER: The time is now -- one
20 minute.
21 BY MR. PARKINS:
22 Q.        Okay. Last question. To the extent that
23 Mr. Whitehurst in his deposition characterized the use
24 of the restraint chair, being tased with a drive stun

Page 145

1 taser, being assaulted by guards, are those -- are
2 those things contributing factors to the condition he
3 was in upon the intake at the hospital?
4 A.        Well, you mentioned --
5        MR. HEALEY: Objection.
6        THE WITNESS: You mentioned three things.
7 It could be.
8 BY MR. PARKINS:
9 Q.        Okay. Can you explain that?
10        THE VIDEOGRAPHER: I have to change it.
11        MR. PARKINS: All right.
12        THE VIDEOGRAPHER: The time is now 12:49.
13 This ends media unit number two.
14        (A brief recess was taken.)
15        THE VIDEOGRAPHER: The time is now 12:56.
16 This begins media unit number three. We're back on
17 the video record.
18 BY MR. PARKINS:
19 Q.        Doctor, I was asking you about
20 Mr. Whitehurst's testimony regarding the restraint
21 chair, the physical abuse, the drive stun taser. Are
22 these potential causes of some of the injuries that he
23 suffered?
24        MR. HEALEY: Just objection.

37 (Pages 142 - 145)

Page 146

1  MR. FRANCIS: Join.
2  THE WITNESS: Such events could
3  potentially cause some of the problems he experienced.
4  Certainly rhabdomyolysis could conceivably be caused
5  by physical abuse. Sure.
6  BY MR. PARKINS:
7  Q.  What about some of the other -- the air
8  pockets?
9  A.  It's conceivable that physical abuse
10 could cause release of air from, say, an intestinal
11 tear. I should probably point out that I didn't base
12 my conclusions on Mr. Whitehurst's testimony. Just as
13 I don't view the doctor's testimony as something that
14 I can consider necessarily factual when I've got a
15 medical record that I'm reviewing, I don't view
16 Mr. Whitehurst's testimony as necessarily something I
17 can know as fact.
18      I'm not unaware of the fact that there
19 may have been some psychiatric versus drug issues
20 related to his experiences and his recollection. So I
21 mean it's certainly possible that those things could
22 have contributed to what he had, yes.
23      MR. PARKINS: I don't have anything
24 further.

Page 147

1      - - -
2      EXAMINATION
3  BY MR. HEISLER:
4  Q.  Doctor, just one or two questions. Would
5  it be fair to say that the expert opinions that you
6  gave today are confining to the standard of care for
7  the medical care and treatment provided by the medical
8  personnel at the Lackawanna County Prison?
9  A.  If you're defining medical like
10 Dr. Mallik defines medical, then probably the answer
11 is no. If you're defining medical in a more general
12 sense, I think the answer is probably yes.
13 Q.  I think what you're trying to do is
14 you're saying you're confining your expert opinions to
15 the nonpsychiatric medical care that was given?
16 A.  That is true and I'm also confining it to
17 not including care given by officers.
18 Q.  That's excluded --
19 A.  Or attention by corrections officers
20 rather.
21 Q.  You're not giving any opinions regarding
22 corrections officers?
23 A.  That is correct.
24      MR. HEISLER: I have nothing further.

Page 148

1      - - -
2      FURTHER EXAMINATION
3  BY MR. HEALEY:
4  Q.  Doctor, just two follow-up, if I can. If
5  I could direct you to your report and page 2, the --
6  at least on my copy, the final paragraph. Further,
7  the medical care -- "Further, the medical record
8  reveals that for an eight-day period prior to
9  June 9th, 2015 Mr. Whitehurst apparently had no
10 contact with nurse or physician or any medical staff
11 member at the correctional facility." Do you stand by
12 that statement?
13 A.  I do not stand by that statement, as
14 evidenced by the fact that you've pointed out that
15 Dr. Mallik had some sort of documented interaction
16 with the patient. I would not stand by that
17 statement.
18 Q.  Okay. And the following sentence, "There
19 are no medical notes documenting any interaction
20 between Mr. Whitehurst and medical staff between
21 May 28th and June 8th of 2015," do you stand by that
22 statement?
23 A.  I stand by that statement. Dr. Mallik
24 made it very clear that he provided psychiatric care.

Page 149

1  He was not a medical doctor. He didn't provide
2  medical care or medical evaluations. So, by his
3  description, I would certainly stand by that. There
4  are no medical -- there are no nursing notes that I
5  saw. I didn't see any doctor notes, didn't see any
6  nurse-practitioner notes, didn't see any physician's
7  assistant notes. I only saw psychiatric notes. So,
8  yes, I would stand by that statement.
9  Q.  Okay. And so any interaction -- you
10 would agree with me that there was interaction between
11 Mr. Whitehurst and medical staff; correct?
12 A.  I would not. I don't know what
13 interaction you're referring to.
14 Q.  I'm referring to -- how do you use it?
15 A.  Well, I don't see any documentation of
16 any interaction, except perhaps some psychiatric
17 interaction.
18 Q.  And I don't want to beat a dead horse.
19 Is this going back to the distinction you make between
20 medical notes and psychiatric notes?
21 A.  As I've said several times, I didn't make
22 that distinction. Dr. Mallik did.
23 Q.  But you rely on it?
24 A.  Well, it's appropriate as he describes

38 (Pages 146 - 149)

1  his role.

2        MR. HEALEY:  Those are all the questions

3  I have for you.  Thank you.

4        MR. FRANCIS:  Nothing further, Doctor.

5        - - -

6        FURTHER EXAMINATION

7  BY MR. PARKINS:

8  Q.       Just briefly based on that, when you were

9  asked about there's no nursing or medical care, let's

10  talk about three things:  One, nursing care, two,

11  medical care and, three, psychiatric care.  Okay?

12        My questions will be based on that

13  breakdown.  Based on your review of the record,

14  between May 28th, 2015 and June 9th of 2015 was there

15  an abandonment of psychiatric care?

16  A.       No.

17        MR. FRANCIS:  Object to form.

18  BY MR. PARKINS:

19  Q.       Was there an abandonment of medical care?

20  A.       Yes.

21  Q.       Was there an abandonment of nursing care?

22  A.       Yes.

23  Q.       And to the extent that you were asked

24  about your opinions being limited to the medical

1  treatment at the prison, in addition to medical

2  treatment, you'd agree with me that you also rendered

3  opinions as to causation of the injury?

4  A.       Yes.

5  Q.       And you also gave some opinions I think,

6  based on your history in corrections, about the

7  appropriate role of correctional staff; correct?

8  A.       Correct.

9  Q.       And all of those opinions that you've

10  offered, do you feel qualified to offer those

11  opinions?

12  A.       I do.

13        MR. PARKINS:  Okay.  No further

14  questions.

15        MR. HEALEY:  No follow-up.

16        THE VIDEOGRAPHER:  The time is now 1:02.

17  This ends media unit number two (sic) in the video

18  deposition of Dr. Nathaniel Evans, M.D.

19        (Evans Exhibit Number 2 was

20        marked for identification.)

21

22        (Deposition concluded at 1:02 p.m.)

23

24

1        C E R T I F I C A T E

2        I do hereby certify that I am a Notary

Public in good standing, that the aforesaid testimony

3  was taken before me, pursuant to notice, at the time

and place indicated; that said deponent was by me duly

4  sworn to tell the truth, the whole truth, and nothing

but the truth; that the testimony of said deponent was

5  correctly recorded in machine shorthand by me and

thereafter transcribed under my supervision with

6  computer-aided transcription; that the deposition is a

true and correct record of the testimony given by the

7  witness; and that I am neither of counsel nor kin to

any party in said action, nor interested in the

8  outcome thereof.

9        WITNESS my hand and official seal this

8th day of March, 2019.

10

11        _Sara J. Vonchura_

12

13        _____

        Notary Public

14

15

16

17

18

19

20

21

22

23

24

1        INSTRUCTIONS TO WITNESS

2

3        Please read your deposition over

4  carefully and make any necessary corrections.  You

5  should state the reason in the appropriate space on

6  the errata sheet for any corrections that are made.

7        After doing so, please sign the errata

8  sheet and date it.

9        You are signing same subject to the

10  changes you have noted on the errata sheet, which will

11  be attached to your deposition.

12        It is imperative that you return the

13  original errata sheet to the deposing attorney within

14  thirty (30) days of receipt of the deposition

15  transcript by you.  If you fail to do so, the

16  deposition transcript may be deemed to be accurate and

17  may be used in court.

18

19

20

21

22

23

24

Page 154

```
1            - - - - -
             E R R A T A
2            - - - - -
3  PAGE   LINE   CHANGE
4  ___ ___ _____
5  Reason for
6  Change:_____
7  ___ ___ _____
8  Reason for
9  Change:_____
10 ___ ___ _____
11 Reason for
12 Change:_____
13 ___ ___ _____
14 Reason for
15 Change:_____
16 ___ ___ _____
17 Reason for
18 Change:_____
19 ___ ___ _____
20 Reason for
21 Change:_____
22 ___ ___ _____
23 Reason for
24 Change:_____
```

Page 155

```
1        ACKNOWLEDGMENT OF DEPONENT
2
3       I, _____, do hereby
4  certify that I have read the foregoing pages __ to
5  ___ and that the same is a correct transcription of
6  the answers given by me to the questions therein
7  propounded, except for the corrections or changes
8  in form or substance, if any, noted in the attached
9  Errata Sheet.
10
11 _____      _____
12 DATE           SIGNATURE
13
14 Subscribed and sworn to before me this
15 22nd day of February, 2019.
16
17 My commission expires:
18 May 29, 2021
19 Notary Public
20
21
22
23
24
```

40 (Pages 154 - 155)