Page 1

1                          - - -

2              IN THE UNITED STATES DISTRICT COURT

3                MIDDLE DISTRICT OF PENNSYLVANIA

4                          - - -

5      AMIR WHITEHURST          : CIVIL ACTION
                                :
6              vs.              : No. 3:17-CV-00903
                                :
7      LACKAWANNA COUNTY, et al:

8                          - - -

9              Friday, March 15, 2019

10                          - - -

11             Videotaped Deposition of MICHELLE

12     THERSSEN JOY, M.d., taken at Burns White, LLC, 100

13     Four Falls Corporate Center, Suite 515, 1001

14     Conshohocken State Road, West Conshohocken,

15     Pennsylvania 19428, beginning at 10:09 a.m.,

16     before Barbara C. Stalheim, Certified Shorthand

17     Reporter and a Notary Public.

18                          - - -

19

20

21

22

                    VERITEXT LEGAL SOLUTIONS

23                  MID-ATLANTIC REGION

              1801 Market Street - Suite 1800

24            Philadelphia, Pennsylvania  19103

EXHIBIT
ST

Page 2

1 A P P E A R A N C E S :
2 COMERFORD LAW
   BY:  CURT PARKINS, ESQUIRE
3 204 Wyoming Avenue
   Scranton, Pennsylvania  18503
4 570.880.0777
   curt@comerfordparkins.com
5   Representing the Plaintiff
6
   CIPRIANI & WERNER
7 BY:  AMY A. SHWED, ESQUIRE
   415 Wyoming Avenue
8 Scranton, Pennsylvania  18503
   570.780.6640
9 ashwed@c-wlaw.com
   Representing Defendant Satish Mallik, M.D.
10
11 BURNS WHITE
   BY:  JOSEPH T. HEALEY, ESQUIRE
12 575 Pierce Street
   Suite 202
13 Kingston, Pennsylvania  18704
   570.338.6112
14 jthealey@burnswhite.com
   Representing Defendant Dr. Zaloga, et al.
15
16 CIPRIANI & WERNER
   BY:  DAVID E. HEISLER, ESQUIRE
17 475 Wyoming Avenue
   Scranton, Pennsylvania  18509
18 570.347.0600
   dheisler@c-wlaw.com
19  Representing Defendant Lackawanna County
20
   ALSO PRESENT:
21
   Michael Barankovich, videographer
22
23
24

Page 4

1        DEPOSITION SUPPORT INDEX
2 INSTRUCTION NOT TO ANSWER:
3 Page     Line
4 (None)
5
6 REQUEST FOR PRODUCTION OF DOCUMENTS:
7 Page     Line
8 (None)
9
10 STIPULATIONS:
11 Page     Line
12  5        1
13
14 PREVIOUSLY-MARKED EXHIBITS REFERENCED:
15 (None)
16
17 MARKED QUESTION(S):
18 (None)
19
20
21
22
23
24

Page 3

1            I N D E X
2              - - -
3 TESTIMONY OF:  MICHELLE THERSSEN JOY, M.D.
4 By Ms. Shwed...........................7,231,244
5 By Mr. Healey.................................151
6 By Mr. Heisler...............................178
7 By Mr. Parkins...........................180,240
8        E X H I B I T S
9              - - -
10 NUMBER          DESCRIPTION          PAGE
11   1       Curriculum Vitae          244
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1            - - -
2     (It is hereby stipulated and agreed by
3 and among counsel for the respective parties
4 that sealing, certification and filing are
5 waived, and that all objections, except as to
6 the form of the question, be reserved until
7 the time of trial.)
8            - - -
9        P R O C E E D I N G S
10            - - -
11     THE VIDEOGRAPHER:  Good morning.  We
12 are going on the record at 10:09 on March 15,
13 2019.
14     Please note that the microphones are
15 sensitive, and may pick up whispering and
16 private conversations.
17     Please turn off all cell phones, or
18 place them away from the microphones, as they
19 can interfere with the deposition audio.
20     This is media unit one of the video
21 deposition of Michelle Joy in the matter of
22 Amir Whitehurst versus Lackawanna County, et
23 al., filed in the U.S. District Court in the
24 Middle District of Pennsylvania, Case No.

2 (Pages 2 - 5)

MICHELLE THERSSEN JOY, M.D.

Page 10

1   A.   Yes.
2   Q.   -- expert?
3   A.   I was.
4   Q.   Okay.  Have you authored any expert
5   reports other than the New Jersey case and the one
6   that we're here today on?
7   A.   Yes.
8   Q.   On how many occasions?
9   A.   I would say including federal, because
10  I do some work for the VA system --
11  Q.   Oh, sure.
12  A.   -- and within the realm of 200
13  evaluations, most -- predominantly criminal, and
14  predominantly competency evaluations.
15  Q.   Okay.
16  A.   200 to 300.
17  Q.   Okay.  Have you authored reports in
18  medical malpractice cases?
19  A.   No; I have not.
20  Q.   Okay.  Would this be the first one --
21  A.   Yes.
22  Q.   -- then?
23       And the one in New Jersey, was that a
24  medical malpractice case?

Page 11

1   A.   It was not.
2   Q.   Okay.  Okay.  I have your CV.
3        Did you bring a copy --
4   A.   I --
5   Q.   -- with you?
6   A.   -- did.
7   Q.   Okay.  Because I -- I only brought
8   one.
9        Okay.  I just wanted to go over some
10  of your -- your background information so I can
11  just get an understanding of what you do today.
12  Okay?
13  A.   Yes.
14  Q.   But, initially, let's just -- can you
15  walk me through your educational background
16  starting with college, and then moving forward
17  into medical school?
18  A.   Yes.  So I attended Brown University,
19  and the degree there, instead of a Bachelor of
20  Science, it's called an ScB.  They just rearranged
21  the initials, essentially, and that was in
22  cognitive neuroscience.  I graduated magna cum
23  laude from Brown University.
24       From there, I attended Yale for

Page 12

1   medical school, and that's where I got my medical
2   degree.
3        After that, I -- so both -- both of
4   those educational experiences were four years in
5   length.
6   Q.   Okay.  So I just want to --
7   A.   Uh-huh.
8   Q.   -- put some dates on it.
9        At least, according to your CV, you
10  graduated -- you attended Yale from 2008 to 2012;
11  is that correct?
12  A.   Yes; it is.
13  Q.   Okay.  And then would Brown have been
14  2004 to 2008?
15  A.   2003 -- fall of 2003.
16  Q.   Okay.  And then from Yale, you
17  received your medical degree, and then you do
18  postgraduate work.
19       Where did you do that?
20  A.   I did that at the University of
21  Pennsylvania.
22  Q.   Okay.
23  A.   And that was my psychiatry residency,
24  which was four years in length, followed by a

Page 13

1   one-year forensic psychiatry fellowship also at
2   the University of Pennsylvania.
3   Q.   And you completed your forensic
4   psychiatry fellowship in June of 2017?
5   A.   Yes; that's correct.
6   Q.   Okay.  During the time that you're
7   doing postgraduate work, are -- are you also, even
8   if you're being supervised, practicing psychiatry?
9   A.   Yes.
10  Q.   Okay.  And when did that start?
11  A.   When did I start practicing
12  psychiatry?
13  Q.   (Nods head up and down.)
14  A.   So during medical school, you practice
15  as -- as a medical student, not independently.  So
16  that would have been in 2000- -- I believe my
17  first rotation would have been around 2010, but
18  in -- under supervision, and more independently,
19  would have been starting in 2012 as a resident.
20  And -- and during that time, so 2012 to 2013, was
21  half psychiatry.  Other -- other rotations
22  included neurology and medicine.  And following
23  that, which would have been 2013 on, has been only
24  psychiatry.

4 (Pages 10 - 13)

MICHELLE THERSSEN JOY, M.D.

Page 18

1 predominantly, I would not see those patients
2 again.
3    Q.    Okay.  So what percentage of your time
4 when you were at Fairmount was spent doing the --
5 I don't know if I'm using the right lingo, but
6 emergency assessment versus the inpatient
7 treatment?
8    A.    99 percent.
9    Q.    Was the emergency?
10   A.    Yes.
11   Q.    Okay.  And then --
12   A.    My role was the emergency assessment.
13 I would just say that occasionally things would
14 come up overnight, but my role was to do the
15 emergency assessments.
16   Q.    Yeah; that's how I was understanding
17 it.  I just --
18   A.    Great.
19   Q.    -- wanted to make sure that I was -- I
20 was clear.
21        Then you have the position at Penn
22 Hospital inpatient and emergency services.
23        You started that, I guess, in August
24 of 2017, and maintain that position today?

Page 19

1    A.    Correct.
2    Q.    And so what is your -- what were -- is
3 the -- do you have the same responsibility today
4 as did you when you started?
5    A.    So this is -- I would -- both that and
6 Fairmount are what we call per diem, or you're --
7    Q.    Okay.
8    A.    -- paid when you go.  And so I -- I
9 don't have the same regularity that I had.  I am
10 working there less frequently, but I still
11 maintain credentialing, but it would be the same
12 role.
13   Q.    Okay.  And so how often, if you can
14 estimate for me, would you see patients at Penn
15 Hospital?
16   A.    During what time period?
17   Q.    Let's start with 2015 moving -- or
18 2017 moving forward.
19        If it changed, let me know, because
20 we're -- I guess we're --
21   A.    Uh-huh.
22   Q.    -- talking about a year and a
23 half-ish; right?
24   A.    Correct.

Page 20

1        I would say -- I would say,
2 approximately -- so you -- you work -- for the
3 role that I was in, you work weekends, and so you
4 would cover the entire weekend from Friday night
5 on the phone until Monday morning, and then you're
6 there for Saturday and Sunday.  And I would say a
7 weekend shift, such as that, approximately every
8 other month at the beginning, and now I would say
9 I've only done it once or twice in the last year.
10   Q.    Okay.  And how often -- I didn't
11 realize that the Fairmount Behavioral Health
12 System position was per diem, too.
13   A.    Yes.
14   Q.    Moving from 2015 -- I guess you
15 were -- I'm trying to figure out the times that
16 you weren't in your fellowship.
17        So from 2017, moving forward, how
18 often would you -- would you see patients in that
19 emergency assessment position you described
20 earlier?
21   A.    During what -- can you repeat the time
22 period?
23   Q.    Yeah.
24        Starting after your fell- -- once you

Page 21

1 completed your fellowship.
2    A.    I ranged -- again, I've decreased over
3 time, so I would say originally after fellowship
4 would have been, approximately, once a month, and,
5 again, now I've probably only done it four times
6 in the last year.
7    Q.    Okay.  And, just, if you can describe
8 for me in the -- the weekend work at the
9 Pennsylvania Hospital Inpatient Emergency
10 Services, what did you do there?
11   A.    So there, there are two units at
12 Pennsylvania Hospital, two separate floor --
13 floors, the fourth floor and the sixth floor.  The
14 fourth floor has two teams, divided the patients
15 into two teams.  That is all acute psychosis work.
16 And the sixth floor is half geriatric patients and
17 half what would be classified as mood patients,
18 and so you see all those patients, which would be
19 40 patients on Saturday and Sunday, and you can
20 also be called to do consult work in the hospital,
21 but that's less regularly, but you'd see all 40
22 patients, assess their safety, assess their
23 treatment over the weekend.  And, like I said, I
24 was also on the phone supervising the Penn

6 (Pages 18 - 21)

MICHELLE THERSSEN JOY, M.D.

Page 26

1 emergency room, that is, I would say, 99 percent
2 veterans, but, again, it's focusing on suicide,
3 homicide, psychosis, high acuity patient that come
4 in needing to be seen.
5        The reason I said that there might not
6 all be veterans is because it's an emergency room.
7 You don't turn someone away --
8    Q.   Right.
9    A.   -- in the middle of an emergency, but
10 predominantly it's veterans because that's who
11 would come to the hospital.
12        So you also asked when I started
13 versus now.  So I originally did a 24-hour shift
14 there.  I started at 8 a.m. and continued until
15 8 a.m. the next day in the emergency room;
16 however, the policies and staffing changed at the
17 VA such that they did not -- they changed their
18 role so that there's no psychiatrists overnight
19 between 11 p.m. and 8 a.m.  So now I work 8 a.m.
20 until 11 p.m. in the emergency room, but I'm
21 accessible by phone from 11 p.m. until 8 a.m.
22    Q.   Okay.
23    A.   So that's the sense that my role
24 changed.  That was, approximately, one year ago by

Page 27

1 virtue of the policy of the VA that the hours
2 in-house decreased.
3    Q.   And how often would you do this shift,
4 whether it was the 24-hour shift, or now the --
5 the -- whatever the time is in the hospital?
6    A.   Every week.
7    Q.   One time a week?
8    A.   Yes.
9    Q.   Okay.  And then you have on your CV
10 that -- something classified as a forensic
11 evaluator for the Court Mental Health Clinic,
12 First Judicial District of Pennsylvania.
13        What is that?
14    A.   So when you previously asked about the
15 number of expert evaluations that I have submitted
16 reports for, the majority come from this position.
17 So during my training as a fellow, I started
18 there.  For one third of the year during my
19 fellowship I was there, approximately, three days
20 a week.  In 2017, when I was hired, I -- I've been
21 there since then between one and twice a week.
22 And those evaluations, again, I would say, upwards
23 ever 90 percent are competency to stand trial, as
24 well as diagnosis and treatment recommendations,

Page 28

1 primarily focused on psychosis; whether or not
2 someone is competent for criminal charges.  Once
3 in a while there are evaluations for
4 post-sentencing recommendations for treatment;
5 however, as I said, the vast majority are
6 competency to stand trial.
7    Q.   Okay.  Is there any way you can break
8 down when you say "vast majority of competency,"
9 can you be more specific?
10        I don't want you to pull a number up,
11 but is it, like -- when you say "vast majority," I
12 don't know what that means.
13        So is it, like, 50 percent?
14 60 percent?
15    A.   I believe I said upwards of
16 90 percent.
17    Q.   Oh, I'm sorry.  I didn't hear you.
18 Okay.
19        And then the last position that you
20 have listed here is jail-based competency
21 psychiatric evaluator, MHM Services.
22        I don't know what -- what is that?
23    A.   Yes.  So this is a great one to bring
24 up.  So there's the ACLU has sued the --

Page 29

1 essentially, the state hospitals in Philadelphia,
2 feeling that psychiatric care in jail is so poor,
3 and we're, essentially, at the bottom of national
4 standards for psychiatric care in jail in
5 Pennsylvania.  And so the ACLU has sued, and me,
6 and three other doctors, were hired as the
7 independent assessment experts in this case to see
8 every person in the state hospitals at Norristown
9 State Hospital and Torrence State Hospital to make
10 recommendations about where the placement should
11 be.  So the case is, essentially, that there's
12 such a long wait to get treatment in jail,
13 psychiatric treatment, to the state hospital, and
14 that treatment in jails in Pennsylvania are
15 substandard.  And so they need assessments at the
16 two state hospitals to get patients out of the
17 state hospital into alternative settings so that
18 people can be moved from the jail to the state
19 hospitals for appropriate treatment.
20    Q.   Okay.  And who -- you said you were
21 hired.
22        Who hired you?
23    A.   MHM Services.
24    Q.   Who's that?

8 (Pages 26 - 29)

MICHELLE THERSSEN JOY, M.D.

Page 34

1 the initial evaluation, you may not know, at that
2 time, whether the psychosis is a result of Spice
3 or something else.
4    A.   Correct.
5    Q.   Okay.  And then, as part of your
6 practice then, do you, also, treat patients who,
7 at one point or another, was determined that their
8 psychosis was the result of the Spice?
9    A.   Yes.  I would say even in those cases
10 it's hard to distinguish.  I would put them in
11 several categories, whether it was substance
12 induced, substance enhanced, whether there was an
13 initial psychosis that was worsened by -- by
14 Spice, or other synthetic cannabinoids, or other
15 drugs.  And I think, for the most part, we don't
16 look too far into it because if the psychosis
17 continued, even from the beginning, they'd get the
18 same treatment.
19    Q.   Okay.  But are you able to estimate --
20 and if you can't, just tell me that, too -- how
21 much patients that you do follow-up care in who
22 have psychosis that at least the working diagnosis
23 is as a result of Spice?
24    A.   No; I can't make an estimate.

Page 35

1         I can say one of the patients that I
2 saw -- let me see.  One of the patients that I saw
3 on Wednesday who -- sometimes I will see the same
4 patients in the emergency room that are also on my
5 outpatient team, he jumped out of a window and
6 broke both of his legs with what we're assuming
7 was substance-induced psychosis.
8    Q.   Okay.
9    A.   So there are people, but, again, I
10 can't make an estimate of how many.
11    Q.   Okay.  And when you have a person who
12 you believe is suffering from psychosis from
13 Spice, what is the -- generally speaking, what is
14 the treatment plan?
15    A.   So the treatment plan would be -- for
16 psychosis, in general?
17    Q.   Psychos- -- okay.  Does it make a
18 difference for you -- I guess that's one thing I
19 should ask you before we get into the treatment.
20         Does it make a difference for you, as
21 a psychiatrist, if you're treating a patient who
22 has a psychosis that is not believed to be as a
23 result of Spice?
24    A.   It does not make a difference for me.

Page 36

1    Q.   Okay.
2    A.   I would say that the difference is the
3 acuity of the psychosis and the symptoms and the
4 safety requirements, but I would treat -- I would
5 assume that psychosis is psychosis, and I wouldn't
6 make that differentiation in terms of the
7 medications that I would prescribe.
8    Q.   Okay.  And so is the -- the initial
9 treatment for someone -- a patient that you're
10 seeing that has acute psychosis medication
11 initially?
12    A.   Is the treatment for acute psychosis
13 medication?
14    Q.   Yes; is that part of it?
15    A.   It is part of it; yes.
16    Q.   Okay.  And what is the medications
17 that are prescribed?
18    A.   Well, wonderfully, there are a wide
19 range of medications that can be prescribed.  I
20 would say --
21    Q.   Maybe you can give me, like, I
22 don't -- you know, aspirin versus Tylenol.
23    A.   Right.
24    Q.   Do you know what I mean?

Page 37

1    A.   So two -- two main categories.  The
2 standard of care would be to prescribe an
3 antipsychotic and/or a benzodiazepine.  And within
4 those categories there are numerous options, some
5 of them are intramuscular, as well, and some are
6 by mouth.  So those would be the two classes of
7 medications that I would prescribe for acute
8 psychosis irrelevant of the cause.
9    Q.   Okay.  And would those medications
10 also be part of the treatment regimen, same kind
11 of patient we're talking about back in 2015?
12    A.   Can you repeat the question?
13    Q.   Yeah.
14         So we're still talking about the same
15 kind of patient --
16    A.   Uh-huh.
17    Q.   -- who has psy- -- acute psychosis
18 that Mr. Whitehurst was treated in May and June of
19 2015.
20         So I'm just wondering if the treatment
21 would have been -- would have included both the
22 antipsychotic and the benzodiazepine medication.
23    A.   Yes.
24    Q.   Okay.  And then you said, also, that

10 (Pages 34 - 37)

MICHELLE THERSSEN JOY, M.D.

Page 42

1    A.    Yes.
2    Q.    -- testified to that under an
3  appropriate circumstance, restraints have an
4  appropriate -- are an appropriate mechanism in
5  psychiatric treatment to stabilize a patient?
6    A.    Yes; with those caveats. Because they
7  also can cause significant harm, and so we try to
8  limit the amount of time in restraints and get
9  people out of them as quickly as possible.
10    Q.    Can you just give me a sense of, since
11  your fellowship -- we went over what -- all the
12  various positions that you hold today.
13         Just, I want to get a sense of what is
14  your typical week like.
15    A.    Uh-huh.
16    Q.    Like, where -- where are you?
17    A.    So Monday and Tuesday I'm in the VA
18  outpatient clinic, the silver team, which is the
19  psychosis, seriously mental ill team, and this
20  is -- some weeks might vary, but I'm going to give
21  you the typical weeks.
22    Q.    Okay.
23    A.    So a 8 a.m. until 6:30 p.m. on
24  Mondays, and then 8 a.m. until 4:30 p.m. on

Page 43

1  Tuesdays. Wednesday, 8 a.m. until 11 p.m. I'm in
2  the emergency room, and then I'm available
3  overnight between 11 p.m. and 8 a.m. at the -- for
4  the -- for the VA Hospital emergency room.
5  Thursdays, typically, I'm in the courthouse for
6  the competency evaluations between 11 and 2, doing
7  three evaluations during that time period. And
8  the rest of the week will vary if I have students,
9  because I train all the students in forensic
10  psychiatry -- all the residents, I'm in charge of
11  training them in forensic psychiatry. So
12  sometimes I'll add additional days if they're on
13  rotation with me. And then between Friday and
14  Sunday I might do another day at the courthouse.
15  I might be at Norristown. I might be
16  participating in some forensic evaluation, and
17  occasionally moonlighting.
18    Q.    So how many hours a week do you work,
19  typically?
20    A.    So --
21    Q.    I understand they vary.
22         Can you give me a range?
23    A.    Yes. Thirty-three hours at the VA
24  on-site. Eleven p- -- nine off-site. Is that

Page 44

1  right? Nine off-site. Three at the courthouse.
2  So I would say minimum of 43 hours --
3    Q.    Okay.
4    A.    -- somewhere.
5    Q.    Okay. Okay. And did you -- I -- did
6  you have an opportunity -- I sent a Notice of
7  Deposition for you to come here today.
8    A.    Yes.
9    Q.    Did you have an opportunity to look at
10  it?
11    A.    Yes.
12    Q.    Okay. And did you -- I see that
13  you're -- you're not a paper person, you're a
14  computer person --
15    A.    This is correct.
16    Q.    -- but did you -- at some point, I'll
17  have to get copies of it, but did you bring with
18  you -- and I'm just going to read off, just to
19  see --
20    A.    Uh-huh.
21    Q.    -- what we have. I asked you to bring
22  a copy of your report, which is December 31, 2018.
23  I -- I have one.
24    A.    Yes.

Page 45

1    Q.    So that's not that big of a deal.
2         A listing and description of all
3  documents and materials that you reviewed to
4  prepare the re- --- report?
5    A.    And that is in my report at the end.
6    Q.    Okay. So it's -- it's the last page;
7  I think?
8    A.    Yes.
9    Q.    That's what we're talking about?
10    A.    Yes.
11    Q.    Have you reviewed any additional
12  documents since you prepared the report?
13         For example, I know there were
14  depositions taken, maybe, two weeks ago, three
15  weeks ago.
16         Dr. Evans, did you read his
17  deposition?
18    A.    No.
19    Q.    And then there's also a psychologist,
20  Dr. -- I'm going to brutalize it -- Deesh (ph)?
21         MS. SHWED: Is that how you say it?
22         MR. PARKINS: Are you talking about
23  Sisti?
24

12 (Pages 42 - 45)

MICHELLE THERSSEN JOY, M.D.

1  see his CV?
2      A.   Yep.
3      Q.   My highlighting is just my reminders.
4  You can --
5      A.   Yes; I have not seen this.
6      Q.   Okay.  So take your time, and look at
7  it; if you like.
8      A.   I've briefly reviewed it at this
9  point.
10     Q.   And that's all I wanted to ask you is
11  that, at least, if -- if you assume that all of
12  the documentation in that curriculum vitae is
13  accurate, and I think he testified to it, too, but
14  the deposition will reflect that, that Dr. Mallik
15  is a licensed psychiatrist to practice in the
16  Commonwealth of Pennsylvania, and he's been
17  practicing psychiatry for, approximately, 22
18  years?
19     A.   Yes.
20     Q.   Okay.  And can we agree that on -- in
21  the Commonwealth of Pennsylvania, in order to
22  practice as a psychiatrist, you do not need to be
23  board certified?
24     A.   That is my understanding --

1      Q.   Okay.
2      A.   -- correct.
3      Q.   And so can we agree then that a
4  psychiatrist who's practicing, who has a license
5  to practice in the Commonwealth of Pennsylvania,
6  does not breach the standard of care simply
7  because he doesn't have a board certification?
8      A.   Not in and of itself; that is correct.
9      Q.   Okay.  Can I have that back --
10     A.   Yes.
11     Q.   -- just so I can keep my stuff.
12          Okay.  And then, at -- at least
13  according to his curriculum vitae, since July of
14  1997 until present day, he's been a psychiatrist
15  at both the State Correctional Institute at
16  Waymart, which is the state corrections back in
17  Lackawanna County, and the Lackawanna County
18  Prison; if this is --
19     A.   That is on there.
20     Q.   Okay.
21     A.   Again, I have no idea how much time
22  he's spent there.  If six hours a week counts
23  as --
24     Q.   It does.

1      A.   -- being there are continuously.
2      Q.   Yeah.  And I'm not representing the
3  time.
4      A.   Okay.
5      Q.   I'm not representing hours, but -- and
6  he did testify to that, that he has continuously
7  provided psychiatric care from -- to inmates from
8  1997 until -- he continues to do it today.
9          Do you recall him testifying to that,
10  or no?
11     A.   Yes.
12     Q.   Okay.  And then in addition to that,
13  he also practices in private practice with Dr.
14  Burger and his group.
15     A.   I do --
16     Q.   Do you recall that?
17     A.   -- recall that.
18     Q.   Okay.
19     A.   And I believe a nursing home is part
20  of that, as well --
21     Q.   Correct.
22     A.   -- from his testimony.
23     Q.   Okay.  And do you have an
24  understanding, as it relates to the -- the

1  treatment of Mr. Whitehurst, that Dr. Mallik was
2  not an employee of the Lackawanna County Prison?
3      A.   He was contracted --
4      Q.   Yes.
5      A.   -- is my understanding.
6      Q.   He -- he was a general contractor.  So
7  he's not an employee of the Lackawanna County
8  Prison.
9          Was that your understanding?
10     A.   Yes; it was.
11     Q.   And that he also, similarly, is not an
12  employee of the Correctional Care.  He, similarly,
13  had a contra- -- you know what, let me just
14  correct it.  He, actually, didn't have contract
15  with the Lackawanna County Prison.  He had the
16  contract with Correctional Care.
17          Do you recall that?
18          And Correctional Care has a contract
19  with Lackawanna County Prison.
20     A.   Can you repeat the specifics again --
21     Q.   Sure.
22     A.   -- just so I make sure we're on the
23  same page?
24     Q.   I think what Dr. Mallik testified to

14 (Pages 50 - 53)

MICHELLE THERSSEN JOY, M.D.

Page 58

1  you've reviewed, up to and including today, that
2  he limits the amount of time that he spends to the
3  Lackawanna County Prison to exactly nine hours
4  when he's physically on-site?
5       Do you know one way or the other if he
6  does that or not?
7    A.   I don't understand what you mean by if
8  he limits it.
9    Q.   So are there times when you're at a
10 facility where you stay longer because you may
11 need to complete an evaluation, or an emergency
12 patient comes in, and to -- to complete an
13 assessment, you stay longer than what, maybe, your
14 allotted times to complete the task; whatever it
15 may be?
16   A.   Yes.
17   Q.   Do you know if there are occasions
18 when Dr. Mallik does exactly that?
19       Even though he's supposed to be there
20 at least nine hours a week, do you have
21 information one way or the other if he does
22 exactly what I described, that he stays later
23 because someone may come in, he needs to see the
24 patient, or he's involved with a prisoner, and,

Page 59

1  you know, say he's leaving at three o'clock, the
2  clock strikes three, but he continues to stay
3  later to finish -- finish the treatment or
4  assessment?
5    A.   I do not know what he does --
6    Q.   Okay.
7    A.   -- in that regard.
8    Q.   And then, at least according to the
9  contract, and Dr. Mallik's deposition testimony,
10 in addition to the time that he is physically
11 on-site that week, he also is available for phone
12 calls in emergency-type situations, as described
13 in the question I just read to you?
14   A.   That's my understanding of what you
15 read, but I would say I'm unsure of what he could
16 do remotely since they don't have an electronic
17 medical record. When I'm available overnight, I
18 log onto the computer. I can see everything about
19 the patient, their entire history, and I can order
20 medications. But since they have a written
21 medication, you know, they -- all of his orders
22 are done handwritten, so I don't know what he
23 could do by phone.
24   Q.   He can't do a verbal order for

Page 60

1  medication?
2    A.   I don't know.
3    Q.   Okay. So you don't know one way or
4  the other?
5    A.   Right.
6    Q.   But are you aware in practice that
7  there are times when physicians and psychiatrists
8  do verbal order medication because they're not
9  physically on the site?
10   A.   It's tended to move away from that.
11 Most of the places that I work for don't practice
12 that way anymore because you don't have
13 information about the patient, you're not able to
14 see them, you don't have there are records, and
15 you wouldn't, for instance, know if they have
16 allergies, or anything else. So I know that it
17 is -- it does happen, but I know that they're
18 moving way from that with the preponderance of
19 electronic medical records in order to enhance
20 safety and better care.
21   Q.   Okay. But it's not a breach of the
22 standard of care for a physician to provide a
23 verbal order today; am I correct?
24   A.   Is it a breach of the standard of

Page 61

1  care?
2       Not inherently, but if it's not now,
3  it soon is going to be.
4    Q.   Right.
5       But you understand that you're here to
6  testi- -- I -- I understand the trend.
7    A.   Uh-huh.
8    Q.   And when you practice in a city
9  situation like you do in Philadelphia, the
10 technology seems to be more advanced than from
11 places like Lackawanna County where we may linger
12 a little behind. But the standard -- once
13 you're -- the standard of care, as I understand
14 it, is that I always refer to it to the jury is
15 the floor, not the ceiling.
16   A.   Uh-huh.
17   Q.   So it's the minimum requirement of a
18 physician similarly situated in a similar
19 circumstance; correct?
20       Is that your --
21   A.   That is my --
22   Q.   -- understanding?
23   A.   -- understanding.
24       It is an agreed-upon standard, not the

16 (Pages 58 - 61)

MICHELLE THERSSEN JOY, M.D.

1    Q.    (Nods head up and down.)
2    A.    No; I did not.
3         MS. SHWED:  Okay.  Do you want to go
4    off the video record for a minute?
5         THE VIDEOGRAPHER:  Time is now 11:11.
6    Going off video record.
7              - - -
8         (Whereupon a discussion was held off
9    the record.)
10             - - -
11        THE VIDEOGRAPHER:  Time is now 11:13.
12   Back on the video record.
13   BY MS. SHWED:
14   Q.    Okay.  Dr. Joy, we took a -- a
15   few-minute break off the video record so that you
16   would have an opportunity to review the
17   December 12, 2013, letter from Shirley Moore,
18   M-O-O-R-E, and her last name is Smeal, S-M-E-A-L,
19   executive depth secretary, and the other letter
20   also authored by her on September 25, 2015; right?
21   A.    Yes.
22   Q.    Okay.  Did you -- is that the first
23   time that you had an opportunity to read those
24   records?

1    A.    It is.
2    Q.    Okay.  And so you did not, obviously,
3    have that information prior to you preparing your
4    report on December 31, 2018?
5    A.    Correct.
6    Q.    Okay.  Did you also have an
7    opportunity, prior to preparing your report, to
8    read the deposition of the warden in Dec- -- in
9    2015, Robert McMillan?
10   A.    I did not.
11   Q.    Okay.  The -- the letters -- and I'm
12   just going to read some of them for you.
13        This letter, December 12, 2013, is
14   addressed to Corey O'Brien, who was the Lackawanna
15   County Commissioner at the time, and it says --
16   and I'll read it all to you because both letters
17   are the same.
18        Congratulations are in order as the
19   Lackawanna County Prison has earned the 2013
20   Certificate of Compliance.  Warden Robert
21   McMillan, and the Lackawanna County correctional
22   staff deserve credit for their efforts in
23   operating this facility in accordance with
24   statewide correctional standards.  There are no

1    deficiencies, or citations, to this report.
2         The Pennsylvania Department of
3    Corrections Office of County Inspection and
4    Services, Director Thomas G-R-E-I-S-H-A-W,
5    inspectors Sandra L-E-O-N-O-W-I-C-Z, and Joseph
6    F-E-R-R-A-N-T-I conducted the inspection of the
7    Lackawanna County Correctional Facility on
8    October 3, 2013.  The results of the inspection
9    show that the facility has achieved a hundred
10   percent compliance with Title 37, Chapter 95
11   County Correctional Institutions Administrative
12   Standards Regulations and Facilities.
13        Staff commitment to compliance was
14   evident throughout the facility, allowing the
15   facility to maintain an audit-ready status.  Staff
16   at the Lackawanna County Prison should be proud of
17   their accomplishments and are encouraged to
18   maintain this level of compliance.
19        Receiving the Certificate of
20   Compliance is a distinction that is earned when a
21   facility and staff have met, or exceeded, the
22   Department's expectations.  Due to this
23   achievement, the Lackawanna County Prison is
24   exempt from the normal one-year inspection cycle.

1    As such, the next inspection cycle for this
2    facility will be 2015.
3         As the executive deputy secretary, I
4    extend my congratulations and gratitude to all
5    involved for their outstanding inspection results
6    and a job well done.
7         And it's pretty much an identical
8    letter dated September 25, 2015, except that this
9    references that the next inspection cycle will be
10   2017.
11        And have you ever had an opportunity
12   to review what's referred to in this letter as
13   Title 37, Chapter 95, County Correctional
14   Institutions?
15   A.    No.
16   Q.    Okay.  I'm just going to read for you
17   some of the things that are included as the
18   administrative standards and regulations for the
19   facilities.  Those include personnel, orientation,
20   inmate rules and staff procedures, medical and
21   health services, security and treatment services,
22   among others.  Okay?
23        And, Doc- -- and, lastly, until I get
24   into the question that I do want to ask you, with

18 (Pages 66 - 69)

MICHELLE THERSSEN JOY, M.D.

Page 74

1 those letters; yes.
2    Q.    And to -- and that letter is based, of
3 course, on the state's inspection?
4    A.    Yes.
5    Q.    Okay.
6    A.    Again, like I said, my understanding
7 from my work in the -- in the -- in the ACLU case
8 is that -- that says we have compliance with our
9 state regulation, I believe, but the content of
10 that lawsuit is that we're pretty much the worst
11 in the -- our state is the worst in the country
12 for our treatment in jail for mental health, so...
13    Q.    But the people who are -- or, you
14 won't disagree with the fact that the people who
15 are in charge of ensuring that the Department of
16 Corrections regulations, administrative
17 regulations, are being followed, go out and do the
18 inspections, it's their sole purpose in going out
19 there is to determine whether a particular
20 facility meets the regulations or not; correct?
21    A.    Yes.
22    Q.    And that inspection has the ability to
23 find deficiencies and write citations for those
24 deficiencies if they -- they see it and they deem

Page 75

1 it appropriate; correct?
2    A.    Yes.
3    Q.    And based on the two letters that we
4 saw, that did not happen in the Lackawanna County
5 Prison in 2013, and it did not happen in 2015;
6 correct?
7    A.    Correct.
8          I wish it had because some things
9 might have improved.
10    Q.    Is -- in -- it's my understanding that
11 you intend to provide expert opinion as it relates
12 to Dr. Mallik as to whether he breached the
13 standard of care from May 25, the time that
14 Mr. Whitehurst was brought into Lackawanna County
15 Prison, to June 8, 2015; is that right; when he
16 went to -- he was then transferred to the
17 Geisinger CMC?
18    A.    Correct.
19          He was transferred on June 9; I
20 believe.
21    Q.    Yeah.  The last time that Dr. Mallik
22 saw him would have been the day before.
23    A.    Correct.
24    Q.    Okay.

Page 76

1    A.    But I would say into June 9 because I
2 think he should have had more frequent visits.  I
3 just want to extend it to that time period.
4    Q.    Well, he was taken to the hospital in
5 the morning hours, right, of June 9, was that your
6 understanding, it was, like, nine o'clock?
7    A.    I'm not sure what time, but...
8    Q.    Okay.  Do you intend to provide
9 opinions as to the causes of the medical
10 conditions that brought Mr. Whitehurst to
11 Geisinger CMC on June 9?
12    A.    I -- insofar as I'm a medical doctor,
13 I can provide some opinions largely based on my
14 review of the hospital records and their
15 conclusions.
16    Q.    Are you -- I guess -- you know, in the
17 medical malpractice realm, we call it causation.
18          Are you intending to provide causation
19 testimony as it relates to the medical conditions
20 that brought him to Geisinger CMC?
21    A.    Yes.
22    Q.    Okay.  Did you have an opportunity
23 to -- to review the discharge diagnoses from
24 Geisinger CMC?

Page 77

1    A.    Yes.
2    Q.    Okay.  Can you tell me what in --
3 opinion you intend to provide was the cause of
4 Mr. Whitehurst's hyperkalemia?
5          I'm just going to read off the
6 diagnoses --
7    A.    Uh-huh.
8    Q.    -- that are on the discharge summary.
9    A.    So when you asked me, I don't think
10 that I would provide them for each and every
11 diagnosis.
12    Q.    Okay.  I'll go over them --
13    A.    Okay.
14    Q.    -- and if you don't, just tell me you
15 don't.
16    A.    Okay.
17    Q.    So I'm getting from this answer, at
18 least, you don't intend to provide an answer as to
19 what caused Mr. Whitehurst's hyperkalemia?
20    A.    Correct.
21    Q.    Drug-induced thrombocytopenia,
22 T-R-O-M-B-O-C-Y-T-O-P-E-N-I-A [sic].
23    A.    Correct; I will not be providing an
24 opinion there.

20 (Pages 74 - 77)

MICHELLE THERSSEN JOY, M.D.

Page 82

1 non-environmental; so I can see that.
2    Q.    Right.  I can read that, too.
3          Okay.  Can I ask you, did you have any
4 documentation to suggest to you that
5 Mr. Whitehurst had a mental health diagnosis
6 coming into the Lackawanna County Prison on May, I
7 think it was 25th of 2015?
8    A.    When you say "coming into"...
9    Q.    Was there some psychologist, or
10 psychiatrist, who diagnosed Mr. Whitehurst with a
11 mental health diagnosis prior to his being brought
12 into the Lackawanna County Prison on May 25, 2015?
13    A.    I believe that he had had interaction
14 with psychiatry at some point, but I don't know --
15 I didn't see those --
16    Q.    Okay.
17    A.    -- reports.
18    Q.    And when you say that, I don't
19 remember seeing one.
20          So what -- what information are you
21 talking about?
22    A.    Where -- again, I saw stuff after, but
23 I'm not certain that I saw anything before the
24 prison in Lack- -- the Lackawanna County Prison in

Page 83

1 May of 2015.
2          So can you be more specific about what
3 you saw that suggests that he was seen by a
4 psychiatrist before then?
5    A.    Yes; I believe it was in his
6 deposition he talks about having seen a
7 psychiatrist prior.
8    Q.    Okay.  About -- how about as far as
9 psychiatric records --
10    A.    No.
11    Q.    -- or treatment records?
12    A.    No.  Not at all.
13    Q.    Okay.  And I think in his deposition
14 he referred to a psychiatrist who -- I forget if
15 it was psychiatrist or psychologist, Dr. Fishbein;
16 is that what you're talking about?
17    A.    No.  That was specific because I
18 believe he -- let me see when that report was.
19 Give me one moment.
20    Q.    Oh, yeah.  Take your time.
21    A.    My understanding was that he had seen
22 an additional psychiatrist at some point prior to
23 his entering into the prison.
24    Q.    Is it strictly from

Page 84

1 Mr. Whitehurst's --
2    A.    Yes.
3    Q.    -- deposition --
4    A.    Yes.
5    Q.    -- that you're recalling that?
6    A.    Yes.
7    Q.    Okay.  I know in your report you --
8 you talk about when Mr. Whitehurst was able to get
9 cognizant again that he recognized the difference
10 in his physical appearance.
11          Do you recall that?
12    A.    Yes; I do.
13    Q.    Okay.  Do you know what page that's
14 on?
15    A.    Yes; it is on page 11.
16    Q.    Okay.  All right.  I think I get to
17 that later, but I will -- let me just make sure I
18 write that down so I know.
19          So then let's talk a little bit about
20 Dr. Mallik's involvement with Mr. Whitehurst.
21 Okay?
22    A.    Yes.
23    Q.    You -- you know, at least from
24 reviewing the records, that Dr. Mallik saw

Page 85

1 Mr. Whitehurst on May 25, 2015, according to the
2 documentation; right?
3    A.    I couldn't read any of it, but
4 assuming that he writes that he saw him, there is
5 progress notes.
6    Q.    Did you get -- his reading -- his
7 writing is difficult to read, so he transcribed it
8 for the litigation.
9          Did you get to see that?
10    A.    No.
11          Only --
12    Q.    Okay.
13    A.    -- my understanding of it is largely
14 from his testimony --
15    Q.    Okay.
16    A.    -- from his deposition.
17    Q.    Okay.  So you do know, at least either
18 from the documentation, or his deposition
19 testimony, that he saw -- that Dr. Mallik saw
20 Mr. Whitehurst on May 25, 2015.
21          Does that seem right?
22    A.    Yes.
23    Q.    On May 28, 2015?
24    A.    I don't have the exact dates in front

22 (Pages 82 - 85)

MICHELLE THERSSEN JOY, M.D.

Page 90

1   Q.   Right.
2        And when a person does a psychiatric,
3   or psychological, evaluation, part of that
4   evaluation, when you can, is an exchange with the
5   patient; a verbal exchange with the patient;
6   correct?
7   A.   Yes.
8   Q.   You try to get the patient to -- you
9   ask certain questions, and you try to get the
10  patient to answer certain questions; am I correct?
11  A.   Yes.
12  Q.   And that type of interaction will help
13  you, as the psychiatrist, try to figure out what
14  an appropriate diagnosis may be for a patient?
15  A.   That is part of the --
16  Q.   Okay.
17  A.   -- evaluation; yes.
18  Q.   Can we agree that it is, at times,
19  difficult to evaluate a patient who will not
20  provide that information to you for whatever
21  reason?
22  A.   What do you mean by "difficult"?
23  Q.   If you're not provided the answers to
24  your questions, it's difficult to come up with a

Page 91

1   psychiatric diagnosis?
2   A.   No; I do not agree.
3   Q.   So you don't need the patient to
4   interact with you at all to come up with a
5   psychiatric diagnosis?
6   A.   So "interaction," you -- by that, you
7   mean verbal?
8   Q.   Yes.
9   A.   You can use a number of different data
10  collection means, and you would not need,
11  necessarily, answers to questions; correct.  In a
12  large portion of the patients that I see that are
13  acutely psychotic, they may -- may not be
14  providing information.  In fact, there's a
15  specific type of psychosis called catatonia where
16  the patients don't speak.
17  Q.   And in the patients who can speak --
18  A.   Uh-huh.
19  Q.   -- they're speaking, they're just not
20  responding to your questions, are you able, if
21  they don't respond to your questions, to come up
22  with a definitive diagno- -- psychiatric
23  diagnosis?
24  A.   Yes.

Page 92

1   Q.   And how do you do that?
2   A.   So my training is in evaluating signs
3   and symptoms of mental illness, and that would
4   include appearance, behavior, speech, monitoring
5   of emotional range, thought content, whether
6   someone is responding to internal stimuli,
7   responding to hallucinations.  It would include
8   their psychomotor activity -- this is called the
9   mental status exam, and only one part of that
10  entire exam is based on what the patient says,
11  which is mood.  And so the entire exam, only one
12  word of it is what the patient says.
13  Q.   So in someone like Mr. Whitehurst's
14  case where there were descriptions of him -- I
15  think you saw the video.
16  A.   I did.
17  Q.   All right.  So you saw some of the
18  activity.  And there were some descriptions in the
19  Lackawanna County Prison notes of him talking to
20  the toilet, talking to spirits, those types of
21  things.
22        So based on your observation of the
23  video, and the reading of some of the deposition
24  testimony and the records of what was going on

Page 93

1   with Mr. Whitehurst, would psychosis be one of the
2   things you would diagnose him with?
3   A.   I would have said unspecified
4   psychotic disorder.  I know that Dr. Mallik wrote
5   psychosis nos.  But I -- this was 2015.  That
6   wasn't a diagnosis in 2015.  It changed in 2013.
7   Q.   Okay.  So would -- yours would have
8   included the psychosis, not -- not otherwise
9   specified; is that what you said?
10  A.   Mine would be unspecified psychotic --
11  Q.   Unspecified.
12  A.   -- disorder.  Not otherwise specified
13  was no longer a diagnosis as of 2013.
14  Q.   Okay.
15        THE VIDEOGRAPHER:  Counsel, just so
16  you know, there's about five minutes before
17  I'll have to change disks.
18        MS. SHWED:  Okay.  Well, let's take a
19  break now then.
20        THE VIDEOGRAPHER:  Time is now 11:40.
21  This concludes disk one.
22             - - -
23        (Whereupon a recess was taken at this
24  time.)

24 (Pages 90 - 93)

MICHELLE THERSSEN JOY, M.D.

1    Q.    Okay.
2    A.    Which I think the equivalent of
3  Mr. Whitehurst's -- I -- his condition was the
4  equivalent of that at that time.
5    Q.    Well, can we agree Mr. Whitehurst was
6  not in a psychiatric hospital; correct?
7    A.    Because there wasn't one.  So the
8  level of observation that he was on was one-to-one
9  observation, and that would actually be equivalent
10  and above the acuity -- one of the highest acuity
11  patients if he were in a psychiatric hospital.  He
12  wasn't in a hospital by virtue of the fact that
13  there wasn't --
14    Q.    Right.
15    A.    -- one available at the jail.
16    Q.    Right.
17          He was in the Lackawanna County
18  Prison; correct?
19    A.    Correct.
20    Q.    And I know you said that -- you
21  reference in your report that, at some point, it
22  was your opinion that Mr. Whitehurst should have
23  been transferred to a different -- out of the
24  Lackawanna County to a different facility.

1          When did you -- when do you believe
2  that should have occurred?
3    A.    Where did I -- can you tell me --
4    Q.    Oh, maybe I --
5    A.    -- where I say that specifically?
6    Q.    Maybe I misunderstood.
7          Do you have an opinion that you intend
8  to render at the time of trial that at some point
9  Mr. Whitehurst, during that May 25 through June 8,
10  the last day Dr. Mallik saw him as a patient,
11  should have been transferred to a different
12  facility?
13    A.    My -- the opinion that I will provide
14  with regard to that is that that was one option.
15  There could have been a number of interventions that
16  didn't happen.  That could have been an option,
17  but it is not the only one.
18    Q.    Okay.  So if I understand what you're
19  saying, the fact that he was not transferred out
20  of the Lackawanna County Prison, in and of itself,
21  is not a breach of the standard of care because
22  there were --
23    A.    Correct.
24    Q.    -- other options, in your opinion,

1  that could have been done in the prison setting?
2    A.    Correct.
3    Q.    Okay.
4    A.    I would characterize my opinion that
5  in and of itself that was not a breach of the
6  standard of care, but not doing anything, I
7  believe, was a breach of the standard of care.
8    Q.    And you said that you knew that he was
9  on the -- he was in the portion of the prison
10  where there was the camera cells; correct?
11    A.    Correct.
12    Q.    Okay.  And you knew from when --
13  Dr. Mallik's testimony is that the practice was
14  that he would have to see every inmate in a camera
15  cell every time he was in the prison; correct?
16    A.    Yes.
17    Q.    Okay.  And we read the dates off that
18  Mr. Whitehurst was seen by Dr. Mallik prior to him
19  going to the hospital.
20          Do you recall?
21    A.    I do.
22    Q.    I think it was, like --
23    A.    -- seven; I believe.
24    Q.    I'm glad you remember.

1          Okay.  So he saw -- when I say "he,"
2  Dr. Mallik saw Mr. Whitehurst seven times between
3  May 25, 2015, until June 8, his last visit, 2015;
4  understanding June 9 is when he's taken to
5  Geisinger CMC; correct?
6    A.    Yes.
7    Q.    And you -- you -- do you have an
8  opinion that did not meet the standard of
9  care, the frequency of the visits?
10          Let's just stick with that first.
11          I'm not talking substantively right
12  now.  I'm talking frequency of the visits.
13    A.    Again, I think -- I think that in --
14  in the context of not receiving treatment, and not
15  updating the treatment plan, but in and of itself,
16  he should have seen some mental health provider
17  everyday.  It wouldn't have to be Dr. Mallik,
18  necessarily, but it's within the range of what I
19  would characterize as the breach of standard of
20  care, but in and of itself I don't think any fact
21  does that on a solo basis.
22    Q.    And I understand.
23          I -- I -- we'll get into what you
24  think --

26 (Pages 98 - 101)

MICHELLE THERSSEN JOY, M.D.

1 benefits, treatment planning, options of
2 medications, and things of that nature.
3     Q.    And can a patient who has a diagnosis
4 of psychosis just simply choose not take the
5 medication?
6         Do they have a right to do that; as
7 you understand it?
8     A.    It depends on the acuity of the
9 situation.
10        And I just want to respond that in
11 this case he was deemed to be at acute risk of
12 harm to self or others, so the standard of care is
13 to make sure that he has medication to not harm
14 himself or others.
15     Q.    So you would have injected him
16 regardless of whether he wanted it or not, the
17 medication?
18     A.    Well, I wouldn't do it.  The nurse
19 would.
20     Q.    I understand.
21        You would have ordered the nurse to
22 inject the medication whether Mr. Whitehurst
23 agreed to it or not in the setting that you know
24 it to be --

1     A.    Correct; because --
2     Q.    -- from your review of the records?
3        THE COURT REPORTER:  Let her finish.
4 BY MS. SHWED:
5     Q.    In the setting that you knew it to be
6 from reviewing the records.
7     A.    Sorry.  I got distracted.
8        Can you repeat that for me?
9     Q.    Yeah; sure.
10        So I guess my understanding is that it
11 will be your testimony at the time of trial that
12 the standard of care in 2015 required Dr. Mallik
13 to order the nurses to inject the -- either the
14 antipsychotic medication, or the benzodiazepine
15 medication, even if Mr. Whitehurst told them he
16 did not want that medication?
17     A.    Again, it's within the range of
18 options.  So you could have considered another
19 by-mouth medication.
20     Q.    And -- okay.  And I -- I understand.
21        I guess what I'm trying to figure out
22 is do you intend -- the purpose of a discovery
23 deposition --
24     A.    Uh-huh.

1     Q.    -- is so that I understand what you
2 intend to testify to at the time of trial.  And so
3 that's what I'm trying to figure out.
4     A.    Uh-huh.
5     Q.    And so when you say to me there are
6 other options, so I want to figure out, is it
7 specifically your testimony to a reasonable degree
8 of scien- -- psychiatric certainty that, as you
9 understood Mr. Whitehurst's condition to be in
10 that week or so, May 25 to June 8, 2015, that the
11 standard of care required Dr. Mallik to order a
12 nurse to inject the medications you discussed,
13 even if Mr. Mallik said he did not want them
14 [sic]?
15     A.    I think it's a mischaracterization
16 because the standard of care would be consumption
17 of medication in some form.  Again, it could have
18 been alternative medications.  It could have even
19 been the Risperdal and the Ativan with -- with
20 counseling and discussion of the medication.  So I
21 can't say in and of itself that he definitively
22 should have ordered an intramuscular injection,
23 but the patient needed required medication.
24     Q.    Okay.  So does the -- did the -- is it

1 your opinion to a reasonable degree of psychiatric
2 certainty that in 2015 the standard of care
3 required Dr. Mallik to order a nurse to give
4 Mr. Whitehurst either an injection, or oral
5 medication that you've described, even if he said,
6 no, I don't want the oral medication, and I don't
7 want any injections?
8     A.    Correct.
9     Q.    You -- you believe that because he did
10 not order the nurse do that, he breached the
11 standard of care?
12     A.    Because the patient -- yes.
13     Q.    Okay.
14     A.    Yes.
15     Q.    Do you believe that a psychiatrist has
16 the ability to force a patient diagnosed with
17 psychosis to take medication via injection, or
18 orally?
19     A.    Only in situations where they're at an
20 acute risk of harm to self or others, which is
21 well documented in the record.
22     Q.    We talked a little bit about what I
23 referred to, or what Dr. Williams refers as the
24 patient load.  That was the 75 to 100 --

28 (Pages 106 - 109)

MICHELLE THERSSEN JOY, M.D.

Page 114

1  for example, is always going to be a history.
2      Q.   I'm not talking about substance abuse.
3      A.   Okay.
4      Q.   I'm talking about mental health
5  issues.
6          Can -- can -- you just said to me that
7  there are lawyers who have psychosis --
8      A.   Uh-huh.
9      Q.   -- correct?
10         So the lawyers who carry a diagnosis
11  with psychosis do not need to be seen every single
12  day.  They can go out in the world, and they can
13  practice at lawyer -- as lawyers without having to
14  see a psychiatrist every day; correct?
15     A.   That is correct.
16         But I also want to say you said -- you
17  were talking about mental health and not substance
18  abuse, but substance abuse is within the realm of
19  mental health, and Dr. Mallik was charged with
20  seeing patients with substance abuse, as well.  So
21  I don't want to distinguish those who are trained
22  in substance abuse.
23     Q.   I'm talking about -- we're going to
24  get -- I'm talking now about mental health

Page 115

1  patients.
2          The point I'm trying to make is that
3  there's no way that you can tell a jury, when
4  you're called to testify at the time of trial,
5  there was prison inmate Smith --
6      A.   Uh-huh.
7      Q.   -- and he was being treated by
8  Dr. Mallik for schizophrenia --
9      A.   Uh-huh.
10     Q.   -- on June 1, 2015.  There's prisoner
11  Brown.  He was being treated for psychosis by
12  Dr. Mallik on June 10, or whatever date.
13         That data simply doesn't exist for us
14  to be able to provide that information to the
15  jury; correct?
16     A.   Correct.
17         I wish it did.
18     Q.   Okay.  So as you sit here today, at
19  least for the week that's relevant to
20  Mr. Whitehurst, you don't know if Dr. Mallik saw
21  ten patients, 20 patients, 150 patients.  You --
22  you don't know that.  The best you can do is
23  statisti- -- statistically try to figure out.
24     A.   What do you mean by "statistically"?

Page 116

1      Q.   By looking at the numbers because you
2  don't know the people he treated.
3      A.   So you're saying that by looking at
4  the numbers, I can't know the numbers?
5      Q.   There's no way you can actually know
6  who he treated, and for what reason, and how long
7  he spent with any of those inmates, from May 25 to
8  June 8, 2015, because you don't know who they are.
9      A.   Partially incorrect, as well, because
10  I can see from his documentation, for example, all
11  of his notes only have three words for what the
12  patient said, which indicates to me that you
13  document everything that happens with a patient,
14  and so it looks like he only had enough of an
15  interaction for three words.
16     Q.   Well, you -- you -- in -- in fairness
17  to Dr. Mallik, you don't know how long he -- he
18  spent with any of the patients that he was seeing
19  in the prison in that May 25 to June 8 time
20  period; right?
21         You don't know who they are, and you
22  don't know how long he spent --
23     A.   I know how long he spent with Mallik
24  was enough to have a three-word interaction each

Page 117

1  time.
2      Q.   No.  They're two different things.
3          You're judging him based on the
4  content of his note.  I get that.  But you do not
5  know, as you sit here today, how long Dr. Mallik
6  spent with any of the prison patients he saw for
7  that week.  You just simply don't know.
8      A.   Well, standard of care is to document
9  your interactions.  It was also in the --
10     Q.   My question is not standard of care.
11  My question is very simple.
12         As you sit here today, can you tell me
13  how much time Dr. Mallik spent with any of the
14  patients he treated from May 25 to June 8, 2015?
15     A.   Yes; I can tell you for
16  Mr. Whitehurst.
17     Q.   How long did he spend with him on
18  May 25, 2015, by minutes, or seconds, or hours,
19  however you want to say.
20     A.   I would say it's on the order of
21  minutes.
22     Q.   How do you know that?
23     A.   Because he has a very, very brief note
24  that has --

30 (Pages 114 - 117)

MICHELLE THERSSEN JOY, M.D.

Page 122

1  say that she can somehow testify to a
2  reasonable degree of scientific certainty
3  based on the number of words on a page that
4  she believes she didn't spend a lot of time
5  with him. I get that. She's testified to
6  that. But the reality is, as she just
7  answered, that she doesn't know because the
8  only information she has is that she saw him
9  on -- he saw him on a particular day.
10        MR. PARKINS: Okay. Well, I'm -- I'm
11  not trying to recap the testimony.
12        I'm objecting to a specific question.
13        MS. SHWED: Are you instructing her
14  not to answer?
15        MR. PARKINS: So to the -- to the
16  extent -- to the extent that there's -- that
17  I'm objecting to the question, obviously, if
18  she understands the question, and she thinks
19  she can answer it, she can do so. If she
20  doesn't feel like she can answer it, she can
21  tell you she can't answer it.
22  BY MS. SHWED:
23     Q.    Okay. So those are the only facts
24  that you have in the hypothetical.

Page 123

1     A.    Can you say --
2     Q.    You know that Dr. Mallik saw
3  Mr. Whitehurst on particular days. They're
4  documented in the records. I won't go over to
5  dates anymore.
6     A.    So this is reality now?
7     Q.    No; this is my hypothetical.
8        Dr. Mallik saw Mr. Whitehurst on I
9  think you said we counted seven days. Assume that
10  for this hypothetical. That's all you know.
11        How long did he see him each day?
12     A.    I can't answer that question.
13     Q.    You don't -- you -- you're not able to
14  answer it because you don't have enough
15  information; right?
16     A.    In a hypothetical in which I'm not --
17     Q.    Yes; in a hypothetical.
18     A.    -- presented information.
19     Q.    No; in the hypothetical that you don't
20  have enough information based on my hypothetical
21  that I've asked you to tell me the amount of time
22  that he saw this patient; correct?
23     A.    Say it again, please.
24     Q.    I didn't provide you enough

Page 124

1  information in the hypothetical that I just asked
2  you for you to be able to determine the amount
3  time Dr. Mallik spent with Mr. Whitehurst.
4     A.    I --
5     Q.    That's why you can't answer it; right?
6     A.    I can't answer it; correct.
7     Q.    Why can't you answer it?
8     A.    Because there isn't the information
9  that I would need to answer it --
10     Q.    Right.
11     A.    -- in the hypothetical.
12     Q.    Okay. I know that there were also
13  some criticisms that the nurses and the
14  correctional officers were not trained in mental
15  health issues; is that correct?
16     A.    Yes.
17     Q.    What do you intend to testify,
18  specifically, about that?
19     A.    Can you ask me a question?
20     Q.    Yeah. I -- I'm sorry.
21        Are you critical of the fact that the
22  correctional officers and the nurses did not
23  receive additional training in mental health
24  issues at the Lackawanna County Prison?

Page 125

1     A.    Yes.
2     Q.    And what do you in- -- why are you
3  critical of that?
4     A.    I'm critical of that because of a
5  number of reasons. One is that the triage system,
6  as Dr. Mallik testifies -- or, in his deposition
7  says is that most of the patient that he sees,
8  unless he's responding to a sick call, are
9  referred to him by either a correctional officer
10  or a nurse. And if they're not trained on what to
11  look for, or how to communicate their
12  observations, that's inappropriate.
13        I believe one of the correctional
14  officers said that they use commonsense, which is
15  inappropriate for a triage system, which is,
16  essentially, how he finds his workload. So I
17  think that's inappropriate.
18        I also know that the standard of care
19  is to have training. And I will refer to my
20  report. So, for instance, they have those
21  screening instruments that we have in the record.
22  We have no sense that they were trained on how to
23  use those screening instruments. I can't even
24  tell how well they're performed. They are ref- --

32 (Pages 122 - 125)

MICHELLE THERSSEN JOY, M.D.

Page 130

1  three ways that Dr. Mallik had -- would get, I'll
2  call them, referrals.  The prisoners --
3      A.    Yes.
4      Q.    -- could ask themselves to be seen;
5  correct?
6          There was a mechanism by which they
7  could write to the medical department and that
8  they could ask to be seen by a psychiatrist;
9  correct?
10      A.    Yes.  The sick call form; I believe.
11      Q.    Right.
12          And that a nurse, who would be in
13  the -- both the general population and the, I
14  guess they called it the Delta unit, the camera
15  cells, that nurse who could -- who interacted with
16  an inmate could then refer the inmate to be seen
17  by Dr. Mallik if she thought that that was
18  appropriate; correct?  Or he.
19      A.    Yes; that's part of my concern.
20      Q.    And so -- and, also, the corrections
21  officer could do the same thing.  When they see a
22  person in the prison whose had -- behavior is
23  concerning, whether it be talking to themselves,
24  or as Mr. Mallik was -- Mr. Whitehurst was playing

Page 131

1  in the toilet, talking inappropriate topics, those
2  types of things, the correction officer, if he
3  observed or heard that, could then refer that
4  inmate to be seen by Dr. Mallik, as well; correct?
5      A.    Correct.
6          Again, that's part of my concern
7  because the correctional officer testified to the
8  fact that it was based on commonsense.  And in no
9  hospital, medical, or other system would you ever
10  have triage -- imagine an emergency room, the
11  triage person is up there that's never been
12  trained in how to discuss health problems.
13      Q.    Okay.
14      A.    Specifically, I also want to refer to
15  on page two, there's a notification that
16  Mr. Whitehurst was presented with, but I assume --
17  I know that it's presented to patients there, at
18  least during that time frame, and it -- it talks
19  about signing up for sick call, and it says the
20  nurse will provide treatment as necessary, and if
21  your complaint warrants treatment by the
22  physician, you will be -- by the institutional
23  physician, you will -- you will be seen at the
24  next doctors line.

Page 132

1          So, first of all, they're saying that
2  nurses --
3      Q.    I'm sorry.  Where are you?
4      A.    Yea; on the bottom of page two of my
5  report.
6      Q.    Okay.
7      A.    So it says nurses will provide
8  treatment, as necessary, and they make the
9  decisions about whether to refer someone to the
10  institutional physician.  And, again, if they are
11  making a triage decision based on no training in
12  mental health.
13      Q.    Was it your understanding that the
14  nurses were doing that for psychiatric patients
15  versus medical patients?
16      A.    That's one of the three systems you
17  just talked about.
18      Q.    But was it your understanding that the
19  nurses were saying for a psychiatric patient, I
20  can treat you versus a -- a physician treating
21  you?  Was that your understanding of the process?
22      A.    Well, the process says here that they
23  decide whether they'll see them, or whether the --
24  the doctor sees them.

Page 133

1      Q.    My recollection was that the nurses
2  were talking about medical care.  So if the -- if
3  the inmate had a non emergent or urgent rash,
4  something, that the nurses could take care of
5  that, and if it was something more emergent, the
6  nurse would say, no, you need to be seen by a
7  physician.
8          Was it your understanding, based on
9  your review of the documents, that that same
10  process occurred with psychiatric patients?
11          In other words, a -- a nurse would
12  look at a prisoner, and he would be demonstrating
13  psychiatric, or psychosis, behavior, and the nurse
14  would decide on her own that she would treat that
15  patient?
16      A.    The nurse is deciding when to refer to
17  the psychiatrist based on no training.  For
18  example, like you said, it would just be based on
19  they are making a decision about whether the
20  person can access treatment or not.  So in and of
21  itself, that is a kind of decision about
22  treatment, whether someone can see a physician or
23  not.
24      Q.    And your specific -- is it -- let me

34 (Pages 130 - 133)

MICHELLE THERSSEN JOY, M.D.

Page 138

1 medical should be involved in it. And so though
2 they might not order it, and I have nowhere in the
3 notes that Dr. Mallik ordered it, there is, and
4 should be, some involvement with medical staff,
5 as -- as -- even according to their policy.
6      Q.     And when you say "medical staff," who
7 are you talking about?
8      A.     I think it would depend on who was
9 there. I can't say, specifically, at every moment
10 in time Dr. Mallik would be --
11     Q.     Okay. But --
12     A.     -- most appropriate.
13     Q.     Look, who -- who would be the list by
14 title of people you're including in medical?
15     A.     Well, it depends for which part of
16 this. So, for example, a written report of
17 medical condition once restraints are removed --
18     Q.     Yeah; who would that include is your
19 understanding?
20     A.     I think that could be either
21 Dr. Mallik or Dr. Zaloga, but for something like
22 medical checks, ten minutes every two hours, that
23 could be nursing.
24     Q.     And was it your understanding that

Page 139

1 Dr. Mallik saw the patients after they were
2 released from the restraint chair?
3      A.     The patients?
4      Q.     Yeah. I'm sorry. Whoever the
5 prisoner was who was put in the restraint chair.
6      A.     Are you talking about Mr. Whitehurst?
7      Q.     No. Just, generally, was it your
8 understanding that Dr. Mallik saw that --
9 prisoners after they were taken out of the
10 restraint chair?
11     A.     Well, he's only there three days a
12 week. So it would probably be pretty impossible.
13     Q.     Well, when he's there, of course.
14     A.     I don't know.
15     Q.     Okay. Do you remember him testifying
16 to that at his deposition, that, at 135, says when
17 they get released from the camera restraint chair,
18 they're place in a camera cell, and then I see
19 them?
20     A.     So what's the question?
21     Q.     That -- were you aware that Dr. Mallik
22 does see these patients, these prisoners, after
23 they're released from the restraint chair?
24     A.     So going book to him being there

Page 140

1 Thursday, and then Sunday, how soon after -- if
2 someone is taken out on a Thursday evening, how
3 could he evaluate any effects on them until
4 Sunday?
5      Q.     Well, he talked about the -- the
6 ability for people to call him.
7           Do you remember us going over that
8 early in the deposition?
9      A.     I do remember, but a written report of
10 medical condition once restraints are removed,
11 where is he making the written report, and medical
12 condition should be assessed there. And any
13 hospital I work at, I have to see the person
14 within an hour.
15     Q.     And why is that?
16     A.     To make sure --
17     Q.     No; why is it that you have to see
18 them within -- I understand the purpose.
19          Why is it that you have to see them
20 within an hour?
21          Is there a policy that says that, or
22 practice, or regulation?
23          Why is that?
24     A.     Yes. I mean, hosp- -- most every

Page 141

1 hospital setting that I work in has an internal
2 policy about it --
3      Q.     A hospital policy?
4      A.     -- and it's also -- yes; and it's also
5 standard of care to at least have some type of
6 assessment.
7      Q.     Okay. You also make reference to the
8 National Commission on Correctional Healthcare in
9 your report; correct?
10     A.     Correct.
11     Q.     Is it your understanding that that
12 accreditation is not required under the
13 Commonwealth of Pennsylvania?
14     A.     Correct.
15     Q.     Okay. It's a voluntary accredita- --
16 the prison, or the jail, may choose to be
17 accredited. They don't have to in the
18 Commonwealth of Pennsylvania.
19     A.     That's my understanding.
20     Q.     Okay. And Dr. Evans was asked, in his
21 deposition, and I know that you did not -- I think
22 you said you didn't have an opportunity to review
23 his testimony; is that right?
24          He's the -- he's the plaintiff's

36 (Pages 138 - 141)

MICHELLE THERSSEN JOY, M.D.

1 of what an institution would look at to make sure
2 that they are meeting the standard of care.
3     Q.    Do you think --
4     A.    There is no thing that is more
5 authoritative that someone would refer to in terms
6 of establishing policies and procedures.  So like
7 I said, they cannot establish this is what you
8 have to do, every single thing in this, and that's
9 the only way to meet standard of care, but it's
10 the authoritative guideline in how someone would
11 establish policies and procedures to meet the
12 standard of care.
13     Q.    Do you agree that the -- the
14 regulations passed in the Pennsylvania Code for
15 corrections is the standard of care as it relates
16 to those particular regulations and administrative
17 guidelines?
18     A.    Is this what we talked about the
19 Title --
20     Q.    Title 37, Chapter 95.
21     A.    I can't comment because I don't have
22 those.
23     Q.    You don't have -- do you want to look
24 at them again, or you just don't know as you sit

1 here today if they -- they're standard of care or
2 not --
3     A.    You'd have --
4     Q.    -- because you haven't reviewed the
5 code, itself?
6     A.    Correct.
7     Q.    Okay.
8     A.    You gave me a listing of the
9 categories, but I --
10     Q.    Yeah.
11     A.    -- was not able to assess the content
12 of them.
13     Q.    Right.
14     I just brought the topics that are
15 discussed because it was too big to lug around
16 from Scranton.  Okay.
17     A.    I understand.
18     Q.    Can you tell me now, and we're at the
19 end, I promise, because I thought we were going to
20 be two hours, but we're longer than that.
21     I want you to tell me all the things
22 that you believe were gross negligence on behalf
23 of Dr. Mallik.
24     A.    All of the things?

1     Q.    Yeah.  All of the things that you
2 believe show gross negligence on behalf of
3 Dr. Mallik in his interaction that we talked about
4 that May 25 to June 8, the last time he saw --
5     A.    Okay.
6     Q.    -- Mr. Whitehurst.
7     A.    Can -- just so -- so we're on the same
8 page, gross negligence, can you tell me legally --
9     Q.    Oh, reckless disregard.
10     A.    Okay.  Meaning -- okay.  I believe
11 that he had a reckless dis- -- disregard for not
12 treating psychosis in a -- in acute state -- such
13 acute state that he was a risk of danger to
14 himself or others.
15     Q.    Okay.  Let me stop you there.
16     What, specifically, do you mean "not
17 treating"?
18     What are the things he didn't do that
19 you think he should have done?
20     A.    Given the patient medication.
21     Q.    And what meds?
22     The two we -- the two groups we talked
23 about?
24     A.    I couldn't list them all because

1 there's so many options.  Just something in those
2 two groups.
3     Q.    What was -- what was the purpose of
4 the meds?
5     A.    To -- multiple purposes.  To relieve
6 subjective suffering.  To keep the patient safe.
7 To keep staff safe.  To be able to have him calmer
8 so that he could do more thorough psychiatric
9 evaluation.  To have the patient get out of the
10 restraint chair sooner, which is not the least
11 restrictive means he should have been in.  To --
12 to be able to treat the condition that he was
13 suffering from.
14     Q.    Now, when you say "treat the
15 condition," what do you -- what do you mean?
16     Is it what you just -- I just want to
17 make sure I'm not missing part of --
18     A.    Uh-huh.
19     Q.    -- your opinion.
20     Is it something in addition to what
21 you just testified to when you say "not treat the
22 patient"?
23     A.    Say it again.
24     Q.    I need to know -- what I"m trying to

MICHELLE THERSSEN JOY, M.D.

Page 154

1 physically in the ER --
2     A.   Uh-huh.
3     Q.   -- that you're being called to conduct
4 an evaluation as to whether the person requires
5 involuntary commitment.
6     A.   So whether they require involuntary
7 commitment, or whether there's an evaluation
8 for --
9     Q.   Whether --
10     A.   -- for the need?
11     Q.   -- there's an evaluation under that
12 guise.
13     A.   So I can give a ballpark, and then you
14 can tell me if that --
15     Q.   Sure.
16     A.   -- meets --
17         So the VA definitely has the least of
18 those. I would say that that is certainly under
19 ten percent. And part of that comes from the
20 reason that a lot of times people are taken to the
21 closest hospital, which the VA is very specific
22 for, you know, a patient population, might not be
23 the closest hospital. And then I would say for
24 Pennsylvania Hospital and Fairmount, more than

Page 155

1 that, but not the majority.
2     Q.   Okay. In a -- in a scenario where
3 you're in the emergency room, be it at the VA, or
4 at Penn, and a decision is made either to a
5 voluntary admission, or an involuntary commitment,
6 would you follow that patient as an inpatient in
7 those scenarios when you're working in the ER?
8     A.   So usually not, but I'm the only
9 psychiatrist for part of the day --
10     Q.   Okay.
11     A.   -- and so if someone needs anything
12 during that time because it's a 24 hour -- a
13 psychiatrist is always available 24 hours, I might
14 repeatedly see the person, but it's not routine
15 that I see them every day. There are four
16 psychiatrists -- most of this is at the VA, and
17 that's the only time I would see someone on the
18 inpatient unit, not the other settings, and so
19 I -- it would be the exception, not the rule;
20 however, since I'm also in outpatient there, a lot
21 of times it will be a patient of mine who I see
22 then post discharge. They have to be seen within
23 seven days of discharge from hospital. So in that
24 setting, I would see them, but on the outside.

Page 156

1     Q.   On the outside. I see.
2         Are there scenarios, for example,
3 where you will be at home, and you will receive a
4 call from the emergency room from a nurse, or an
5 emergency room doctor, or anyone, outlining the
6 scenario of the person in crisis at hand and
7 asking for a -- a recommendation as to 302
8 commitment or not?
9     A.   I would drive into the hospital.
10     Q.   Okay. So you would never make that
11 decision over the phone. It's an automatic trip
12 to the hospital for you?
13     A.   Yes; as we have a policy regarding
14 that.
15     Q.   Okay. Are there scenarios where you
16 would ever not see a person in crisis in person
17 before making that recommendation?
18     A.   Before making the recommendation of?
19     Q.   Involuntary commitment, or attempting
20 to do, for instance, like, a 201 voluntary --
21     A.   No.
22     Q.   -- or something along those lines?
23     A.   The -- the state regulation is that
24 they have to be seen within two hours of

Page 157

1 presenting in. So I would never -- for -- for a
2 302.
3     Q.   Okay.
4     A.   And so, no; I would never do that, and
5 I don't think it's appropriate, and no.
6     Q.   Okay. Going to one of your opinions,
7 you noted, and I think you said it a couple times,
8 I'm not merely a psychiatrist, I'm a -- I'm a
9 medical doctor, what's the -- what's the overlap
10 there; if you could tell me --
11     A.   Yes.
12     Q.   -- that?
13     A.   I just -- I know sometimes people
14 confuse, and I think --
15     Q.   Right.
16     A.   -- it's happened even during the
17 course of today's deposition, confuse psychologist
18 and psychiatrist.
19     Q.   Uh-huh.
20     A.   And so I went to medical school. I
21 did four years of training that all medical
22 doctors do. Anyone that has an M.D., right, we
23 all go to medical school for the same amount time.
24 And that's -- means I can prescribe medications;

40 (Pages 154 - 157)

MICHELLE THERSSEN JOY, M.D.

Page 162

1 record?
2    A.    No.
3    Q.    Okay.  And if Dr. Evans --
4    A.    I don't even know what that would
5 mean.
6    Q.    If Dr. Evans said that the psychiatric
7 progress records here, and the corresponding
8 psychiatric physician's orders, don't, in his
9 opinion, constitute medical records, you would
10 disagree with that?
11    A.    Again, I know you just said it, but I
12 just want to make sure I'm hearing it in its
13 entirety.
14    Q.    If Dr. Evans said, in his opinion, the
15 psychiatric records here, and the corresponding
16 psychiatric physician's orders, do not constitute
17 medical records in this case, do you agree with
18 that?
19    A.    No.
20    Q.    Okay.  You and Amy went over it in --
21 in detail, but -- but there is no dispute that in
22 between May 25 and June 8 of 2015, that Dr. Mallik
23 saw Mr. Whitehurst on seven occasions; correct?
24    A.    You're asking if I'm disputing that

Page 163

1 fact?
2    Q.    Yeah.
3    A.    I'm not disputing that fact.
4    Q.    Okay.  As we know from your report,
5 you also reviewed the deposition transcript of
6 Nurse Alexis Moritzkat, and you're aware that she
7 would have accompanied Dr. Mallik on those seven
8 interactions with Mr. Whitehurst between the 25th
9 of May and June 8 of 2015; correct?
10    A.    Did I review that deposition.  I
11 remember her talking about a accompanying him, but
12 I can't remember, at this time, if she asserted
13 that it was at each visit.
14    Q.    Okay.
15    A.    I know she said that someone is with
16 him.
17    Q.    Right.
18        So -- so what we have is, at a
19 minimum, Dr. Mallik is accompanied by either Nurse
20 Moritzkat, or another nurse, when he sees
21 Mr. Whitehurst on these seven occasions; correct?
22    A.    That's what he testified to.
23    Q.    Right.
24        And then legibility aside, we do know

Page 164

1 that Dr. Mallik had progress records and
2 physician's orders which corresponded with each
3 time that he saw Mr. Whitehurst between May 25 and
4 June 8 of 2015; correct?
5    A.    That's how I've established that
6 that's when he saw him.
7    Q.    Right.
8        And in addition to -- to those seven
9 progress records, and the corresponding orders
10 entered by Mallik, there are also medicine
11 administration records as part of the chart;
12 correct?
13    A.    Yes.
14    Q.    And that -- those MARs reflect that
15 the nurses, at a minimum, attempted to administer
16 the ordered medications two times per day between
17 the 25th of May and June 8 of 2015; correct?
18    A.    Attempted to administer --
19    Q.    And then they were refused by
20 Mr. Whitehurst; correct?
21    A.    I think the record would indicate that
22 it -- that -- or the MAR would indicate that they,
23 at least, saw him, and that there was some -- I
24 can't say that they attempted to administer

Page 165

1 because I don't know exactly what happened during
2 those times.  If, for example, they could have
3 just saw him through the window and said, okay,
4 he's not going to get the meds, but at least they
5 were there in some sense.
6    Q.    Let's see if we can agree upon this.
7        At a minimum, it is some documentation
8 evidencing an interaction between the nurse and
9 Mr. Whitehurst concerning medication; correct
10 [sic]?
11    A.    I can't establish that it was an
12 interaction that there -- I would agree to the
13 fact that there was a visit at least twice a day.
14    Q.    Okay.  A visit by a nurse with respect
15 to administering, or attempt to administer,
16 psychiatric medications ordered by Dr. Mallik
17 through his orders; correct?
18    A.    You said "administer or attempt to
19 administer"?
20    Q.    Right.
21        I say "attempt to administer" because
22 Mr. Whitehurst was refusing.
23        That documentation exists?
24    A.    I've seen that documentation.  Again,

42 (Pages 162 - 165)

MICHELLE THERSSEN JOY, M.D.

1  treatment for the inmate; correct?
2      A.    To this --
3      Q.    And that you were concerned that the
4  nurses, and the correctional officers, didn't have
5  sufficient training to identify a problem and
6  report it to a medical or psychiatric; correct?
7      A.    That the goal of the system is to make
8  decisions about whether someone has access or not,
9  right, because if -- if the goal were access, it
10  would mean everyone, you know, that has a
11  complaint automatically goes. So I think my fear
12  is that the goal of the system is to make
13  decisions about who can access care and who can't,
14  and that they're insufficiently trained to do
15  that.
16      Q.    Okay. And we know within this
17  scenario that Mr. Whitehurst comes in on May 24th
18  of 2015, he refuses an intake, and then as of
19  May 25, 2015, he sees Dr. Mallik for the first
20  time, and then is seen every two days including up
21  to and including June 8th of 2015; correct?
22      So this isn't a situation where
23  Mr. Whitehurst was -- somehow had fallen through
24  the cracks and wasn't provided psychiatric care;

1  correct?
2      A.    I think he had fallen through the
3  cracks, and was not provided with psychiatric
4  care.
5      Q.    He was under the care of Dr. Mallik,
6  we can agree to that, who saw him seven times.
7      A.    He was -- he had established a
8  doctor-patient relationship.
9      Q.    Which is what the goal of triage, as
10  it relates to a psychiatric problem, is designed
11  to accomplish, getting him under the care of a
12  psychiatrist who is then qualified to order
13  medications and make a medical diagnosis; correct?
14      A.    That is part of it; however, for
15  instance, during those -- all the time outside of
16  those seven times that Dr. Mallik documented he
17  saw the patient visually, it's not just about
18  accessing care in terms of referral. It can be
19  that something is going on in between the visits
20  that he needs to be seen again. That his
21  condition is worsening. It sounds like he gets
22  report -- Dr. Mallik is supposed to get report
23  from nurses and correctional about a number of
24  things, and so it's not just about access care.

1  It's about making sure that care is carried
2  through with, and also that updates on the
3  patient's condition.
4      Q.    Which would bring -- so is -- is that
5  your training issue with the corrections officers,
6  or is it triage?
7      I'm just trying to figure out what --
8      A.    I'm not sure what you mean.
9      Q.    What -- what's the -- where is the --
10  as it relates to this case, what is your proposed
11  testimony as to the training and what the problems
12  were with the training here that led to
13  Mr. Whitehurst's admission to Geisinger?
14      A.    So I don't think that -- at least with
15  regard to mental health that they weren't trained
16  to provide any updates about his status. That
17  they, perhaps, weren't trained -- there's no
18  evidence that they were trained on, for example,
19  how to encourage a patient to take medication with
20  psychosis. There's specific strategies that
21  nurses in psychiatric facilities use.
22      I don't know that there was
23  training -- clearly, they missed the fact that he
24  had lost significant weight and was visibly

1  medically compromised at a -- a point too late in
2  time. So I don't think they were properly trained
3  or -- to report on that fact to either Dr. Zaloga
4  or Dr. Mallik.
5      I think that training would have been
6  appropriate -- training was both indicated in the
7  policy, and should be the standard of care, and --
8  on effects of restraints, on interacting with the
9  staff about restraints, on less-restrictive
10  treatment means for mental health, they -- it
11  doesn't -- other types of restraints, the effects
12  of isolation and seclusion; those type of things.
13      I think that other than referral to
14  treatment in the beginning, it's all of the
15  interactions outside of the minutes that
16  Dr. Mallik is outside of the door, training could
17  have affected the other 23-plus hours of the day.
18      Q.    Okay. How long was Mr. Whitehurst in
19  the restraint chair?
20      A.    I think that's really hard to
21  determine from the record.
22      Q.    Well, that -- that's what I'm trying
23  to -- to get my arms around. You -- you seem to
24  suggest that there's an excessive amount of time

44 (Pages 170 - 173)

MICHELLE THERSSEN JOY, M.D.

Page 178

1     THE VIDEOGRAPHER:  Counsel, just so
2  you know, there's about five minutes before
3  I'll have to change disks.
4     Do you want me to just change it now
5  or --
6     MR. PARKINS:  It's up to you.
7     MS. SHWED:  I have nothing else.
8     MR. PARKINS:  I have -- I -- I have
9  questions.  I'll be a little bit.
10     THE COURT REPORTER:  I need a break,
11  anyway.
12     THE VIDEOGRAPHER:  Time is now 1:09.
13     This concludes disk two.
14           - - -
15     (Whereupon a recess was taken at this
16  time.)
17           - - -
18     THE VIDEOGRAPHER:  Time is now 1:16.
19     This begins disk three.
20  BY MR. HEISLER:
21     Q.    Doctor, my name is David Heisler; as
22  you now know.  I just have a few questions.
23     When did Mr. Whitehurst process into
24  the -- prison?

Page 179

1     A.    When?
2     I want to veri- -- the -- I -- I
3  believe -- I don't want to guess.
4     Do we have the record?
5     Give me one second.
6     The 20- -- it was either the 23rd or
7  24th of May, 2015.
8     Q.    On the 23rd you indicate in your
9  record that he was not in prison, but he was in a
10  hospital in another setting.
11     A.    Where is this?
12     Q.    On page nine.
13     A.    Okay.  I see that.
14     Q.    Is it your understanding that he went
15  into the prison on May 24?
16     A.    Sometime between the 23rd and it -- it
17  could have been late to on the 23rd or on the
18  24th.  I don't remember at this time.
19     Q.    Well, you know he's taken to the
20  hospital on June 9; right?
21     A.    Yes.
22     Q.    Was he observed by a medical
23  professional every day that he was at the prison?
24     A.    He was seen -- I can agree to the fact

Page 180

1  that he was seen, meaning, visually, by a nurse,
2  with no psychiatric training, every day -- or no
3  updated psychiatric training.
4     Q.    But my question was would it be fair
5  to state that every day he was in the prison he
6  was observed, or, as you put it, seen by someone
7  in the medical profession every day?
8     A.    Visually seen; yes.
9     MR. HEISLER:  I have no further
10  questions.
11  BY MR. PARKINS:
12     Q.    I'm seeing you right now; correct?
13     A.    Yes.
14     Q.    Am I providing you with any medical
15  treatment?
16     A.    No.
17     Q.    Are you providing me with any medical
18  treatment?
19     A.    No.
20     Q.    So is it possible to see somebody
21  without providing them with meaningful care?
22     A.    Yes.
23     Q.    And based on your review of the file,
24  was Mr. Whitehurst provided with meaningful

Page 181

1  medical and psychiatric care on the days that he
2  was there?
3     A.    He was not.
4     Q.    Was he provided with meaningful care
5  on most of the days he was there?
6     A.    No; he was not.
7     Q.    Okay.  All right.  Now, I'm going to
8  go through, because the way I take my notes is
9  that as Attorney Shwed asked you questions, I take
10  notes.  So we're going to retrack what she you a
11  little bit, probably in a similar order, okay, but
12  I'll probably jump around a little bit.
13     A.    Yes.
14     Q.    All right.  She asked you about your
15  qualifications.
16     And -- and can you just, specifically,
17  lay out for the record what your experience is,
18  specifically, in the field of care and
19  correctional facilities?
20     A.    I will use -- I'll give you both
21  educational and clinical and forensic, all aspects
22  of that.
23     Q.    Okay.
24     A.    So as a fellow in forensic psychiatry,

46 (Pages 178 - 181)

MICHELLE THERSSEN JOY, M.D.

Page 186

1    Q.    You can answer.
2    A.    Yes.
3         THE COURT REPORTER:  Can I just remind
4    everybody one at a time.
5         THE WITNESS:  Yes; I am writing the
6    figurative, but the literal PowerPoint in
7    training curriculum
8  BY MR. PARKINS:
9    Q.    Okay.
10   A.    Let's see.
11   Q.    And let me just ask you.  I think we
12  hit the -- I think we hit the big points, so I'll
13  move on, but you -- in 2016, you gave a -- you
14  gave a lecture called "Can a Correctional Facility
15  be a Therapeutic Space;" is that correct?
16   A.    Correct.
17   Q.    What's your opinion on that as to
18  whether or not a correctional facility can be a
19  therapeutic in terms of psychiatric care?
20   A.    Right.
21        So my opinion is that it's inherently
22  counter therapeutic.  It has -- there are
23  elements, such as medications, that can be
24  therapeutic, but it's inherently counter

Page 187

1  therapeutic; I would say.
2    Q.    Okay.
3         MS. SHWED:  I'm sorry.  What did you
4  say?
5         THE WITNESS:  I said it's inherently
6  counter therapeutic --
7         MS. SHWED:  Oh.
8         THE WITNESS:  -- but some elements of
9  therapeutic care can be provided, and, kind
10  of, the -- the talk was on the different
11  elements of what can be done, and what can't,
12  and what should be implemented.
13        I mean, there's a lot of this here, so
14  I will just skip to some things that I think
15  is important is that I was on the American
16  Psychiatric Association Counsel of Psychiatry
17  and the Law for two years.  And that's, kind
18  of, the -- so American Psychiatric
19  Association is, kind of, our flagship
20  organization -- professional organization,
21  and I was specifically on their subcommittee
22  for psychiatry and the law.
23        Actually, I'm working on a book
24  chapter right now, I should be finished with

Page 188

1  it tomorrow, for a book that we have a
2  publisher for, and my chapter is on
3  correctional mental health care.
4         I think -- oh, I think -- let's see.
5  I -- like I said, I run the forensic rotation
6  for all residents.  I developed -- started --
7  there was no psychiatric -- forensic rotation
8  for Penn residents, and I developed that.  So
9  I do the whole curriculum planning for that,
10  which includes corrections.  I also teach in
11  the forensic psychiatry fellowship at Penn,
12  largely on ethics, and some of that involves
13  correctional healthcare aspects.
14  BY MR. PARKINS:
15   Q.    All right.  So I'll move on from your
16  CV.  We all have a copy.
17   A.    Okay.
18   Q.    In regards to one of your jobs, your
19  job at Fairmount, I think you said you -- you do
20  the evaluations for patients in psychosis in terms
21  of level of care; is that correct?
22   A.    I mean, I would say all of my clinical
23  job you're making decisions about level of care,
24  but definitely acutely at Fairmount, the VA and

Page 189

1  Pennsylvania Hospital.  At this point in time, my
2  VA job would be the most consistent form of that
3  consideration.
4    Q.    So would they be patients that are in
5  a similar state as to what Mr. Whitehurst was in
6  when he entered the Lackawanna County Prison?
7    A.    Yes.
8    Q.    And so your evaluation for a level of
9  care, can you describe that?
10   A.    Uh-huh.
11   Q.    Does that mean level of care within a
12  prison, whether or not they're transferred out, or
13  what, specifically, does it entail?
14   A.    For my evaluations?
15   Q.    Yes.
16   A.    So usually they -- for an involuntary
17  it would be an acutely elevated imminent risk of
18  harm to self or others, or inability to care for
19  self, but most relevant is the acuity elevated
20  imminent risk of harm to self or others, and that
21  is -- goes on a number of chronic and acute risk
22  factors.  Some of it is from history, some of it's
23  from observation.  If it's voluntary, it's, again,
24  whether there is some elevated risk, but the

48 (Pages 186 - 189)

MICHELLE THERSSEN JOY, M.D.

Page 194

1 have operated on that assumption in the acute
2 setting. I would have treated him as someone that
3 was suffering from severe mental illness.
4    Q.    All right. And in the case of Amir
5 Whitehurst, you said that the frequency with which
6 somebody has to see a patient varies on a
7 case-by-case basis?
8    A.    The patient is one of the factors, and
9 there are also logistical factors.
10    Q.    Okay. And in regards to the case of
11 Amir Whitehurst, do you have an opinion as to how
12 frequently he should have been seen by some sort
13 of psychiatric provider while he was in the
14 prison?
15    A.    Meaning, a psychiatrist?
16    Q.    Why don't you say your opinion in
17 regards to a psychiatrist, in regards to a
18 psychiatric nurse, or other staffing.
19        What's your opinion regarding --
20    A.    My opinion --
21    Q.    -- any type of staff?
22        THE COURT REPORTER: Let him finish.
23        THE WITNESS: My opinion would be
24 aimed for daily evaluations by a psychiatrist

Page 195

1 because that's how it is in a hospital, in
2 any hospital that I've ever been in, or
3 worked in. I understand that there can be
4 recruitment difficulties, possibly, getting a
5 psychiatrist in a more remote setting, or
6 something like that. So there should have at
7 least been someone else trained, such as a
8 physician assistant. There are a number --
9 physician assistant, nurse practitioner on
10 the other days, and then the -- and then, in
11 addition, the staffing should have been --
12 the staff should have been trained, the ones
13 that were seeing him, and those -- I mean, in
14 a hospital setting you're, basically, never
15 out of the eyesight of a nurse. So you're in
16 the milieu. A therapeutic milieu involves
17 essentially always being seen by medical
18 staff at all times, including when you're
19 asleep every 15 minutes, and so definitely
20 more than line of sight twice a day by
21 someone with no --
22 BY MR. PARKINS:
23    Q.    Okay.
24    A.    -- updated mental health training.

Page 196

1    Q.    So it was a little bit of a long
2 answer.
3    A.    Yes.
4    Q.    So is it -- am I correct in saying
5 that it's your opinion that Amir Whitehurst should
6 have been seen daily by a psychiatrist, and if
7 not, that at least daily by someone with
8 psychiatric training?
9    A.    Yes.
10    Q.    And, in your review of the case, other
11 than Dr. Mallik, was anybody that saw Amir
12 Whitehurst in that prison competent to, or trained
13 to, deal with his mental health issues?
14    A.    No. My opinion is that they were not.
15    Q.    Now, Attorney Shwed asked you about
16 what a -- a treatment plan would be for
17 Spice-induced psychosis; is that correct?
18        Do you recall that?
19        MS. SHWED: I believe I said
20    "protocol."
21 BY MR. PARKINS:
22    Q.    Or protocol.
23        Do you recall that?
24    A.    If there was a -- I believe she asked

Page 197

1 if there was an established protocol in 2015 for
2 Spice-induced psychosis.
3    Q.    Okay. And -- and -- and I'm going to
4 get into -- to what the protocol is, but I think
5 you noted in your report, and the defense experts
6 noted in their report, that Dr. Mallik's strategy,
7 or course of treatment, was to give him time and
8 space; is that correct?
9    A.    Yes. And I -- I'm saying for the
10 record that I'm laughing only because I laugh
11 every time that I read that.
12    Q.    Why?
13    A.    Because it seemed so inappropriate,
14 below the standard of care, counter therapeutic,
15 and not treatment --
16        MS. SHWED: I just want to object to
17    the form of your question, but I was trying
18    to consciously not speak over others.
19        MR. PARKINS: All right. No problem.
20 BY MR. PARKINS:
21    Q.    All right. So is there any
22 psychiatric merit to treating someone in
23 Mr. Whitehurst's condition with time and space?
24        MS. SHWED: Objection to form.

50 (Pages 194 - 197)

MICHELLE THERSSEN JOY, M.D.

Page 202

1 willing to take it at least one time, would have
2 been appropriate. Asking him if there were other
3 medications that he would prefer. For example, a
4 lot of people that I see don't want to take
5 Risperidone because they see on TV that it causes
6 for the layperson breast imminent. A lot of
7 people have, like, a very bad perception of
8 Risperidone. So I don't know if he had any
9 discussions if there's medications that he would
10 prefer. Usually, I give them -- like I said, I'll
11 give some kind of a would you prefer this one or
12 this one to give some kind of option.
13         Again, I don't consider restraints to
14 be treatment; however, there was, I believe in the
15 policies at the -- the policies at the prison says
16 that the use of restraints in the chair is the
17 most -- more restrictive than other restraints
18 that are available. So that they could have --
19 again, not treatment, but could have been in a
20 different less restrictive type of restraint,
21 which, per my review of the record and the video,
22 they didn't try other options.
23         And then, right, so the way that we
24 think about things in psychiatry, is the biosocial

Page 203

1 model, so things are not just medicine. We're
2 also trained in therapy. And so part of that is
3 verbal de-escalation. We're trained to help
4 de-escalate situations, keep people safe,
5 encourage them to take medications. Motivational
6 interviewing is where if someone doesn't want to
7 do something, you can encourage them to see the
8 benefits of it. We use that a lot. There's the
9 Amador model, which is called "I'm not sick, I
10 don't need help" is the title of the book, and
11 it's, kind of, having discussions with people in
12 psychosis about them seeing the benefits of
13 treatment. So I think that there is a lot of
14 psychological interventions that could happen, as
15 well, which I don't see any evidence of.
16    Q.    So -- let me ask you.
17         Any of those less restrictive
18 alternatives, were any of those attempted in this
19 case prior to the use of the restraint chair?
20    A.    My understanding is that they were
21 not.
22    Q.    Do you see any evidence in the record
23 that they were?
24    A.    I can say he did prescribe the

Page 204

1 Risperidone and Ativan once, but that was the
2 only.
3    Q.    But they didn't ensure it was
4 administered?
5    A.    Exactly.
6    Q.    What are the -- the -- the -- the
7 potential purposes of a restraint chair?
8    A.    You mean potential out in the world,
9 or in this case?
10    Q.    Let -- let me ask you.
11         Treatment is a potential use of the
12 restraint chair; correct?
13    A.    Treatment?
14    Q.    Is -- is treatment a -- for --
15 although not eight hours, is temporary use of
16 restraints, does, at some point, serve treatment
17 purpose?
18    A.    Restraints, but restraint chairs don't
19 exist anywhere outside of jail settings. So I
20 would say that's not treatment.
21    Q.    Okay.
22    A.    But restraints can be used for short
23 period of time to keep someone safe, alongside
24 other options.

Page 205

1    Q.    And -- and -- and I'm not asking
2 whether it's right or wrong, but punishments is
3 a -- is a potentially sort of restraint chair;
4 correct?
5    A.    People could use it for that.
6    Q.    Security?
7    A.    People could use it for that.
8    Q.    Okay. So based on -- on your
9 knowledge of medicine, the law, and your
10 experience in corrective -- correct- -- correction
11 facilities, should a restraint chair be used for
12 punitive purposes?
13         MS. SHWED: Objection to form.
14 BY MR. PARKINS:
15    Q.    Okay. You can answer.
16    A.    No; it should not.
17    Q.    Okay. What -- what purposes, in a
18 correctional facility, should it be used for?
19         MS. SHWED: Can I just have an
20 objection -- an ongoing objection --
21         MR. PARKINS: Sure.
22         MS. SHWED: -- to her opinions of
23 things that happen in a correctional
24 institution?

52 (Pages 202 - 205)

MICHELLE THERSSEN JOY, M.D.

1 presents to the emergency room, they said he
2 hasn't been eating.
3      Q.   Okay.
4      A.   So that was either on report of Amir,
5 himself, or on report of the staff bringing him
6 in.
7           So in addition to him being physically
8 malnourished, there was a statement made that he
9 had not been eating.  I don't remember if it was
10 eating or drinking, but...
11     Q.   Okay.  And so -- so you talk about
12 someone who presents in the hospital with --
13 with -- and there -- there I'm using different
14 words, but, essentially, malnourishment and
15 dehydration --
16     A.   Yes.
17     Q.   -- correct?
18          And excessive use of a restraint chair
19 can cause problems with eating and drinking;
20 correct?
21     A.   Yes.
22          MS. SHWED:  Objection to form.
23 BY MR. PARKINS:
24     Q.   So -- and we already said at some

1 point in the record there's a note Amir is in the
2 restraint chair, but no note when he comes out;
3 correct?
4      A.   Correct.
5      Q.   So in addition to the excess of eight
6 hours he spent in the restraint chair, there's
7 other periods of time that we don't know how long
8 he was in there; correct?
9      A.   That's correct.
10     Q.   And so would you say that there's a
11 medical correlation between time spent in a
12 restraint chair and malnourishment and
13 dehydration?
14     A.   Yes.
15          MS. SHWED:  Objection to form.
16 BY MR. PARKINS:
17     Q.   And, additionally, when you're in a
18 restraint chair, am -- am I correct in saying you,
19 essentially, can't move?
20     A.   Correct.
21     Q.   And one of the things that Attorney
22 Shwed asked you about was this rhabdomyolysis;
23 correct?
24     A.   Correct.

1      Q.   Did I say that correctly?
2      A.   I knew what --
3      Q.   Somewhat?
4      A.   -- you meant.
5      Q.   And -- and that's a breakdown in the
6 muscle?
7      A.   Correct.
8      Q.   And it occurs from not moving;
9 correct?
10     A.   Correct.
11     Q.   Would that be similar to the inability
12 to move in a restraint chair?
13     A.   Yes.
14          Which, in fact, I can also say we
15 frequently -- if someone is in restraints in a
16 hospital setting, we know to check CK, creatine
17 kinase, which is one of those things, just because
18 it's so well known, that being in restraints, even
19 the -- the less-restrictive restraints causes
20 rhabdomyolysis.
21     Q.   In order to avoid these complications
22 of the restraint chair, how often should medical
23 evaluate a patient's who's in a restraint chair?
24     A.   So medical, again, can mean a number

1 of things.
2      Q.   Be it a nurse, a doctor, someone from
3 the medical department.
4      A.   It should be minimum of every two
5 hours.
6      Q.   Okay.  All right.  I'm going to move
7 on from the restraint chair.  I want to talk to
8 you about the -- about the frequency with which
9 Dr. Mallik was at the prison.  Okay?
10     A.   Yes.
11     Q.   We talked about the fact that it
12 changed, at some point in the -- shortly prior to
13 2015, from six to nine hours a week; correct?
14     A.   Yes.
15     Q.   And so at the time that Mr. Whitehurst
16 was there, we're in the time frame where
17 Dr. Mallik is, on average, spending nine hours a
18 week there; correct?
19     A.   Yes.
20     Q.   And let me ask you this:  Is -- based
21 on your review of the population of the prison,
22 okay, is -- is -- is -- is the custom or practice
23 of having a psychiatrist on staff nine hours a
24 week, is that custom or practice adequate or

54 (Pages 210 - 213)

MICHELLE THERSSEN JOY, M.D.

1    A.    It would be those two combined.
2    Q.    Okay.
3    A.    Which is also consistent with what the
4  nurse estimated on saying that he was seeing
5  hundreds of -- 400 patients and screening 600 to
6  700 patients and seeing more than 80 percent of
7  inmates.
8    Q.    Okay.  So is -- is nine hours a week
9  sufficient to treat that many patients from a
10 psychiatric standpoint?
11   A.    No.
12   Q.    Would 20 hours be enough?
13   A.    Looking at statistics --
14   Q.    Okay.
15   A.    -- I do not believe so.
16   Q.    Okay.  So we're not even close?
17   A.    Not at all.
18   Q.    And you were asked if you were aware
19 if Dr. Mallik would take calls over the phone at
20 night --
21   A.    I was asked that.
22   Q.    -- and put in orders; correct?
23   A.    Yes.
24   Q.    And in the course of practice in a --

1  in a correction- -- correctional facility, or at
2  any medical facility --
3    A.    Uh-huh.
4    Q.    -- if that occurs, should there be a
5  note of it in the file?
6          MS. SHWED:  Objection to form.
7          Let me just put on the record to
8     anything related to a correctional facility.
9          MR. PARKINS:  Okay.
10         THE WITNESS:  Yes.
11         Sorry.  Ask again so I can make sure I
12    understand.
13 BY MR. PARKINS:
14   Q.    If a doctor is called when they're off
15 or on call and puts an order over the phone,
16 should that show up in the medical record?
17   A.    It has to.
18   Q.    And, in your review of the case, is
19 there any evidence that he was ever called, or
20 placed any order over the phone, in regards to
21 Amir Whitehurst?
22   A.    No.
23   Q.    Attorney Shwed asked you about the
24 Navane that was prescribed.

1    A.    Yes.
2    Q.    And it was prescribed on his last
3  night in the prison, June 8; correct?
4    A.    Yes.
5    Q.    Did you read the defense expert
6  reports that attempted to blame Mr. Whitehurst's
7  physical condition upon entry into the hospital on
8  the Navane?
9          MS. SHWED:  Objection to form to the
10    extent of the characterization of the expert
11    report.
12 BY MR. PARKINS:
13   Q.    Any of the four expert reports that
14 I -- I provided you from defense counsel in this
15 case, Dr. Zurad, Williams, Fawks and Hughes, do
16 you recall discussion in those reports --
17   A.    At least one.
18   Q.    -- of Navane as being a potential
19 cause of the injuries?
20   A.    Yes; at least one of them.
21   Q.    Is that at all, in your opinion,
22 medically possible?
23         MS. SHWED:  Objection to form.
24         THE WITNESS:  So when I -- I read

1  that, again, I'm just going to have to say I
2  did laugh a little bit because it said it was
3  from -- his decomposition was from an
4  overnight sleep, and I slept last night, and
5  didn't end up hospitalized.  So, no, I don't
6  think that could have caused his
7  hospitalization, including the fact that he
8  was malnourished, which happens over a period
9  of time, not overnight.
10 BY MR. PARKINS:
11   Q.    Is it -- is it possible that the
12 malnourishment, the dehydration, and the muscle
13 breakdown could have occurred overnight as a
14 result of one dose of Navane?
15   A.    No.
16   Q.    And --
17   A.    It could have worsened it, but it
18 could not have caused it.
19   Q.    Okay.  And have you run into in -- in
20 the practice of psychiatry before, like, occasions
21 where a patient doesn't want to eat or drink?
22   A.    Yes.
23   Q.    Okay.  And do you just say, okay, you
24 don't have to eat or drink?

56 (Pages 218 - 221)

MICHELLE THERSSEN JOY, M.D.

Page 226

1    Whitehurst comes in with Glasgow Coma Score
2    of four, and, like I said, this table has a
3    Glasgow Coma Scale of three, actually, that's
4    how we think about it. So he was so poorly
5    interacting and so compromised that he -- I
6    don't know exactly what point that he got, he
7    might have been that he opened his eyes. But
8    so he was much worse mentally at that time,
9    had much fewer -- less ability to communicate
10   than during all the times that Dr. Mallik saw
11   him, but still, nonetheless, within the first
12   line of the first person that sees him, my
13   understanding is that he looked visibly
14   malnourished.
15   BY MR. PARKINS:
16       Q.    Is there any evidence in the record
17   that Dr. Mallik did anything to treat that
18   condition?
19       A.    No.
20             And I also want to --
21       Q.    Other than -- other than ignore it.
22       MS. SHWED:  Objection to form.
23       THE WITNESS:  Correct.
24             I also want to say that the -- that

Page 227

1    opening doctor describes him as cachectic,
2    and that's a term that we use, most commonly,
3    to describe end-stage cancer patients because
4    their -- your bone -- I mean, the way we
5    describe it is your skin is so sunken in,
6    that your bones are sticking out. You can
7    use it for other cases, but, like I said,
8    it's usually used for end-stage cancer
9    patients. So they were describing him as
10   visibly malnourished.
11   BY MR. PARKINS:
12       Q.    You saw the -- the video of the cell
13   extraction on the day he was put into the prison;
14   correct?
15       A.    Yes.
16       Q.    Did he appear to be in that state on
17   that day?
18       A.    No.
19       Q.    And --
20       A.    I said that loudly because, like said,
21   the -- the video I watched after my report was
22   finished, so I was actually astonished to see what
23   appeared to be pretty -- a vastly contrasting
24   state to how he was described on June 9.

Page 228

1        Q.    Okay. Did -- and -- and attorney
2    Healey started to talk about it a little bit, but
3    Dr. Mallik, in his deposition, do you recall him
4    differentiating, saying I only treat psychiatry at
5    the prison, I don't handle medical care?
6        A.    I do remember that.
7        Q.    Okay. Is -- is -- would -- would that
8    be -- would a delegation of duties, is -- is -- is
9    that an excuse to ignore medical emergency if you
10   see it; from a medical standpoint as a doctor?
11       A.    Not at all. It doesn't excuse it,
12   and, in fact, for instance, when I'm in the
13   emergency room, which happens every Wednesday, at
14   a minimum for 15 hours, we work alongside the
15   medical doctors, and our policy is to have at
16   least one conversation per shift per patient with
17   the medical doctors to update them about your
18   plan, to make sure you're not missing anything.
19   So, for example, sometimes I might find out during
20   my psychiatric evaluation that the patient hit
21   their head. It would be negligent of me to not
22   inform the medical doctor. They could die if I
23   didn't tell them because they might be bleeding in
24   their head, and if I ignore that and artificially

Page 229

1    separated it, it would be very poor substandard
2    care.
3        Q.    So would you -- would you say you have
4    a duty to either take steps to treat it yourself,
5    or to the advise the on-call medical doctor?
6        A.    Correct.
7              And espec- -- and going to the case of
8    Amir Whitehurst, my understanding, from the
9    record, is that Dr. Zaloga was not seeing him, and
10   so if you're the only medical provider there, it
11   is in your scope of duty to either treat or refer.
12       Q.    Okay. So is -- is there any evidence
13   in the record that Dr. Mallik treated the
14   condition, or attempt- -- or -- referred it to
15   Dr. Zaloga?
16       A.    There is no evidence of that. I think
17   there's also evidence from his deposition that
18   he -- he's basically saying that he didn't,
19   either, because he's calling that outside his
20   scope of practice, which I don't agree with. One
21   more thing I was going to say about that. Hold
22   on. No. I forgot.
23       Q.    That's okay.
24             And in regards to the amount of times

58 (Pages 226 - 229)

MICHELLE THERSSEN JOY, M.D.

1 Mr. Whitehurst when he came into the emergency
2 room at CMC. That's exactly what he has
3 documented in his note as it relates to head,
4 ears, nose and throat; normal, atraumatic, no
5 mass, no tenderness, no adenopathy.
6       That -- this documentation, authored
7 by the emergency room physician at CMC Geisinger
8 on that day, documents a normal head, ear, nose,
9 throat evaluation --
10   A.   Can --
11   Q.   -- correct?
12   A.   Can I briefly see that because I know
13 I reviewed it, I just want to see -- so this is
14 the portion of -- this is auto populated --
15   Q.   Yeah. This is the physical exam.
16   A.   -- and it -- it -- it contradicts --
17 so that contradicts the narrative that the
18 physician provided. For example, that would
19 contradict the fact that he's cachectic and the
20 other words that they use to describe him. So it
21 was such an emergency situation that I don't think
22 that they were duplicating documentation. I would
23 go more what he thought was very important to
24 include in the beginning, which was that he was

1 malnourished, cachectic and not eating.
2   Q.   Well, is it your testimony that the
3 emergency room physician did not perform a head,
4 nose, ears and throat examination, as documented
5 in this chart?
6   A.   Can I see it again?
7       I mean, again, right here it says
8 cachectic, and it says --
9   Q.   I understand that's the description.
10   A.   Uh-huh.
11   Q.   My question is very simple. This
12 record documents in the emergency room record of
13 that day of this patient, Mr. Whitehurst, the
14 head, ear, nose and throat examination was normal,
15 atraumatic, no masses, no tenderness, no
16 adenopathy. That's what's documented in the
17 record.
18       If we believe the words on the page,
19 that's a normal examination.
20   A.   Again, there is concurrent evidence
21 that it wasn't normal, and I don't -- because it
22 was an emergency situation, I would go for the
23 words that the -- the physician documented
24 describing the patient as not what's automatically

1 populated.
2   Q.   So for an emergency room physician to
3 not accurately diagnose a head, ear, nose and
4 throat examination would be a breach of the
5 standard of care; correct?
6   A.   I think that they did document it,
7 just elsewhere.
8   Q.   This is where it's documented. Head,
9 ears, nose and throat, normal, atraumatic, no
10 masses, no tenderness, no adenopathy.
11       Your testimony is you don't believe
12 that that's accurate.
13       And my question is if your belief is
14 true, and this emergency room physician prepared
15 this report, he breached the standard of care.
16   A.   What's the question?
17   Q.   That when you improperly document a
18 medical record that's inconsistent with patient's
19 physician, that's a breach of the standard of
20 care.
21   A.   Again, I think you're
22 mischaracterizing the documentation; so I can't
23 agree with that.
24   Q.   Neck, supplemental, normal range of

1 motion, no thryro- -- thyromegaly.
2       That's a normal neck examination;
3 correct?
4   A.   Again, it says cachectic, and there --
5   Q.   I'm not asking that. Listen to my
6 question, please.
7       My question is: Is it a normal neck
8 examination to find the neck supple with normal
9 range of motion?
10       Is that a normal neck examination?
11   A.   Hypothetically?
12   Q.   Is that -- do those words mean a
13 normal neck examination?
14       That's all I'm asking you because
15 that's what's in this record. You weren't there
16 at Geisinger, neither was I. So the only thing
17 that we can go by is what's documented in the
18 record. This physical examination documents the
19 neck as being supple, normal range of motion.
20       That's a normal neck examination;
21 correct?
22   A.   Again, I would believe the parts that
23 the physician wrote.
24   Q.   I'm not ask- -- I'm not asking you to

60 (Pages 234 - 237)

MICHELLE THERSSEN JOY, M.D.

Page 242

```
 1   it would be impossible to do.
 2          For example, tenderness, you know,
 3   you're -- the person is probably not responding.
 4   He's not able to respond, necessarily, to that,
 5   and that's why you repeatedly evaluate a patient
 6   over time as they improve.
 7          The other thing about that was, for
 8   example, the cardiovascular normal rate and
 9   rhythm, you're going to go by the more accurate
10   assessment, which is the EKG, which is actually
11   giving you a readout of it rather than just using
12   your ears.
13      Q.   Okay.  And -- and -- and I think what
14   you said was the information on this one page that
15   was selected from the medical record as a whole,
16   the information on here, you said, is auto
17   populated; correct?
18          MS. SHWED:  Objection to form.
19          THE WITNESS:  Yes.
20   BY MR. PARKINS:
21      Q.   And by "auto populated," that means a
22   computer automatically fills these answers in --
23      A.   Yes.
24      Q.   -- correct?
```

Page 243

```
 1      A.   And that you can change them, but
 2   those are the ones that automatically come in, and
 3   they have to be changed, or it would be routine
 4   practice to address it in an emergency situation
 5   in some other element of that same chart of which
 6   is multiple pages.
 7      Q.   Okay.  And the parts of the chart like
 8   the narrative, those are the parts that doctors
 9   actually write in themselves based on the
10   situation they're presented; correct?
11      A.   Yes.
12      Q.   And based on what the doctors wrote in
13   this case, Mr. Whitehurst was cachectic; correct?
14      A.   Yes.
15      Q.   And we know that his face, his skin,
16   his temperature, was abnormal in contrast to this;
17   correct?
18      A.   Right.
19          And even I think it says cachectic
20   there at the top of what -- what purpose would it
21   serve to write it three places.  He or she is
22   making it known that he's cachectic at least
23   twice.
24      Q.   Okay.
```

Page 244

```
 1      A.   Which was a visible -- easy to see
 2   visibly.
 3          MR. PARKINS:  Okay.  No further
 4   questions.
 5   BY MS. SHWED:
 6      Q.   Were you at CMC that day?
 7      A.   Say it again.
 8      Q.   Were you at the hospital that day?
 9      A.   No.
10      Q.   Did you see Mr. Whitehurst on that
11   day?
12      A.   I didn't.
13          MS. SHWED:  No further questions.
14          THE VIDEOGRAPHER:  Time is now 2:22.
15   This concludes this video deposition.
16          - - -
17   (Witness excused.)
18          - - -
19   (Whereupon the document was marked,
20   for identification purposes, as Exhibit No.
21   1.)
22          - - -
23   (At 2:22 p.m., proceedings were
24   concluded.)
```

Page 245

```
 1          - - -
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

62 (Pages 242 - 245)