Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF PENNSYLVANIA
 2
 3      AMIR WHITEHURST,          :   NO. 3:17-CV-00903
                                  :
 4            Plaintiff           :
                                  :
 5            vs.                 :
                                  :
 6      LACKAWANNA COUNTY,        :
        et al.,                   :
 7                                :
              Defendants          :
 8
 9
10
11
             VIDEOTAPE DEPOSITION OF DOMINIC A. SISTI, Ph.D.
12
13         Taken in the offices of Burns White, LLC,
14    100 Four Falls, Suite 515, 1001 Conshohocken State
15    Road, West Conshoshocken, Pennsylvania, on Friday,
16    February 22, 2019, commencing at 1:11 p.m., before
17    Sara J. Vanchure, Notary Public.
18
19
20                           - - -
21              VERITEXT LEGAL SOLUTIONS
                   MID-ATLANTIC REGION
22           1801 Market Street - Suite 1800
             Philadelphia, Pennsylvania 19103
23
                             - - -
24
```

EXHIBIT U

Page 2

1  APPEARANCES:
2  COMERFORD LAW OFFICES
3  BY:  CURT M. PARKINS, ESQ.
4  204 Wyoming Avenue
5  Scranton, Pennsylvania 18503
6  (570) 880-0777
7  curt@comerfordparkins.com
8  -- Representing the Plaintiff
9
10
11
12
13  BURNS WHITE, LLC
14  BY:  JOSEPH T. HEALEY, ESQ.
15      NICOLE C. FREILER, ESQ.
16  100 Four Falls, Suite 515
17  1001 Conshohocken State Road
18  West Conshohocken, Pennsylvania 19428
19  (484) 567-5700
20  jthealey@burnswhite.com
21  -- Representing the Defendants Correctional Care,
22  Inc.; Edward Zaloga, D.O.; Alexis Moritzkat; Amy
23  Collarini; Raenn Rodriguez; Nicole Ortana; and
24  "Nurse Ken" (Ken McCawley)

Page 3

1  APPEARANCES CONT'D:
2  CIPRIANI & WERNER, P.C.
3  BY:  CHRISTIAN W. FRANCIS, ESQ.
4  415 Wyoming Avenue
5  Scranton, Pennsylvania 18503
6  (570) 347-0600
7  cfrancis@c-wlaw.com
8  -- Representing the Defendant Satish K. Mallik,
9  M.D.
10
11
12
13  CIPRIANI & WERNER, P.C.
14  BY:  DAVID HEISLER, ESQ.
15  415 Wyoming Avenue
16  Scranton, Pennsylvania 18503
17  (570) 347-0600
18  dheisler@c-wlaw.com
19  -- Representing the Defendant Lackawanna County
20
21
22
23
24  Also present:  Ryan Morton

Page 4

1              INDEX OF WITNESSES
2  EXAMINATION                            PAGE
3  DOMINIC A. SISTI, Ph.D.
4   by Mr. Healey                         8, 103
5   by Mr. Francis                        57, 108
6   by Mr. Heisler                        68
7   by Mr. Parkins                        69, 109

               INDEX OF EXHIBITS

EXHIBIT        DESCRIPTION            MARKED

Sisti 1 - Sisti Notice of Videotaped
          Deposition                  6

Page 5

1           DEPOSITION SUPPORT INDEX
2  Direction to Witness Not to Answer
3  PAGE      LINE           PAGE      LINE
4   --        --             --        --

Request for Production of Documents

PAGE      LINE           PAGE      LINE
 --        --             --        --

Stipulations

PAGE      LINE           PAGE      LINE
 6         2              --        --

Questions Marked
PAGE      LINE           PAGE      LINE
 --        --             --        --

2 (Pages 2 - 5)

Page 10

1  Q.    Very good. And so can you outline
2  generally for me -- and be it from your report or
3  whatever is easiest for you -- the documents that you
4  reviewed and drafted in your report?
5  A.    And I do have copies of those, in fact.
6  Q.    Okay.
7  A.    So I consulted with the Canon of
8  Bioethics Literature to start and then I drilled into
9  the more specific literature on the ethics of
10 correctional medicine, with a particular focus on
11 correctional mental healthcare; and then I reviewed
12 the guidelines, statements, model processes and
13 practices issued by professional organizations such as
14 the American Psychiatric Association, the National
15 Commission for Correctional Mental Health, the
16 American Medical Association, and the American Academy
17 of Psychiatry and the Law.
18        THE VIDEOGRAPHER: I'm sorry, Doctor. Do
19 you have the microphone on?
20        THE WITNESS: Oh, I'm sorry. Oh, it fell
21 off. I apologize. I'll try it this way (indicating).
22 BY MR. HEALEY:
23 Q.    And in addition, Doctor, did you review
24 deposition transcripts?

Page 11

1  A.    Yes, I did.
2  Q.    Can you tell me --
3  A.    I'm sorry. Can I tell you -- can you say
4  that again?
5  Q.    Yeah. Whose deposition transcripts did
6  you review?
7  A.    The ones that are listed in the report
8  and, in addition, the more recent reports by experts
9  Evans, Folks, Hughes, and Joy.
10 Q.    Understood. And did you review the
11 entirety of the Lackawanna County Prison chart?
12 A.    What was provided to me I reviewed. I'm
13 not sure if that was the entirety, but what was
14 provided to me I reviewed.
15 Q.    Are you able to tell me, the copy that
16 you were provided of the medical records, how many
17 pages it was?
18 A.    Sure. I can look.
19 Q.    Thanks.
20 A.    Let's see here. So there's a number of
21 files, all different PDF files here. Let's see.
22 Onsite medical records. It appears to be -- at least
23 the one I have in front of me is 64 PDF pages,
24 prescription logs, 52 pages. I believe that's all I

Page 12

1  have in terms of the records from the jail. There are
2  records also from the offsite referral.
3  Q.    Oh, from Geisinger Medical Center?
4  A.    Correct. Well, actually these are CCI
5  records as well now that I look. Well, maybe not.
6  Nope. They're Geisinger. Correct.
7  Q.    Okay. The --
8        MR. PARKINS: I think there were -- there
9  were, just for clarity, Geisinger records in the CCI
10 records I think.
11       MR. HEALEY: There are, yeah.
12       THE WITNESS: I noticed that.
13       MR. PARKINS: So do you have -- you have
14 them all split up.
15       THE WITNESS: They were split up.
16       MR. PARKINS: You don't have them all as
17 one joint thing with how many pages it is? Okay.
18 BY MR. HEALEY:
19 Q.    Are you able to tell me what's the
20 64-page PDF?
21 A.    This appears to be the medical records --
22 Q.    Can I look over your shoulder?
23 A.    You sure can. Why not?
24 Q.    Yeah.

Page 13

1  A.    It starts with this page (indicating).
2  Q.    Okay. And then that's a 64-page document
3  which you believe to be the entirety of the Lackawanna
4  County Prison medical chart that you received?
5  A.    I don't know if it's the entirety or not.
6  Q.    Oh, okay. Is that what -- are those the
7  only records that you have, those 64 pages, which
8  would purport to be the Lackawanna County Prison
9  medical chart for Mr. Whitehurst?
10 A.    I believe so.
11 Q.    Okay. And the reason I ask, Dr. Sisti,
12 is the chart that I have for the Lackawanna County
13 Prison has 215 pages, but it appears that yours is
14 just the 64 pages?
15 A.    Well, there -- as I mentioned, there were
16 other files. So maybe you can take a look at these,
17 too. There's some documentation here, medical
18 restriction sheets that might --
19 Q.    Okay.
20 A.    You know, might be in your portfolio.
21 Q.    I see. Okay.
22 A.    And then there's some prescription logs
23 here that might again be combined --
24 Q.    Oh, okay.

Page 18

1  Q.     Have you ever treated patients?
2  A.     I never -- I'm not a clinician.
3  Q.     Okay. Have you ever been qualified as an
4  expert in a case where you opined as to the standard
5  of care of an internal medicine physician?
6  A.     No.
7  Q.     Would you be qualified to do that?
8  A.     If it's a clinical question, I would not
9  be. If it was an ethical question, I would be.
10 Q.     Okay. And how do you -- how do you make
11 that distinction?
12 A.     So clinical questions are questions
13 related to trajectory of care, specific medications
14 being used, interventions, you know, the standard
15 things that doctors have to figure out. Ethical
16 questions are characterized generally by conflicts and
17 values when it's individuals. If it's an
18 organizational issue, it might manifest as, say,
19 questions around particular policies or procedures
20 related to -- related to clinical care.
21        So, for example -- I'll give you an
22 example where there's an interest -- there's a
23 distinction. With -- and we used the example of end
24 of life care earlier. In looking at end of life care,

Page 19

1  there are certain kinds of clinical choices that one
2  can make; but when there's a conflict between those
3  choices, the ethicist maybe steps in to help
4  illuminate the different choices and, in doing so,
5  help to resolve a values conflict about what might the
6  patient want, how should they be treated, is it
7  ethical to, say, withdraw treatment at a particular
8  juncture or continue treatment at a particular
9  juncture. So they're related, but they're distinct.
10 Q.     Would you agree with me that the standard
11 of medical care is something that you wouldn't be
12 qualified to testify to with respect to an internal
13 medicine physician?
14 A.     I mean I think that I could opine on
15 pretty -- so like if an internal medicine physician
16 is -- let's use, like, a random example -- is, say,
17 prescribing medication and they have a conflict of
18 interest, it might be an appropriate, you know,
19 medication, you know, but they might be, say, taking
20 payments from a pharmaceutical company, in which case
21 I would be able to say they're violating a standard of
22 care. That's not appropriate. That's unethical. It
23 might be that the drug is okay, but the milieu or the
24 context within which that practice is happening there

Page 20

1  are ethical problems.
2  Q.     I understand. So, for our purposes, you
3  can't comment upon the care, treatment, medications,
4  orders, things of that nature from a medical
5  standpoint; but in terms of ethical relationships or
6  things of that nature, that you would be able to
7  comment on?
8  A.     I think that's correct.
9  Q.     Okay.
10 A.     If you -- could you repeat that?
11 Q.     Sure. It was a long one. In terms of
12 clinical decision making by an internal medicine
13 physician, you wouldn't be qualified to testify to
14 that; but if there was some underlying ethical issue
15 presented, that you would be able to comment on?
16 A.     Correct.
17 Q.     Okay. What was it that you were called
18 upon to do in this case?
19 A.     To examine the record and ascertain if
20 the clinical care providers were meeting the ethical
21 standards that have been developed by professional
22 organizations in the delivery of healthcare inside
23 correctional facilities.
24 Q.     Is meeting the ethical responsibilities

Page 21

1  different from the standard of care applicable to
2  physicians?
3  A.     Say that again.
4  Q.     Sure. Is meeting ethical
5  responsibilities different from the standard of care
6  applicable to internal medicine physicians and
7  psychiatrists?
8  A.     So the ethical conduct of clinicians,
9  psychiatrists, any physician is prior to the standard
10 of care usually. So the idea that an individual can
11 meet standard of care while being egregiously
12 unethical just seems sort of impossible. So, yeah, in
13 a sense, standard of care requires that a physician be
14 ethical.
15 Q.     Okay. But your purpose is not, nor would
16 you be comfortable opining as to the standard of care
17 for an internal medicine physician?
18 A.     Again, if it relates to something where
19 there's an ethical conflict or there is a deep policy
20 problem then, yes, I could opine on that.
21 Q.     Okay.
22 A.     It would not be --like I'm not -- I'm not
23 qualified to opine on what drug should be prescribed,
24 for example.

6 (Pages 18 - 21)

Page 26

1  Q.      Is it your opinion that NCCHC
2  accreditation is a requirement?
3  A.      No, it is not.
4  Q.      Okay. Is it -- did you find violations
5  of NCCHC guidelines?
6  A.      Yes.
7  Q.      What were they?
8  A.      So I think -- I mean I list a few in the
9  report, including the use of prolonged restraints,
10 seclusion, solitary confinement.
11 Q.      Is prolonged restraint -- is that a
12 corrections side or is that a medical side?
13 A.      What do you mean?
14 Q.      The use or the decision to place an
15 inmate in solitary -- or in a restraint chair, is that
16 a medical choice or a corrections choice?
17 A.      So all of these choices are intermingled
18 because the individual has a serious mental illness;
19 and so the corrections side should be working
20 carefully with the medical side to administer whatever
21 kind of seclusion or restraint they deem appropriate,
22 with the knowledge that such restraint is actually
23 contraindicated for individuals who have serious
24 mental illness because it can exacerbate the symptoms

Page 27

1  and so -- so that was -- you know, that was a key --
2  in my opinion, that was a key transgression of the --
3  you know, the guidelines of the National Commission.
4           Now, that's not to say restraint
5  seclusion is completely off the table; but if a person
6  is in a state of, you know, serious crisis, has a
7  serious mental illness and is decompensating, that's
8  what made me feel as though they transgressed the
9  standard presented by the National Commission.
10 Q.      Is it your opinion that Mr. Whitehurst
11 should not have been placed in a restraint chair?
12 A.      Well, like I said, restraint chairs may
13 be appropriate for a time. My understanding was he
14 was in it for longer than eight hours and that -- that
15 flies in the face of the guidelines that I've
16 reviewed.
17 Q.      So is the eight hours in and of itself
18 the violation that he was in a restraint chair for --
19 A.      Well, there's other -- there's other
20 aspects to that guideline, which include careful
21 monitoring, 15-minute checks, periodic breaks if
22 possible. You know, he was in a camera cell. So
23 essentially there was a clinician that was watching,
24 like, at all times, not just through intervals.

Page 28

1           You know, it's meant that the individual
2  who's in a camera cell should be watched by -- and
3  actually it's important to say this -- a clinician and
4  not a correctional officer, you know, in -- you know,
5  entirely, not just 15-minute checks.
6  Q.      Are you suggesting a clinician should be
7  dedicated to one-on-one observation of Mr. Whitehurst?
8  A.      Yes.
9  Q.      A clinician meaning a nurse? A
10 physician?
11 A.      So in the case of Mr. -- so I know, you
12 know, he had a one-on-one with a nurse. I'm not --
13 it's not clear to me that she was monitoring
14 continuously, you know, not -- you know, one-on-one
15 doesn't simply mean checking in intervals. It means
16 consistent viewing of a screen, a monitor.
17 Q.      And that, in your opinion, should be
18 performed by a clinician, be it a nurse or a doctor,
19 one-on-one on Mr. Whitehurst?
20 A.      Correct.
21 Q.      Okay. Did you review or did you see the
22 extraction video of Mr. Whitehurst?
23 A.      I did.
24 Q.      Okay. Did you know the conduct which led

Page 29

1  to the extraction?
2  A.      I did read about it.
3  Q.      Did you feel that it was appropriate
4  after that conduct where he had barricaded himself in
5  a solitary cell, torn the bed out of the floor that
6  he was appropriate for a restraint chair at that
7  point?
8  A.      I think yes. So I would say -- and
9  again, you know, this is from my reading of the
10 records. I don't -- I didn't see video of prior
11 behavior, but my -- my view on this is that restraints
12 would be appropriate for a period of time such that he
13 could be observed and then transferred to an adequate
14 therapeutic setting.
15 Q.      Such as?
16 A.      A hospital.
17 Q.      The decision to transfer to a hospital
18 would be a clinician's decision, correct, based upon
19 their observations?
20 A.      Well, I'm again gleaning from the
21 guidelines I've read, which is that if an individual
22 needs to be in restraint for such a long period of
23 time, they are not in a therapeutic setting. In fact,
24 such a long period of restraint is often considered a

8 (Pages 26 - 29)

Page 34

1  standards is to demonstrate that you have standards,
2  policies, and practices that are clearly documented.
3  I do not believe that CCI had those things.
4  Q.      Okay. Did Lackawanna County Prison have
5  policies and procedures which governed medical care?
6  A.      So I did review a couple of their
7  policies and they do exist. They are rather vague and
8  broad and I believe they leave quite a bit of
9  discretion to the contractors or providers, which
10 makes sense because you would assume the contractors
11 or providers would bring their own policies and
12 practices and I don't -- I didn't see any of those
13 from CCI.
14 Q.      Okay. Anything else as it relates to the
15 guidelines?
16 A.      Not at the moment.
17 Q.      Okay. CC -- looking at page 8, "CCI did
18 not have adequate staffing and/or medical and
19 psychiatric training in regards to its nursing staff
20 and psychiatric providers." What's the basis of that
21 opinion, Dr. Sisti?
22 A.      The depositions I read where they --
23 where everyone -- in fact, even Dr. Mallik and
24 Dr. Zaloga, Nurse June Reed -- all described no

Page 35

1  training.
2  Q.      How about adequate staffing?
3  A.      So again I'm gleaning that from the
4  depositions I reviewed, in particular Nurse Reed.
5  There was another deposition that counsel just
6  provided me from another nurse who described the lack
7  of personnel; and then I think, more importantly, the
8  fact that Dr. Mallik himself was only present I think
9  six hours a week or something for, you know, a
10 population of inmates who, you know, number in the
11 thousands; and, you know, not to say they all needed
12 psychiatric care, but it seemed to me that that was
13 not a sufficient number of hours. The other -- you
14 know, other correctional facilities that I've worked
15 with have full-time psychiatrists on staff.
16 Q.      Did you read in Dr. Mallik's transcript
17 where he said everybody that was in a camera cell
18 would be seen by him every two days? Were you aware
19 of that or whenever he was present in the facility?
20 A.      Yes.
21 Q.      Okay. And is that, in your mind, not
22 appropriate?
23 A.      Insufficient.
24 Q.      Why is that?

Page 36

1  A.      When an individual is in crisis, when
2  they're in a camera cell, they should be
3  comprehensively evaluated on a daily basis.
4  Q.      In addition to being watched one-on-one
5  by a clinician around the clock?
6  A.      I believe so.
7  Q.      Okay. So what you're saying here is
8  adequate staffing would require round-the-clock
9  observation by a trained clinician of Mr. Whitehurst
10 as well as daily intervention by a psychiatrist?
11 A.      I didn't say intervention, but
12 evaluation.
13 Q.      Okay.
14 A.      Absolutely, and the -- the rationale
15 there is that the services provided inside of the jail
16 should meet a community standard and that would be a
17 community standard. You know, in inpatient
18 psychiatric facilities, that's the community standard.
19 There's rounding every day and -- you know, so every
20 other day is not sufficient.
21 Q.      Is this written down anywhere, this
22 standard that you're talking about? Where does it
23 come from?
24 A.      So I have reviewed the APA standards that

Page 37

1  describe the evaluation process. The Journal of the
2  American Academy of Psychiatry and the Law has
3  articles on how best to manage individuals in crisis.
4  My knowledge of inpatient psychiatric facilities as
5  representing the community standards inform my opinion
6  here. So is there one place where this is? No.
7  Q.      Okay.
8  A.      I mean it's a standard that is met
9  through the professional -- you know, sort of
10 professional consensus.
11 Q.      Was Mr. Whitehurst suffering from the
12 effects of spice, the effects of mental illness, or
13 both, in your opinion?
14 A.      Again, not being a clinician or a
15 psychiatrist, I hesitate to, you know, make a
16 conclusive statement on that, but the deeper question
17 is that is there a distinction here between an
18 intrinsic mental illness or one that's caused by spice
19 and -- okay.
20 Q.      Go ahead. I'm sorry.
21 A.      I was just going to say and I would argue
22 that his mental illness was probably exacerbated by
23 spice, but that he did have a psychosis spectrum
24 disorder; and, you know, the literature now is

Page 42

1  Q.     Okay.  In Dr. Mallik's transcript though,
2  however, he did review his notes and read them into
3  the record; correct?
4  A.     In which?
5  Q.     In his deposition.  You were talking
6  about being unable to read his records.  So from
7  his -- from his deposition transcript, were you able
8  to glean what was in those progress records and
9  orders?
10 A.     No, I wouldn't say I was able to glean
11 the specific details of those progress notes.
12 Q.     Okay.  Were you aware that in between
13 May 24th and June 8th of 2015 that Dr. Mallik, along
14 with Nurse Moritzkat, saw Mr. Whitehurst every two
15 days and that a progress record was entered?
16 A.     I am aware that he did see Dr. -- see
17 Mr. Whitehurst every two days and I am not aware
18 that -- however, that he was actually evaluated every
19 two days.
20 Q.     Okay.
21 A.     He might have looked in and saw him.  I
22 don't know what that means.  I don't know what the --
23 you know, I don't know what was done, what kind of
24 care was delivered, but yes.  I would say, yes, every

Page 43

1  two days they interacted.
2  Q.     They interacted and that interaction was
3  recorded in progress notes drafted by Dr. Mallik along
4  with corresponding orders in the chart; correct?
5  A.     That's a -- that would I believe be true.
6  Let me just ask you --
7  Q.     Sure.
8  A.     -- about the progress notes because I'm
9  not sure I have them.
10 Q.     Yeah.
11 A.     If you have a copy, a hard copy, that
12 might be helpful.
13 Q.     Yeah.  What I'm looking at, Doctor,
14 are -- and they're Bates stamped 198 through 208,
15 which I believe are the orders and the progress notes
16 for Dr. Mallik.
17 A.     Yes.  I recognize the writing.  So these
18 I've seen.
19 Q.     Okay.
20 A.     Yes.
21 Q.     And essentially what --
22 A.     But I haven't -- I have no idea what they
23 say and I don't know -- I've not seen anything
24 transcribed so --

Page 44

1  Q.     Okay.  And so we do know that -- and
2  we'll use the term interaction just to be fair.
3  Whatever interaction that Dr. Mallik had with
4  Mr. Whitehurst he at least recorded in a progress note
5  and entered orders on the chart?
6  A.     Again I don't -- yes.  I mean I guess
7  that would be true.  I don't know about the actual
8  progress notes and where they reside though.
9  Q.     Okay.  I want to talk about the contract.
10 You say, "CCI entered into a contract with Lackawanna
11 County that was fundamentally conflicted."  What's the
12 basis for that?  And I'm looking at page 8 of your
13 report.
14 A.     So there appeared to be an incentive to
15 not use outside hospitalization because it would
16 affect the cost of the care for particular inmates,
17 and there were I believe provisions in that contract
18 that made it more -- that -- so let me start -- let me
19 think this through because my impression was
20 Dr. Zaloga's contract with the county aimed to
21 minimize the cost of caring for individuals inside the
22 jail.
23         Insofar as he could do that, he I believe
24 hesitated to use outside providers -- in other words,

Page 45

1  transfers to hospitals -- because they're much more
2  expensive than treating in-house.  Now, I do
3  understand that the county would end up paying that
4  tab, but he in communications with the county
5  commissioners has -- I believe has -- and I believe
6  I've read some minutes from these meetings where he
7  describes trying to minimize the cost for taxpayers.
8  Q.     My question is this is a situation
9  where -- based upon your review of the contract where
10 it's a cost passed through to the county; correct?
11 A.     Yes.
12 Q.     So, in other words, if someone -- if an
13 inmate were to be sent to an outside facility, that
14 money is paid by the county as opposed to Correctional
15 Care, Inc.?
16 A.     So to -- so I understand what you're
17 asking.
18 Q.     Right.
19 A.     The incentive is to continue to have the
20 contract by showing that you can save the county
21 money, is to continue to be contracted by the county
22 because you are efficient and you save the county
23 money.
24 Q.     Well, the other alternative is there are

Page 50

1  suffering a psychiatric emergency?
2  A.        Yes.
3  Q.        When?
4  A.        Probably from the moment he walked in the
5  door.
6  Q.        So it's your contention from May 24th of
7  2015 through June 9th of 2015 Mr. Whitehurst was in a
8  continual psychiatric emergency state?
9  A.        It actually worsened so yes.
10 Q.        It worsened after he was extracted from
11 his cell?  His psychiatric emergency became worse
12 after that?
13 A.        Well, I believe it worsened just
14 longitudinally through time.  So it was exacerbated
15 but, yeah, it continued to get worse.
16 Q.        Okay.  Number 5, "It appears Dr. Zaloga
17 was unprofessional and on several several occasions
18 demonstrated disdain for his nursing staff." What is
19 that based on?
20 A.        That was based on Nurse Reed's discussion
21 of how Dr. Zaloga would yell at the staff.
22 Q.        Only Nurse Reed though?
23 A.        Yes.
24 Q.        When Mr. Whitehurst was in the restraint

Page 51

1  chair I believe on May 25th and 26th, are there
2  nursing notes which reflect periodic checks on him?
3  A.        I believe so.
4  Q.        Okay.  If Dr. Evans testified that there
5  was no evidence at all of any nursing checks of him
6  while he was in the restraint chair, would that be
7  incorrect?
8  A.        I believe so.  I believe that they --
9  that -- so I don't know if they were physical checks
10 where they actually went into the cell; however, the
11 nurses did obviously monitor him on the screening.
12 Q.        Okay.
13 A.        So I don't recall if they actually went
14 in and checked the actual tethers that are used in the
15 restraint chair, which is something that they're
16 supposed to do every 15 -- every so often.
17 Q.        For example -- and I could just read it
18 to you.  "Inmate removed from restraints.  No
19 circulatory impairment.  Positive pedal and radial
20 pulses."  This -- "No discoloration."  This
21 demonstrates they actually went in and examined him;
22 correct?
23 A.        What -- so what day was -- at what point
24 was that?

Page 52

1  Q.        That was May 25th.
2  A.        Okay.  And he was in the restraint chair
3  for how long?
4  Q.        That I'm not -- it has 23:50 SERT team
5  called and then 12:25, 4:40, and then 9:00 --
6  A.        Right.
7  Q.        -- the next morning.
8  A.        Yeah.  So I do recall that.  There were
9  like nine hours where I don't know if he was checked
10 physically.
11 Q.        Okay.
12 A.        Physically checked.  So on that timeline
13 I don't see any evidence that he was actually checked
14 physically at intervals.  He might -- you know, he was
15 monitored by camera, but did they walk into the cell
16 and actually check in intervals?
17 Q.        Well, I can show you the records.
18 A.        Yeah.
19 Q.        And just so we're working off the same
20 page, going from the SERT chair down, would that
21 reflect that it looks like the nurses are actually
22 examining him as opposed to just looking at the
23 screen?
24 A.        Yes.  So what happened here was that they

Page 53

1  checked on Mr. Whitehurst at 11:50 p.m. and at
2  4:40 p.m., physically checked the -- actually I take
3  that back.  It does -- again it does not appear to me
4  from this record that you can -- that we can say with
5  confidence that he was checked between the hours of
6  11 -- from 11:50 p.m. on 5-25 and 9 a.m.  Something's
7  wrong with the dates here but --
8  Q.        Okay.
9  A.        But, no, I would say that one cannot -- I
10 cannot see how I can say one way or the other whether
11 they checked Mr. Whitehurst's restraints physically
12 during that duration of his time in the restraint
13 chair.
14 Q.        I see.  You just can't say one way or the
15 other based on the report?
16 A.        Well, I would assume that they would have
17 documented if they went into the cell and checked the
18 straps and things.
19 Q.        How would they get vital signs?
20 A.        Can I see that again?
21 Q.        Sure.
22 A.        Did they -- did they check the
23 restraints?  Did they check the straps?  I don't see
24 any evidence here that they did anything related to

14 (Pages 50 - 53)

Page 58

1 report and the conclusions you draw, is it your
2 position that my client, Dr. Mallik, breached any type
3 of standard of care that might be applied to him as a
4 psychiatrist?
5  A.	So insofar as there are standards of care
6 that have been issued by the various accreditation
7 bodies and professional organizations and insofar as
8 those are, you know, ethical standards that may ramify
9 across clinical issues, I would say yes.
10 Q.	Okay. And, you know, your report isn't
11 extremely long. It's only, you know, eight or nine
12 pages, with the exception of the references. What
13 specifically, in your opinion, did he -- what ethical
14 violations did he commit that you think might amount
15 to a breach of the standard of care?
16 A.	It was not clear to me that Dr. Mallik
17 was able to provide comprehensive evaluation and
18 treatment to the patients of the jail, in particular,
19 Mr. Whitehurst, because he was not present enough to
20 be able to do that and so that would be one of the
21 sort of main challenges. To provide adequate
22 comprehensive mental healthcare requires a certain
23 amount of time and presence, which I do not believe,
24 from what I read, that Dr. Mallik provided.

Page 59

1 Q.	Okay. So I'll jump right ahead to that.
2 Did you have an opportunity to review any of the
3 expert reports from Dr. Williams?
4 A.	Yes.
5 Q.	Okay.
6 A.	Penn colleague.
7 Q.	In the first report on page 4, he
8 addresses this and you can -- I don't know if your
9 counsel or --
10 A.	I have it here on my screen.
11 Q.	Okay.
12 A.	Yeah.
13 Q.	So page 4 it says, "Regarding the
14 appropriate frequency of psychiatrist rounding on
15 patients and, therefore, the appropriateness of
16 follow-up intervals generally, no guideline exists
17 specifying the frequency to deliver the best care."
18 Do you not agree that with statement?
19 A.	There are particular professional
20 standards in medicine that may or may not be written
21 down in a particular place, but rounding is
22 conventional in every medical setting that I've ever
23 been exposed to, daily rounding; and for patients who
24 are extremely ill, it happens sometimes twice a day.

Page 60

1 So I don't know what Dr. Williams is
2 saying in terms of guidelines to, like, lay out the
3 frequency of rounding; however, I would argue that
4 rounding is part of a professional standard of
5 continuity of care.
6 Q.	Okay. And it is his opinion at the end
7 of that paragraph that the frequency of assessment by
8 Dr. Mallik met the standard of care. So without going
9 through all that again, your opinion is that you
10 disagree with that or maybe you don't?
11 A.	Well, I found that that paragraph where
12 it's linked up with reimbursement purposes to be
13 problematic. I mean it was like a speculation around
14 why rounding happens and that's not actually -- that's
15 nowhere in the literature. I've never heard that
16 rounding is a result of billing -- for billing
17 reasons.
18 It is a matter of quality comprehensive
19 healthcare that the attendings -- and, in this case,
20 Dr. Mallik is an attending -- round and evaluate their
21 patients on a daily basis, you know; and I would
22 construe the Delta Block as almost like an Intensive
23 Care Unit where there's very, very sick individuals
24 sometimes and, in Intensive Care Units, doctors round.

Page 61

1 Q.	Now, there was some testimony previously
2 about a -- and I think it was specifically in regards
3 to the daily rounding requirement and you had
4 mentioned a community standard?
5 A.	Professional standard.
6 Q.	Okay. Did you use community standard or
7 am I -- did I find that from somewhere else?
8 A.	Did I just say community standard?
9 Q.	No, no, no. I wrote that down before, as
10 I thought that was part of your testimony, but you can
11 clarify.
12 A.	I would clarify and say it's a
13 professional -- it's a professional standard --
14 Q.	Okay.
15 A.	-- to round and to essentially maintain
16 constant vigilance for very sick patients.
17 Q.	So do you have any understanding of
18 community standards as they apply to medical doctors?
19 A.	With regard to what?
20 Q.	The standard of care.
21 A.	And specifically what standard of care?
22 For what?
23 Q.	For any --
24 A.	For psychiatrists?

Page 66

1  A.      So I believe in his deposition he may
2  have gestured to certain interactions with that --
3  with Mr. Whitehurst, but I cannot say for sure how
4  long those interactions lasted; but again I'm, you
5  know, thinking back to the deposition --
6  Q.      Sure.
7  A.      -- and not the progress notes.
8  Q.      Is it your opinion that Dr. Mallik
9  specifically did not provide adequate, competent, and
10 appropriate medical care to Mr. Whitehurst?
11 A.      That is my opinion.
12 Q.      Okay. Do you believe you have standing
13 to make that opinion?
14 A.      Insofar as I understand the guidelines
15 issued by accreditation bodies and professional
16 societies regarding how adequate, comprehensive,
17 and -- adequate, comprehensive psychiatric care is
18 grounded in. Ethical psychiatric care, yes.
19 Q.      Okay. And that's based on?
20 A.      Because by not providing -- by not
21 providing ethical -- you know, the breaches of ethics
22 drive oftentimes clinical shortcomings.
23 Q.      That's based off of the guidelines of the
24 APA; correct?

Page 67

1  A.      Correct.
2  Q.      Are you a member of the APA?
3  A.      I am not. I'm not a physician.
4  Q.      Are you aware of the Mental Health
5  Procedures Act?
6  A.      Yes.
7  Q.      Okay. Tell me what you know about that
8  or your understanding.
9  A.      I don't -- I'm -- so can you ask me
10 specifically about -- I don't recall the -- I'm having
11 a mind blank right now, but I've read it. I know it,
12 but I forget it.
13 Q.      Okay.
14 A.      I don't recall specifics.
15 Q.      Okay. Was it a consideration of yours --
16 because I don't believe --
17 A.      It was not in the report.
18 Q.      Okay. So it's not in your report --
19 A.      Yeah.
20 Q.      -- correct? Regarding any type of
21 standard of care applied to the Mental Health
22 Procedures Act, is it your opinion that Dr. Mallik
23 breached that applicable standard?
24 A.      I can't say. Yeah.

Page 68

1  Q.      And, again, it's not in your report?
2  A.      No. I didn't -- I have taught it and
3  read it, but I'm having a mind blank on it.
4  Q.      Yeah, and it's not a test. I'm not --
5  A.      Yeah, no.
6  Q.      I just wanted to know your --
7  A.      Yeah. I didn't use it in my report.
8         MR. FRANCIS: Okay. Fair enough. I
9  believe that's all the questions I have.
10              - - -
11             EXAMINATION
12 BY MR. HEISLER:
13 Q.      Just a question or two. You used the
14 term National Commission on occasion. When you refer
15 to the National Commission, are you referring to the
16 National Commission on Correctional Health Care?
17 A.      I am, yeah. Sorry. I thought I'd
18 shorten it.
19 Q.      That's fine. And have you ever checked
20 out their website?
21 A.      Yes.
22 Q.      Okay. I'm going to ask you something,
23 whether this is a fair statement. "NCCHC's standards
24 present recommendations for the management of a

Page 69

1  correctional health services system." Does that
2  coincide with what you believe this organization does?
3  A.      Yes.
4         MR. HEISLER: I have no further
5  questions.
6              - - -
7             EXAMINATION
8  BY MR. PARKINS:
9  Q.      Doctor, I'm going to go through some of
10 the points that Attorney Healey and the other
11 attorneys went over with you. I want to talk about
12 the ethical standards versus standard of care. Okay?
13 A.      Okay.
14 Q.      And you were specifically asked I think a
15 couple of times whether or not you're a doctor and
16 whether you can comment on standard of care. Do you
17 recall that?
18 A.      Yes.
19 Q.      And I believe your testimony was that the
20 ethical standard is not always analogous to the
21 standard of care; correct?
22 A.      I believe -- I believe I -- I don't think
23 I used the word analogous, but they're not -- they're
24 not a hundred percent congruent sometimes, yes.

18 (Pages 66 - 69)

Page 74

1  obviously I think we'd all agree prison medical has to
2  provide medical care and psychiatric care; correct?
3  A.       Absolutely.
4  Q.       Is there an ethical requirement for a
5  prison medical to provide detox services?
6  A.       Absolutely.
7  Q.       And to the extent that Mr. Whitehurst was
8  suffering from a spice withdrawal, based on your
9  review of the record, was ethical treatment provided
10 in terms of detox?
11 A.       So --
12         MR. HEALEY: Objection. Sorry. Go
13 ahead.
14         THE WITNESS: Oh, I thought you -- so
15 initially I couldn't tell because I couldn't really
16 decipher the notes, but when I -- I read some of the
17 other -- some of the other reports. It appeared that
18 he was being given Ativan I believe and antipsychotics
19 and, again, not being a clinician, but I do -- I do
20 read. I do know that those are often used for
21 withdrawal.
22         The problem I feel like is about the
23 duration of the seclusion and the fact that it
24 exacerbated his underlying condition.

Page 75

1  BY MR. PARKINS:
2  Q.       So let's talk -- let's talk about two
3  things, the seclusion and the restraint chair. Okay?
4  A.       Okay.
5  Q.       What is -- could you just first describe
6  generally the ethical considerations regarding
7  seclusion in camera cells?
8  A.       So seclusion -- I mean let's start
9  globally and then work our way down. Solitary
10 confinement is generally considered by most
11 international conventions to be essentially torture
12 and it is unjustified in the treatment or the
13 seclusion of individuals with mental illness when
14 there's an alternative -- when there's alternatives
15 available to provide that individual adequate
16 treatment to stabilize the individual. They should
17 not be used as essentially holding pens for
18 individuals who are in psychiatric crisis.
19 Q.       Is that what was done in this case?
20         THE VIDEOGRAPHER: Counsel, I have one
21 minute.
22 BY MR. PARKINS:
23 Q.       Is that what was done in this case?
24 A.       Sorry?

Page 76

1  Q.       You can answer.
2          MR. FRANCIS: Objection to the form.
3  BY MR. HEALEY:
4  Q.       Your characterization that they shouldn't
5  be used as a holding pen for someone with mental
6  illness, based on your review of the record, is that
7  what happened in this case?
8          MR. FRANCIS: Object to the form.
9  BY MR. PARKINS:
10 Q.       You can answer.
11 A.       Can I answer? Yes, I would say so.
12         MR. PARKINS: All right. Do you want
13 to -- he's got to switch cards.
14         THE VIDEOGRAPHER: The time is now 2:46.
15 This ends media unit one.
16         (A brief recess was taken.)
17         THE VIDEOGRAPHER: The time is now 2:47.
18 This begins media unit number two. Back on the
19 record.
20 BY MR. PARKINS:
21 Q.       So we were talking about the camera cells
22 or the solitary confinement; right?
23 A.       Yeah.
24 Q.       And you mentioned a lot during your

Page 77

1  testimony -- you were using the term serious mental
2  illness.
3  A.       Correct.
4  Q.       Is that correct?
5  A.       Yeah.
6  Q.       How would you define that?
7  A.       So I wouldn't define it. IMH defines it
8  it as really three conditions: Major depressive
9  disorder, schizophrenia, or bipolar disorder.
10 Q.       And based on your review of the record,
11 was Mr. Whitehurst suffering from a serious mental
12 illness from May 24th of 2015 through June 9th of
13 2015?
14 A.       It appears that he had a --
15         MR. FRANCIS: Objection to form. You can
16 answer.
17 BY MR. PARKINS:
18 Q.       You can answer.
19 A.       It appears that he was experiencing a
20 psychotic break, whether it was secondary to spice or
21 something else. Again as we just -- as I just
22 described is not relevant, but it appears that from my
23 reading of the records and, you know, viewing of the
24 video that Mr. Whitehurst was experiencing a serious

20 (Pages 74 - 77)

Page 82

1 appropriateness of the restraint chair.
2 Q. Okay. But I think what I'm asking is
3 those policies on their face, are they adequate or are
4 they defective, the Lackawanna County restraint chair
5 policies?
6 A. They reflect the -- so every 15-minute
7 intervals and things like this, they do get some
8 things right in there. The issue, however, is the
9 duration and they peg it at like -- 10 hours I think
10 is like the max and that's not what I'm -- my
11 understanding is would be the ethical consensus on
12 that.
13 Q. So it's your opinion that the Lackawanna
14 County's policy allows for placement in the restraint
15 chair for excessive periods of time?
16 A. Yes.
17     MR. HEISLER: Objection.
18     MR. FRANCIS: Join to the form.
19 BY MR. PARKINS:
20 Q. Is that a "yes"?
21 A. That is a yes.
22 Q. Specifically the policies of Correctional
23 Care and Dr. Zaloga in regards to solitary and the
24 restraint chair, defective, adequate, or nonexistent?

Page 83

1 A. Nonexistent.
2 Q. Why do you say that?
3 A. Because they don't exist. He has no
4 policies that guide the clinical matters involving
5 seclusion and restraint and he said so himself.
6 Q. In his deposition?
7 A. Correct.
8 Q. Does he have any medical written policies
9 whatsoever?
10 A. He does not.
11 Q. Okay. And "he" being Dr. Zaloga; is that
12 correct?
13 A. Correct.
14 Q. Is the utter failure to adopt a written
15 policy an ethical violation and/or a violation of the
16 standard of care?
17     MR. HEALEY: Objection.
18     THE WITNESS: Yes. I've never
19 encountered a medical provider, you know, a service
20 provider company that has nothing -- has no policy
21 book, no employee handbook, nothing. I've never
22 encountered that.
23 BY MR. PARKINS:
24 Q. Did you have a chance to review

Page 84

1 Sections 9.01 through 9.04 of Lackawanna County's
2 policies regarding prison medical?
3 A. I did. Let me just bring it back up so I
4 have it in front of me. The pages are a little out of
5 order but, yes, I did.
6 Q. In regards to those policies, are they an
7 adequate substitution for policies on behalf of
8 Correctional Care?
9 A. No.
10 Q. Why?
11 A. Because they provide discretion. They
12 offer discretion to the provider and it is I guess a
13 safe assumption that the provider would have their own
14 processes and policies in place, which I don't believe
15 they do.
16 Q. Do you have an opinion as to whether or
17 not Lackawanna County's policies and Correctional
18 Care's lack of policies caused some of the injuries
19 sustained in this case?
20     MR. HEALEY: Objection.
21     MR. HEISLER: Objection to form.
22     MR. FRANCIS: Join.
23     THE WITNESS: Insofar as there is no
24 standard operating procedure, no resource for

Page 85

1 employees to draw upon, no way for clinicians employed
2 by CCI to know that they're practicing at or above the
3 standard of care, no policies involving training and
4 expectations, no policies involving the medical
5 decision making when it comes to individuals with a
6 serious mental illness who are restrained and in
7 seclusion, yes.
8 BY MR. PARKINS:
9 Q. Let's -- and I know I'm jumping around
10 here a little bit. We talked about the solitary.
11 Let's talk specifically about the restraint chair.
12 What are the ethical considerations in regards to
13 placing an inmate in a restraint chair?
14 A. Well, first off, again this is another
15 intervention that is not to be used haphazardly of
16 course. It should be rarely used, if it all; and it
17 is considered, if it is done inappropriately or if it
18 is used excessively, to be a fundamental violation of
19 human rights.
20 Q. And, in your review of this case, what's
21 your opinion as to whether or not Mr. Whitehurst's
22 placement in the restraint care was ethical and
23 excessive -- or excessive?
24 A. It was both. It was excessive. It was

22 (Pages 82 - 85)

Page 90

1 whom the company may contract. All decisions
2 regarding hospital admissions with respect to care are
3 medical decisions to be made by the appropriate
4 medical personnel. Every effort will be made to
5 provide as much care as possible on site so as to
6 minimize the disruption in correctional staffing."
7 That -- the last sentence about minimizing --
8  A.     Yeah.
9  Q.     Or incentivizing onsite treatment --
10 A.     Right.
11 Q.     -- is that an ethical provision?
12        MR. HEALEY: Objection.
13        THE WITNESS: It -- I mean it's -- it
14 creates again this perverse incentive to not transfer
15 patients to the appropriate setting, which is kind of
16 what I was trying to get at earlier. The idea that
17 staffing rearranging or resource shifting is a problem
18 does not override or supersede the rights of the
19 individual patient to be provided with adequate
20 healthcare in the setting that is indicated or is
21 appropriate.
22 BY MR. PARKINS:
23 Q.     You were asked a little bit about
24 standards in correctional center -- or correctional

Page 91

1 facilities versus jails or prisons versus jails?
2  A.     Um-hum.
3  Q.     Do you recall that?
4  A.     Yes.
5  Q.     When it comes to medical ethics, does --
6 do the ethics change whether or not you're in a jail
7 or a state prison?
8  A.     No, no.
9  Q.     And when you talk about the standards,
10 the standards for care in jails, how does that relate
11 to the -- I think you were being asked about the
12 community standard. Is it higher or lower? The same?
13 A.     Oh, okay. Yeah. So in terms of the
14 community standard for care, so typically the idea
15 there is that the healthcare provisions inside of a
16 correctional institution should meet or exceed the
17 community standards ideally. You know, that -- you
18 know, as an ethicist, I think about what ought to be
19 the case, not what is the case, and so it ought to be
20 the case that the community standard should be met
21 within inside the jail.
22 Q.     Is the jail standard supposed to be the
23 community standard or is it supposed -- the actual
24 community standard or the ideal community standard?

Page 92

1  A.     The ideal community standard.
2  Q.     And can you explain the difference there
3 or what that means?
4  A.     So insofar as there's a -- sort of an
5 aspirational goal that individuals with serious mental
6 illness will receive care, appropriate care at the
7 right place, at the right time, that there will be a
8 continuity of treatment options from outpatient care
9 to sort of inpatient, but then emergency care that
10 would be referred out, that would be -- that would be
11 kind of the aspirational community model. That should
12 be what correctional facilities strive to meet.
13 Q.     So the -- so the standard to be applied
14 in correctional facilities actually exceeds the
15 community standard or is a higher standard; is that
16 correct?
17 A.     I would --
18        MR. HEALEY: Objection.
19        MR. FRANCIS: Object to the form.
20 BY MR. PARKINS:
21 Q.     Is it a higher or lower standard?
22 A.     I would say it should be at the very
23 least the same, if not better, because, remember,
24 these are individuals who have no choice in how to

Page 93

1 access healthcare and I believe, you know, there's
2 case law on this where it's -- where it's shown that
3 these individuals have a constitutional right to
4 adequate healthcare and mental healthcare.
5  Q.     In regard to the -- in regard to the
6 restraint chair use, Attorney Healey showed you a copy
7 of the nurse's notes from the first day in the
8 restraint chair. Do you recall them?
9  A.     Yeah.
10 Q.     And I think there was a nurse checking
11 when he went in the chair, when he came out of the
12 chair, and once in between; is that correct?
13 A.     I believe it was twice in between, but it
14 was -- the first one was essentially when he went in
15 like 20 -- 30 minutes later.
16 Q.     So it was like 12:30 -- or 11:30 at night
17 or 12 -- or 11:50 at night?
18 A.     Eleven --
19 Q.     Eleven fifty at night, 4:30 in the
20 morning, and then 9:00; correct?
21 A.     Thereabouts.
22 Q.     So is -- should somebody in a restraint
23 chair be checked by medical more or less than once
24 every four hours?

Page 98

1  of patients?
2  A.         I don't believe so.
3         MR. FRANCIS:  Objection to form.
4         MR. HEALEY:  Objection.
5         MR. HEISLER:  Objection.
6         THE WITNESS:  I don't believe so.
7  BY MR. PARKINS:
8  Q.         I'm going to show you a copy of
9  Dr. Folks's report.
10 A.         Okay.
11 Q.         Did you have an opportunity to review
12 that prior to today?
13 A.         Yes.
14 Q.         And could you turn to page 25?
15 A.         I'm just going to use my screen copy
16 here, if that's okay.
17 Q.         Yeah.
18 A.         Yes.
19 Q.         I just want to talk to you about some of
20 the --
21 A.         Oh, yes.
22 Q.         Some of his comments on your report.
23 Okay?
24 A.         Yeah, sure.

Page 99

1  Q.         The -- number 2 where he says, "I did not
2  see in the record that Drs. Mallik and Zaloga were
3  largely absent from the facility.  I disagree with his
4  conclusions that psychiatric and nursing staffing at
5  LCP was below the standard of care."  Could you just
6  state how you came to the conclusion that Drs. Mallik
7  and Zaloga were largely absent and what you relied
8  upon in forming that conclusion?
9  A.         Yes, I can.  The contract, which
10 stipulates six to nine hours for Dr. Mallik, means
11 that 34 -- well, let's say a workweek is 40 hours,
12 which is probably more for most physicians but, you
13 know, six to nine hours is a fraction of that.  So
14 when I say absent, I don't mean he wasn't there for
15 the contractual period.  He was.  I have no reason to
16 believe he didn't fulfill those hours, but those hours
17 themselves were insufficient to manage a case load
18 that probably is in the hundreds.  So -- you know, so
19 that was basically how I thought about it.  Yeah.
20 Q.         The next page he says, "I disagree that
21 there were no policies in place for LCP to guide the
22 mental health screening, management, observation, and
23 restraint of inmates at the LCP.  In addition, CCI
24 depended upon Dr. Mallik to develop treatment plans

Page 100

1  for the psychiatric management of patients through his
2  own practices."  What's your response to that?
3  A.         I mean if there -- if CCI has policies,
4  I'd like to see them.  I don't believe, you know, they
5  do and, if they do, please show me.
6  Q.         Based upon Dr. Zaloga's deposition --
7  A.         He --
8  Q.         -- do they have any policies?
9  A.         I believe he said his policy is, like,
10 right treatment, right time or something like that.
11 Q.         Is that an ethical policy?
12 A.         It's not a policy.  I wouldn't even --
13 you know, it's not even something to entertain as
14 ethical or not.
15 Q.         And is Dr. Mallik's personal practice a
16 substitute for written policies?
17        MR. FRANCIS:  Object to the form.
18        THE WITNESS:  A substitute?  No.
19 BY MR. PARKINS:
20 Q.         In paragraph 4 he says, "In his
21 discussion of the medical ethics principles of justice
22 and fairness, Dr. Sisti apparently ignores the fact
23 that these are incarcerated individuals and treatment
24 of mental health conditions for them in a setting

Page 101

1  other than the jail involves other security logistical
2  and judicial factors."  Does the fact these people are
3  incarcerated change the ethical guidelines?
4  A.         Yes.  It makes them more robust, in fact.
5  Q.         Why?
6  A.         Not less.
7  Q.         Why?
8  A.         Because they're a vulnerable population
9  who has a constraint choice around their medical
10 decisions and choices so yeah.  In fact, there are
11 differences and they happen to be more stringent.
12 Q.         Okay.  Paragraph 5, "These policy
13 statements of psychiatric organizations primarily
14 address long-term restrictive housing of inmates with
15 chronic mental illness."
16 A.         That's just false.
17 Q.         And, furthermore, let's just say -- let's
18 accept it's true for a second.  Does Lackawanna County
19 Prison have long-term restrictive housing of inmates
20 with chronic mental illness?
21 A.         Yes.
22 Q.         And was that something that Amir
23 Whitehurst was subjected to?
24 A.         Yes.

26 (Pages 98 - 101)

Page 106

1  of Corrections that the medical director be on site
2  more than two days a week, using your reasoning?
3  A.      That's not my reasoning.
4  Q.      Okay.  What is your reasoning?  Why does
5  Dr. Zaloga have to be there?
6  A.      I didn't say he had -- I didn't say how
7  much or how little he had to be there.  I just said he
8  wasn't present.  Therefore, it was unclear to me that
9  there was any accountability, any knowledge, any
10 supervision.
11 Q.      How do you know he wasn't present?
12 A.      From depositions -- well, from the
13 nurse -- from Nurse Reed's deposition in particular.
14 Q.      Right.  Nurse Reed, who was fired for
15 having her security clearance pulled; correct?
16 A.      Fired for what?
17 Q.      Having her security clearance pulled by
18 the warden.
19 A.      I guess so.  Is that --
20 Q.      And then you didn't review the transcript
21 of Alexis Moritzkat, who actually cared for the
22 plaintiff and said there were no problems at all with
23 staffing or attendance or anything?  You didn't review
24 that?

Page 107

1  A.      I don't have a copy of that.
2  Q.      Right.  You reviewed the transcript of a
3  disgruntled nurse, correct, and relied on it?
4  A.      I didn't see it as a -- I didn't see her
5  as a disgruntled nurse.
6  Q.      No?
7  A.      No.
8  Q.      Her cross-examination didn't strike you
9  as someone who didn't think she should have been
10 fired?
11 A.      I don't necessarily think that a person
12 who is fired and believes that it was unjust is
13 disgruntled.  They may have a rational set of
14 arguments as to why that firing was unjustified.
15 Q.      Do you know why she was fired?
16 A.      I don't.
17 Q.      Okay.  Did you read in her transcript why
18 she was fired?
19 A.      No.
20 Q.      You didn't see that?
21 A.      If I did, I forget.
22          MR. HEALEY:  Okay.  Those are all the
23 questions.
24                      - - -

Page 108

1              FURTHER EXAMINATION
2  BY MR. FRANCIS:
3  Q.      Doctor, I just have a housekeeping.  I
4  don't know if you provided plaintiff's counsel with a
5  CV or do you have one today?
6  A.      For my CV?
7  Q.      Yeah.
8  A.      Yes.  I do have a -- I thought I brought
9  a copy.
10         MR. PARKINS:  It's in that file
11 (indicating).
12         MR. FRANCIS:  You do have it?
13         MR. PARKINS:  I definitely e-mailed them
14 to you.
15         MR. FRANCIS:  Okay.  I just didn't see it
16 in our --
17         MR. HEALEY:  I have an extra one.
18         MR. FRANCIS:  I don't need it right now.
19 BY MR. FRANCIS:
20 Q.      The only other question I had, Doctor,
21 was in your report you reference a number of
22 publications that you've made over the -- your
23 career?
24 A.      Yeah.

Page 109

1  Q.      Are those references contained in your
2  CV?
3  A.      Yeah, they are.
4  Q.      Okay.
5  A.      Yeah, they should be.
6          MS. FREILER:  They are.
7          MR. FRANCIS:  All right.
8          THE WITNESS:  It's a little hard to find
9  sometimes, but it's a Penn template.  In fact, one of
10 your experts use the same template.
11         MR. FRANCIS:  Okay.  Perfect.  That's all
12 I have.
13                      - - -
14             FURTHER EXAMINATION
15 BY MR. PARKINS:
16 Q.      Briefly, are you aware -- just because
17 we're on the topic, are you aware that June Reed
18 succeeded in her Unemployment Compensation claim
19 against --
20 A.      I'm not.
21 Q.      -- Dr. Zaloga?
22         MR. HEISLER:  Object to the form.
23         THE WITNESS:  I'm not aware of anything
24 about June Reed and her --